**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------- X

Towaki Komatsu,

                       Plaintiff,

        -vs-

The City of New York, NYPD Detective Raymond Gerola
(shield #: 6577), NYPD Lieutenant Ralph Nieves, NYPD
Detective Nicholas Mason (shield #: 6995), NYPD Officer Cruz
(shield #: 751), NYPD Officer Mitchell (shield #: 5486), NYPD
Officer John Doe1 9/14/17 (shield #: 21250), Rachel Atcheson,
Jessica Ramos, Bill de Blasio, James O'Neill, NYPD John
Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4
9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17,
NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, NYPD
Inspector Howard Redmond, Marco Carrion, Harold Miller,
Dustin Ridener, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John
Doe1 9/14/17, John Doe2 9/14/17,

- All of the defendants listed above who are people are being
  sued in their individual and official capacities,

                  Defendants.
----------------------------------------------------- X

**Case No.:** 20-cv-7502

**FIRST AMENDED**
**COMPLAINT**

**JURY DEMAND**

## **TABLE OF CONTENTS**

I.   Preliminary Remarks .......................................................................................... 3

II.   Jurisdiction ........................................................................................................ 12

III.   Parties ................................................................................................................ 12

IV.   Background Facts .............................................................................................. 27

V.   Legal Standards and Additional Background Facts ......................................... 90

VI.   Statement of Facts .......................................................................................... 121

VII.   Causes of Action ............................................................................................ 133

VIII.   Jury Demand ................................................................................................... 155

IX.   Prayer for Relief ............................................................................................. 155

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege all that follows in this pleading.

## PRELIMINARY REMARKS

1.    The following applies throughout this complaint in the interests of brevity:

    a.    Acronyms and aliases in the second column of the following table will be used throughout this pleading instead of the entries in the third column to which they correspond:

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | CCRB | New York City Civilian Complaint Review Board |
| 2 | City Council | New York City Council |
| 3 | Defendant City | Defendant City of New York |
| 4 | DOE | New York City Department of Education |
| 5 | DOI | New York City Department of Investigation |
| 6 | DOJ | U.S. Department of Justice |
| 7 | FOIL | Freedom of Information Law |
| 8 | FRCP | Federal Rule of Civil Procedure |
| 9 | HRA | New York City Human Resources Administration |
| 10 | IAB | The Internal Affairs Bureau of the NYPD |
| 11 | The Mayor | New York City Mayor Bill de Blasio |
| 12 | Mayor's 4/27/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 4/27/17 in Long Island City in Queens that was subject to New York State's Open Meetings Law and was used a campaign event to support the Mayor's re-election interests that I was illegally barred from attending while I had active litigation against HRA. |

| 13 | Mayor's 5/23/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 5/23/17 inside of the Veterans Memorial Chamber within the Bronx Supreme Court during the U.S. Navy's annual "Fleet Week" event in New York City while I continued to be a U.S. Navy veteran and was upholding my military enlistment oath to protect and defend the U.S. Constitution against all enemies. That public forum was also used as a campaign event to support the Mayor's re-election interests and I was illegally barred from attending it as I continued to have active litigation against HRA. |
| --- | --- | --- |
| 14 | Mayor's 6/8/17 town hall | The public town hall meeting that the Mayor conducted as a public forum on 6/8/17 at 93-29 Queens Boulevard in Rego Park in Queens inside of a building named Lost Battalion Hall Recreation Center |
| 15 | Mayor's 7/25/17 publicity stunt | The public stunt that the Mayor illegally conducted on 7/25/17 in an area of a subway station located next to a staircase, below Broadway, and by Warren Street in Manhattan in a manner and location that was in violation of the MTA's Rules as NYPD Inspector Howard Redmond illegally assaulted me in that subway station in front of Defendant Fowler while I was conducting myself lawfully and while that was recorded on video. |
| 16 | Mayor's 8/30/17 town hall | The public town hall meeting that the Mayor conducted as a public forum on 8/30/17 at 195 Graham Avenue in Brooklyn. |
| 17 | Mayor's 9/8/17 public hearing | The public hearing that the Mayor conducted on 9/8/17 at 2 pm in the Blue Room in City Hall that partly concerned proposed legislation about reforming the NYPD as I was illegally prevented from attending that hearing by Defendant Cruz and others |
| 18 | Mayor's 9/14/17 town hall | The public town hall meeting that the Mayor conducted as a public forum on 9/14/17 at 2525 Haring Street in Brooklyn |
| 19 | Mayor's CAU | The Mayor's Community Affairs Unit |
| 20 | Mr. Banks | HRA Commissioner Steven Banks |
| 21 | My HRA lawsuit | The hybrid lawsuit that I commenced against HRA in January of 2017 that corresponds to *Komatsu v. New York City Human Resources Administration*, No. 100054/2017 (Sup. Ct., New York Cty.) and is pending appeal. I asserted claims in that case that my claims in this case related back to and amplify. |

| 22 | My X1 lawsuit | The related case that I commenced against the City of New York, Defendant Nieves, and others in April of 2018 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) that my claims in this case relate back to and amplify. The judges in that case refused to grant me sufficient time to file a further amended complaint in that case that would have otherwise enabled me to assert my claims in that case instead of in this case. In fact, Judge Lorna Schofield explicitly directed me to instead commence a new civil action for additional claims that I sought to assert in that case. |
|----|---------------|---|
| 23 | My X2 lawsuit | The related case that I commenced against the City of New York, Mr. Banks, and others on 8/14/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-6510(LLS)(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 24 | My X3 lawsuit | The related case that I commenced against the City of New York as well as Defendant Nieves, Redmond, and others on 8/29/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-7046 (ER)(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 25 | My X4 lawsuit | The related case that I commenced against the City of New York as well as Defendants Gerola, Mason, Nieves, and others on 9/25/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-8004(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 26 | NTT Data, Inc. | NTT |
| 27 | OCA | New York State Office of Court Administration |
| 28 | OTDA | The New York State Office of Temporary and Disability Assistance |
| 29 | Second Circuit | United States Court of Appeals for the Second Circuit |
| 30 | Urban | Urban Pathways, Inc. It is the slumlord for the building in which I reside. |

2.      Every reference that I make in this pleading that concerns my efforts to have attended the Mayor's 9/14/17 town hall concerns those that I made to have lawfully attended it from within the room in which it was conducted as it was conducted, shortly before it began, and shortly after it ended.

3.      The Mayor' office arranged to have the Mayor's 9/14/17 town hall recorded on video. That video recording is available on the Internet at

https://www.youtube.com/watch?v=InSIaXIZp44.

4.        . The table shown next contains brief information about as well as links to copies of video recordings that I recorded with my cell phone on 9/14/17 while I lawfully conducted myself as I **a)** stood outside of and in close proximity to the building that hosted the Mayor's 9/14/17 town hall shortly before it began and as it was conducted and **b)** was inside of that building as that town hall was being conducted while I was being illegally prevented from attending that town hall from within the room in which it was conducted. The second table that follows this one includes a description of what appears in those video recordings.

| # | Creation Time | Filename | Link to video |
|---|---|---|---|
| 1 | 6:15 pm | IMG_1856.mov | https://drive.google.com/file/d/1RXGMjJTw7A2a28jQbvLZWcTfOpfk05GR/view?usp=sharing |
| 2 | 6:39 pm | IMG_1857.mov | https://drive.google.com/file/d/1s29c0pnDDz_DvomfBExx-cDAmYVakGdo/view?usp=sharing |
| 3 | 6:40 pm | IMG_1858.mov | https://drive.google.com/file/d/1nKQX5VTtYB-cBm8lkx6WxilZey631Q9f/view?usp=sharing |
| 4 | 7:14 pm | IMG_1859.mov | https://drive.google.com/file/d/1k1QqBqeAZv6Qn2gyNjdPPDJB8s8CFdpo/view?usp=sharing |
| 5 | 7:42 pm | IMG_1860.mov | https://drive.google.com/file/d/19bQ3il7D1jN5iMdy8Ykwq3dwHDoDlQ0H/view?usp=sharing |
| 6 | 7:42 pm | IMG_1861.mov | https://drive.google.com/file/d/16bODYI_S8bR95FkVBlHvPHbLyR-bTrZz/view?usp=sharing |
| 7 | 7:46 pm | IMG_1862.mov | https://drive.google.com/file/d/1USG_GGk6pRvLTfJq5AlaPOw7MHogGEMI/view?usp=sharing |
| 8 | 8:30 pm | IMG_1866.mov | https://drive.google.com/file/d/1HCteQfaNo90G3Rb0tszLzjVdrKKcURdO/view?usp=sharing |
| 9 | 8:33 pm | IMG_1867.mov | https://drive.google.com/file/d/1AeaV6ooV8M23XymaxVTfg4QFjTdntWas/view?usp=sharing |
| 10 | 8:41 pm | IMG_1868.mov | https://drive.google.com/file/d/1bv7HB6BDKMYulAOp_3goMOQ8zhqdzK0d/view?usp=sharing |
| 11 | 8:42 pm | IMG_1869.mov | https://drive.google.com/file/d/1VGJBKn0v0MbsysYe51hFMJfd7s88AqHI/view?usp=sharing |
| 12 | 8:42 pm | IMG_1870.mov | https://drive.google.com/file/d/1ZJ5l2fi7ZvjvF7rhW7BQ3Tdorev6pMys/view?usp=sharing |
| 13 | 9:20 pm | IMG_1871.mov | https://drive.google.com/file/d/1JZ_Ktf_pTE4win6LKUgTCMnEuYbjmzPf/view?usp=sharing |
| 14 | 9:20 pm | IMG_1872.mov | https://drive.google.com/file/d/1JA19LDEfMgPkz6hEiH7CRHNNTDqfQRHW/view?usp=sharing |

| 15 | 9:25 pm | IMG_1874.mov | https://drive.google.com/file/d/15GlkNIdTCDxtyH3b9OclRd_uyggNYXfs/view?usp=sharing |
| 16 | 9:42 pm | IMG_1875.mov | https://drive.google.com/file/d/1kHsGIg56bJLp7usdwqVp4hJlrZ9njnSo/view?usp=sharing |

| # | Filename | Description |
|---|----------|-------------|
| 1 | IMG_1856.mov | Defendants Nieves, Mason, Gerola, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe7 9/14/17, and NYPD John Doe5 9/14/17 are shown in this video as I waited in a line with other members of the public next to and near the entrance of the school that hosted the Mayor's 9/14/17 town hall. That line was for members of the public who would be permitted to attend the Mayor's 9/14/17 town hall from within the room in that school in which that town hall would be conducted on that date. A separate line that was used to grant members of the public to the overflow room that was used for that town hall meeting is also shown in this video at the elapsed time of 7 seconds. |
| 2 | IMG_1857.mov | I recorded this video after I was illegally coerced by members of the NYPD to leave the line that I waited in when I recorded the video that corresponds to the filename of IMG_1856.mov. Defendants Nieves, Mason, Gerola, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, and NYPD John Doe7 9/14/17 are shown in this video and were all then aware that I had been illegally coerced to leave the line that I had been in as I was then having my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment, and New York State's Open Meetings Law violated with respect to my efforts to have lawfully attended the Mayor's 9/14/17 town hall within the room in which it was conducted as it was conducted. No member of the NYPD made an attempt to intervene on my behalf to resolve that in spite of the fact that they had a realistic opportunity to do so. |

| 3 | IMG_1858.mov | Defendants Nieves, Mason, Gerola, and NYPD John Doe7 9/14/17 are shown in this video and were all then aware that I had been illegally coerced to leave the line that I had been in as I was then having my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment, and New York State's Open Meetings Law violated with respect to my efforts to have lawfully attended the Mayor's 9/14/17 town hall within the room in which it was conducted as it was conducted. No member of the NYPD made an attempt to intervene on my behalf to resolve that in spite of the fact that they had a realistic opportunity to do so. Members of the public who arrived to the site of that town hall after me on 9/14/17 are shown in that video as they were illegally allowed to enter that school to attend the Mayor's 9/14/17 town hall within the room in which it was conducted in flagrant violation of my Fourteenth Amendment due process and equal protection rights. I'm heard in that video providing narration about the illegal acts that were then being committed against me. |
| 4 | IMG_1859.mov | I recorded this video from within the overflow room that was used for the Mayor's 9/14/17 town hall as I watched Brooklyn District Attorney Eric Gonzalez and Marco Carrion while they were shown on a television set that was used to show how the Mayor's 9/14/17 town hall was being conducted in a different room in that school. |
| 5 | IMG_1860.mov | I recorded this video from within the overflow room that was used for the Mayor's 9/14/17 town hall as I showed the red admission ticket that I was eventually issued to be able to enter that school to observe how the Mayor's 9/14/17 town hall would be conducted from inside of the overflow room instead of from within the room in which it was conducted. |
| 6 | IMG_1861.mov | I recorded this video from within the overflow room that was used for the Mayor's 9/14/17 town hall as I showed the red admission ticket that I was eventually issued to be able to enter that school to observe how the Mayor's 9/14/17 town hall would be conducted from inside of the overflow room instead of from within the room in which it was conducted. |
| 7 | IMG_1862.mov | I recorded this video from within the overflow room that was used for the Mayor's 9/14/17 town hall. Defendant Atcheson is shown as she stood near that room's exit while she looked at a cell phone or computer tablet. |

| 8 | IMG_1866.mov | I recorded this video from within a hallway in the school that hosted the Mayor's 9/14/17 town hall. It shows Defendants Mason and Cruz as they illegally made no effort to intervene on my behalf to enable me to attend that town hall from within the room in which it was conducted in violation of their affirmative Fourteenth Amendment legal duty while they knew that I was being prevented from doing so and that I sought to attend that town hall from within that room. Other members of the NYPD are also shown in this video and similarly illegally didn't intervene on my behalf then as other members of the public were able to go from the overflow room into the room in which that town hall was conducted as it was conducted in violation of my Fourteenth Amendment rights. |
|---|---|---|
| 9 | IMG_1867.mov | I recorded this video from within a hallway in the school that hosted the Mayor's 9/14/17 town hall. It shows Defendants Cruz and NYPD John Doe8 9/14/17 as they illegally made no effort to intervene on my behalf to enable me to attend that town hall from within the room in which it was conducted in violation of their affirmative Fourteenth Amendment legal duty while they knew that I was being prevented from doing so and that I sought to attend that town hall from within that room. I recall having briefly apprised Mr. Cruz while he was in that hallway on that night about my desire to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted. |
| 10 | IMG_1868.mov | I recorded this video from within the overflow room that was used for the Mayor's 9/14/17 town hall. It shows both Mr. Nieves as he slacked off while he was on duty as well as the cover page of whistleblowing literature against the Mayor's administration and the Mayor's NYPD security detail of public concern that I distributed to members of the public while I was in that room and outside of that school on that date as I waited to be granted access into that school. |
| 11 | IMG_1869.mov | I recorded this video from within the overflow room that was used for the Mayor's 9/14/17 town hall. It shows Mr. Nieves as he slacked off while he was on duty. |
| 12 | IMG_1870.mov | I recorded this video from within the overflow room that was used for the Mayor's 9/14/17 town hall. It shows Mr. Nieves giving me a thumbs-up sign with his right hand at the elapsed time of 3 seconds as he exited that room as he likely then knew that I was recording that video for litigation purposes. |
| 13 | IMG_1871.mov | I recorded this video from within the overflow room that was used for the Mayor's 9/14/17 town hall as I watched Mr. Banks while he was shown on a television set that was used to show how the Mayor's 9/14/17 town hall was being conducted in a different room in that school. Mr. Banks was then actively participating in how that town hall was being conducted as he talked with one or more members of the audience. |

| 14 | IMG_1872.mov | I recorded this video from within the overflow room that was used for the Mayor's 9/14/17 town hall as I watched Mr. Banks while he was shown on a television set that was used to show how the Mayor's 9/14/17 town hall was being conducted in a different room in that school. Mr. Banks was then actively participating in how that town hall was being conducted as he talked with one or more members of the audience. |
|----|--------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 15 | IMG_1874.mov | I recorded this video of Defendant Gerola after I exited the school that hosted the Mayor's 9/14/17 town hall and stood near its entrance. Mr. Gerola told me after I exited that school that I wouldn't be allowed back inside. I had exited that school by then mainly because I had sufficient evidence to confirm that he and others had violated my constitutional rights to have attended that town hall from within the room in which it was conducted. |
| 16 | IMG_1875.mov | I recorded this video of Defendant Nieves as he walked next to Mr. Redmond into the school that hosted the Mayor's 9/14/17 town hall. |

5.      References to HRA, DHS, and DSS will be used interchangeably in this pleading for simplicity.

6.      The illegal acts and omissions that were committed against me on 9/14/17 at the site of the Mayor's 9/14/17 town hall were a microcosm of a much larger, pervasive, systemic, and longstanding campaign and pattern of illegal customs, practices, and policies that included flagrant violations of my First Amendment and Fourteenth Amendment rights that were jointly devised, coordinated, implemented, executed, and covered-up by senior decision-making members of the NYPD and members of the Mayor's staff against me in relation to my efforts to lawfully attend public town hall, public resource fair, and public hearings in accordance with my constitutional rights that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other City of New York and State of New York personnel. The Mayor, Defendant O'Neill, and other City of New York, State of New York, and federal government personnel that include members of the City Council tacitly condoned those illegal acts and omissions against me. Those illegal acts and omissions were committed against me on 9/14/17 in relation to my efforts to have exercised my legal right to have done the following:

a. Attended the Mayor's 9/14/17 town hall from within the room in which it was conducted shortly before it began, as it was conducted, and shortly after it ended.

b. Exercised the full extent of my rights while attending that town hall partly by engaging in protected whistleblowing about a broad array of matters of public concern and private matters.

7.     This is a civil rights action to vindicate my rights in response to illegal acts and omissions that were committed against me on 9/14/17 at the site of the Mayor's 9/14/17 town hall in relation to my efforts to have lawfully attended that town hall while Mr. Redmond was then the primary defendant in *Sherrard v. City of New York*, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018) and I was aware of his status in that case for months prior to 9/14/17. Those who committed such illegal acts and omissions against me on 9/14/17 did so as part of a conspiracy in retaliation that was mainly for protected whistleblowing and litigation activities that I continued to be engaged in against Mr. Redmond, themselves, members of the Mayor's staff, HRA, HRA's business partners, and Mr. Banks.

8.     While committing such illegal acts and omissions against me on 9/14/17 in relation to my efforts to have lawfully attended the Mayor's 9/14/17 town hall, that was done to extend a campaign of harassment, retaliation, and unequal and discriminatory acts against me at public forums dating back to 4/27/17 that the Mayor and other government officials conducted with members of the public in a collaborative manner as the Mayor and such other government officials were running for re-election and using those public forums to try to improve their re-election prospects partly by trying to attract publicity.

9.     The illegal acts and omissions that were committed against me on 9/14/17 at the site of the Mayor's 9/14/17 town hall were voter suppression, voter fraud, whistleblower retaliation, a

malicious and naked abuse of process, illegal selective-enforcement, standardless discretion, viewpoint discrimination in violation of the Hatch Act, my constitutional rights, federal and New York State criminal statutes, New York State's Open Meetings Law, and other applicable laws.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§1331 and 1343. This action is brought pursuant to 42 U.S.C. §§1983, 1985, 1988 and the First, Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.

2.      My claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and 2202, FRCP Rules 57 and 65, and the general legal and equitable powers of this Court.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because I reside in the Bronx and New York City Hall's principal place of business is in Manhattan.

4.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

5.      Consistent with the requirements of New York General Municipal Law § 50-e, I filed a timely Notice of Claim with the New York City Comptroller within 90 days of the accrual of my claims under New York law. This Court therefore has supplemental jurisdiction over my claims under New York law because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

6.      My claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

1.      I am, and was at all times relevant to this action, a resident of Bronx County in the State of New York. I am also a U.S. Navy veteran, who swore to defend the U.S. Constitution against all of its enemies indefinitely and without exceptions. I have honored that oath and continue to do so.

2.      Bill de Blasio is the Mayor of the City of New York.

3.      At all relevant times herein, Defendant James O'Neill was the commissioner of the
NYPD. In that capacity, he was among others who were responsible for how the NYPD
operated, how the NYPD's personnel were trained, how they were supervised, and how they
were disciplined.

4.      Defendant City of New York is a municipal corporation duly incorporated and authorized
under the laws of the State of New York pursuant to §431 of its Charter. The City of New York
is authorized under the laws of the State of New York to maintain a police department, the
NYPD, which is supposed to act as its agent in the area of law-enforcement and for which it and
the Mayor are ultimately responsible. The City and the Mayor both assume the risks incidental to
the maintenance of a police force and the employment of police officers. On 11/30/17, Bill de
Blasio conducted a town hall meeting in Queens with New York City Councilman Rory
Lancman as the moderator for at meeting. That meeting was recorded on video as a result of
arrangements that the New York City Mayor's office made. That video is available on the
Internet at https://www.youtube.com/watch?v=CRV0IKbg5tQ. At the elapsed time of 1 hour, 39
minutes, and 10 seconds in that video, Mr. de Blasio is shown and heard in it as his back faced
the video camera that recorded that video as he clearly made the following significant remark in
an unequivocal and unambiguous manner:

               **"If you have a problem with policing, I am ultimately responsible**."

5.      Defendants NYPD Inspector Howard Redmond, NYPD Lieutenant Ralph Nieves, NYPD
Detective Raymond Gerola (shield No. 6577), NYPD Detective Nicholas Mason (shield No. #
6995), NYPD Officer Cruz (shield #: 751), NYPD Officer Mitchell (shield #: 5486), NYPD
Officer John Doe1 9/14/17 (shield #: 21250), James O'Neill, NYPD John Doe2 9/14/17, NYPD

John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6

9/14/17, NYPD John Doe7 9/14/17, and NYPD John Doe8 9/14/17 were at all times relevant

herein officers, employees, and agents of the NYPD and the City of New York.

6.      Both Defendants NYPD Lieutenant Ralph Nieves and James O'Neill have retired from

the NYPD.

7.      The following shows the terms of New York City Charter Section 435(a) that address the

legal duties that all members of the NYPD have and underscores the fact that the defendants in

this action who were members of the NYPD between 9/26/17 and 9/28/17 committed illegal acts

and omissions against me in relation to my claims in this case by flagrantly violating and

disregarding their legal duties as members of the NYPD:

> "**The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public** streets, **sidewalks**, parks and places; **protect the rights of persons** and property, **guard the public health**, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes **to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses**.
>
> (boldface formatting added for emphasis)

8.      The defendants in this action who are people violated the oath that they were required to

take upon becoming personnel of the City of New York that required them to swear or affirm

that they would uphold the U.S. and New York State Constitution in carrying out their work as

such personnel and perform their duties as such personnel to the best of their abilities. They

clearly violated that oath through the illegal acts and omissions that they committed against me in relation to my efforts to have lawfully attended the Mayor's 9/14/17 town hall from within the room in which it was conducted. In doing so, they violated NYPL §195.00 and New York City Charter §1116. New York City Charter §1116 can lead to the firings of those who violate as personnel of the City of New York and a permanent ban on them from working for the City of New York again.

9.      New York State Civil Service Law §62 confirms that personnel of the City of New York are required upon working for the City of New York to take and file an oath or affirmation in which they pledge and declare that they will support the U.S. and New York State Constitution and faithfully discharge the duties of their jobs with the City of New York to the best of their abilities.

10.     The next screenshot shows an excerpt from that transcript that reflects how those new members of the NYPD pledged to uphold the U.S. and New York Constitution and to faithfully discharge their duties as members of the NYPD to the best of their abilities after the defendant in this action who are members of the NYPD most likely did the same before they committed illegal acts and omissions against me that this action concerns. Hindsight therefore confirms that they lied in the oaths that they took upon joining the NYPD to become part of a criminal mob as liars and con artists instead of joining the ranks of actual law-enforcement.

**Mayor:** I do hereby pledge – I'm sorry, I should say repeat after me – I do hereby pledge and declare –

**Recruits:** I do hereby pledge and declare –

**Mayor:** – to uphold the Constitution of the United States –

**Recruits:** – to uphold the Constitution of the United States –

**Mayor:** – and the Constitution of the State of New York –

**Recruits:** – and the Constitution of the State of New York –

**Mayor:** – and faithfully discharge my duties –

**Recruits:** – and faithfully discharge my duties –

**Mayor:** – as a New York City Police Officer –

**Recruits:** – as a New York City Police Officer –

**Mayor:** – to the best of my ability –

**Recruits:** – to the best of my ability –

**Mayor:** – so help me God.

**Recruits:** – so help me God.

11.     The defendants in this action who I identify with John Doe in their name were members of the NYPD on 9/14/17 whose real names I don't know and are shown in the video recordings that I recorded on 9/14/17 that are referenced in the following table at the elapsed time shown:

| # | Defendant | Video | Elapsed Time |
|---|-----------|-------|--------------|
| 1 | NYPD Officer John Doe1 9/14/17 (shield #: 21250) | IMG_1856.MOV | 3 seconds |
| 2 | NYPD John Doe2 9/14/17 | IMG_1856.MOV | 3 seconds |
| 3 | NYPD John Doe3 9/14/17 | IMG_1856.MOV | 3 seconds |
| 4 | NYPD John Doe4 9/14/17 | IMG_1856.MOV | 12 seconds |
| 5 | NYPD John Doe5 9/14/17 | IMG_1857.MOV | 6 seconds |
| 6 | NYPD John Doe6 9/14/17 | IMG_1857.MOV | 4 seconds |

| 7 | NYPD John Doe7 9/14/17 | IMG_1858.MOV | 22 seconds |
|---|---|---|---|
| 8 | NYPD John Doe8 9/14/17 | IMG_1867.mov | 1 second |
| 9 | Jane Doe1 9/14/17 | IMG_1856.MOV | 12 seconds |
| 10 | Jane Doe2 9/14/17 | IMG_1856.MOV | 13 seconds |
| 11 | Joh Doe1 9/14/17 | IMG_1856.MOV | 16 seconds |
| 12 | Joh Doe2 9/14/17 | IMG_1856.MOV | 17 seconds |

12.    The faces of the defendants in this action who I identify with John Doe and Jane Doe in their name are shown in the following table at the elapsed times in the video recordings to which I just referred:

| # | Defendant | Image | |
|---|---|---|---|
| 1 | NYPD Officer John Doe1 9/14/17 (shield #: 21250) |  | |
| 2 | NYPD John Doe2 9/14/17 | | |

| 3 | NYPD John Doe3 9/14/17 |  | |
| 4 | NYPD John Doe4 9/14/17 | | |

| 5 | NYPD John Doe5 9/14/17 |  | |
| 6 | NYPD John Doe6 9/14/17 | | |

| | | | |
|---|---|---|---|
| 7 | NYPD John Doe7 9/14/17 |  | |
| 8 | NYPD John Doe8 9/14/17 | | |

| 9 | Jane Doe1 9/14/17 |  | She appears next to Defendant Gerola as they talked while I stood near the entrance to the school that hosted the Mayor's 9/14/17 town hall. |
|---|---|---|---|
| 10 | Jane Doe2 9/14/17 | | |

| 11 | John Doe1 9/14/17 |  | |
|---|---|---|---|
| 12 | John Doe2 9/14/17 | | |

13.     Defendants Redmond, Nieves, Gerola, and Mason were at all times relevant herein members of the NYPD security detail for New York City Mayor Bill de Blasio.

14.     Defendant Redmond helps to direct how the Mayor's NYPD security detail operates.

15.     On 9/14/17, both Defendant Bill de Blasio and Defendant James O'Neill were responsible for how the NYPD operated. Prior to that date, I had face-to-face conversations with Mr. O'Neill on 6/26/17 and with the Mayor on both 7/16/17 and 7/18/17. My 6/26/17

conversation with Mr. O'Neill was recorded on audio and witnessed by whistleblower news

censors in journalism. My 7/16/17 and 7/18/17 conversations with the Mayor also were

witnessed by whistleblower news censors in journalism that included Michael Garland and

Gloria Pazmino. My 7/18/17 conversation with the Mayor was recorded on video My

conversations with Mr. O'Neill and the Mayor on 6/26/17, 7/16/17, and 7/18/17 partly concerned

illegal acts and omissions that Mr. Redmond and other members of the NYPD committed against

me since 4/27/17 at public forums that the Mayor and other governed officials conducted. Mr. de

Blasio also stood within roughly 20 feet from me as Mr. Redmond was recorded on video on

7/25/17 as he illegally assaulted me in front of many whistleblower news censors in journalism

and NYPD Officer Christopher Fowler of the Mayor's NYPD security detail inside of a subway

station below Broadway by Murray Street in Manhattan as Mr. Redmond continued to flagrantly

violate my constitutional rights at a time and in a location in which the Mayor was illegally

conducting a publicity stunt in violation of the MTA's rules that authorized me to have

conducted myself in the manner in which I did so at the time that Mr. Redmond began assaulting

me and violating my constitutional rights then.

16.     At all times relevant herein, Defendants Harold Miller and Rachel Atcheson worked for

the Mayor's CAU. Mr. Miller's LinkedIn profile that reflects his career is available on the

Internet at https://www.linkedin.com/in/harold-miller-305502171/ and indicates that he worked

as a Deputy Commissioner of the Mayor's office between February of 2014 and July of 2020.

Upon information and belief, as a Deputy Commissioner, Defendant Miller was partly

responsible for providing proper training and supervision of others who worked for the Mayor's

CAU and those who worked with it that include the NYPD to ensure that they **a)** performed their

jobs with the Mayor's CAU and the City of New York in accordance with all applicable laws

and **b)** otherwise didn't engage in illegal acts and omissions that prevented members of the public from lawfully attending public town hall meetings and public resource fair meetings that the Mayor's CAU organized. He was also responsible for performing his job in accordance with all applicable laws.

17.     At all times relevant herein, Defendant Carrion has been the Commissioner of the Mayor's CAU. Upon information and belief, as the Commissioner of the Mayor's CAU, Defendant Carrion was partly responsible for providing proper training and supervision of others who worked for the Mayor's CAU and those who worked with it that include the NYPD to ensure that they **a)** performed their jobs with the Mayor's CAU and the City of New York in accordance with all applicable laws and **b)** otherwise didn't engage in illegal acts and omissions that prevented members of the public from lawfully attending public town hall meetings and public resource fair meetings that the Mayor's CAU organized. He was also responsible for performing his job in accordance with all applicable laws.

18.     The negligent failures by both Defendant Carrion and Miller in properly supervising those who worked for the Mayor's CAU were a contributing factor that proximately enabled me to have been illegally **a)** prevented from attending the Mayor's 9/14/17 town hall from within the room in which it was conducted, **b)** not issued an admission ticket for that town hall for the room in which it was conducted, **c)** not had my name appear in a list that was shown on the computer tablet that Defendant Atcheson used to check registrations for the Mayor's 9/14/17 town hall as she stood next to people who waited in line to attend that town hall from within the room in which it was conducted after I had registered in advance to attend that town hall, and **d)** coerced to wait in an overflow line to enter the school in which it was conducted.

19.     At all times relevant herein, Jessica Ramos worked for the Mayor's office.

20.     Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, and John Doe2 9/14/17 are additional individuals whose actual identities I do not know and were present on 9/14/17 in the immediate area where I was being illegally prevented from attending the Mayor's 9/14/17 town hall and made no effort to intervene on my behalf. I believe that they were then personnel of the City of New York who worked for the Mayor's office in some capacity.

21.     At all times relevant herein, Dustin Ridener has been a member of the Mayor's staff. His LinkedIn profile that reflects his career is available on the Internet at https://www.linkedin.com/in/dustinridener/. He was present on 9/14/17 in the immediate vicinity of where I was near the entrance to the school that hosted the Mayor's 9/14/17 town hall while I was being illegally **a)** coerced to leave the line of people in violation of my First Amendment and Fourteenth Amendment rights in which I lawfully waited to be granted access to the school that hosted that town hall to be able to attend that public forum within the room in which it was conducted, **b)** not issued an admission ticket to attend that town hall from within the room in which it would be conducted in violation of my First Amendment and Fourteenth Amendment rights, and **c)** otherwise prevented from attending that town hall from within that room in violation of my First Amendment, Fourth Amendment, and Fourteenth Amendment rights. Mr. Ridener made no effort on 9/14/17 to try to enable me to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted, cause me to be issued an admission ticket to attend that town hall from within that room, and enable me to remain in the original line in which I waited to be granted access to that room to attend that town hall. All of this is true before he intervened on my behalf on 10/24/18 to enable me to attend the public town hall meeting that the Mayor conducted then in Far Rockaway in Queens in response to the fact that a member of the Mayor's staff yet again deliberately refused to issue me an admission ticket to attend that town

hall in spite of the fact that I was conducting myself in an entirely lawful manner in contrast to that person as I waited in line with other members of the public next to the building that hosted that town hall to be granted access to it to attend that town hall. I had a Fourteenth Amendment due process and equal protection right on 9/14/17 to have had him, members of the Mayor's NYPD security detail, other members of the NYPD, members of the Mayor's CAU, and other members of the Mayor's staff to have immediately and decisively intervened on my behalf to enable me to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted, to be issued an admission ticket for that purpose, and to remain in the line in which I originally waited on 9/14/17 for that purpose.

22.     The individual defendants are being sued herein in their individual and official capacities.

23.     At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD and Mayor at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

24.     The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, and oppressively with malice and egregious, callous, and wanton disregard of plaintiff's rights.

25.     At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

**BACKGROUND FACTS**

1.       On 6/26/17, I talked with Defendant O'Neill at the New York City Bar Association in the

presence of various whistleblower news censors in journalism during a meeting in which he was

the primary speaker. Information about that meeting is available from the New York City Bar

Association's web site at http://www.nycbar.org/media-listing/media/detail/a-conversation-with-

new-york-city-police-commissioner-james-p-oneill. The audio recording of that meeting that the

New York City Bar Association arranged to be recorded is available on the Internet at

http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/police_commissione

r_audio_2017-06-26.mp3.

2.       The next **screenshot** is from a video recording that I recorded on 6/26/17 at 8:35 am at the

New York City Bar Association that shows **Defendant** O'Neill in it as he stood at a podium with

microphones that had the names of various New York City news outlets on them.



3.       The fact that no one reported anything in the news about what I discussed with Mr.

O'Neill on 6/26/17 **confirms** that journalism and freedom of the press in New York City just

doesn't exist and claims to the contrary **are** utter lies. That video that I recorded during that

meeting confirms that the following so-called news outlets had some of their personnel present at

that 6/26/17 meeting:

> PIX11News, 1010 WINS, NBC, CBS New York, WCBS 880, and ABC News

4.      The video recording that I recorded of Mr. O'Neill during that meeting that I just

discussed is available on the Internet at the following address:

> https://drive.google.com/file/d/1sofOzQmsQy_1_lkIglBTn9iZiGNwGNpL/view?usp=sharing

5.      During that meeting on 6/26/17, I had two face-to-face conversations with Mr. O'Neill.

My first conversation with him during that it extends from the elapsed time of **a)** 32 minutes and

38 seconds from the beginning of the audio recording that the New York City Bar Association

recorded of that meeting to **b)** 33 minutes and 36 seconds in that recording. My second

conversation with him during that meeting extends from the elapsed time of **a)** 47 minutes and 4

seconds from the beginning of that recording to **b)** 49 minutes and 14 seconds.

6.      The following is entirely true and accurate about what Mr. O'Neill and I discussed during

that meeting:

> a.    I told him that I was a military veteran and reminded him that he used the comment of
>
> "a free and open society" in a speech that he gave during that meeting. I then
>
> pointedly asked him why members of the NYPD who were inside of the Bronx
>
> Supreme Court on 5/23/17 illegally directed court officers assigned to that courthouse
>
> to prevent me from attending the public resource fair meeting that the Mayor
>
> conducted in that courthouse on that date inside of the Veteran's Memorial Hall
>
> chamber within it and while members of the NYPD have no jurisdiction in
>
> courthouses because jurisdiction for law-enforcement in New York State courthouses

belongs to New York State court officers instead of the NYPD. When he responded to that by claiming that he wasn't aware of that situation, I told him that I had a video recording that confirmed what I had just apprised him about had occurred and that I was willing to share that video recording with him if he so desired.

b.   I asked him when members of the NYPD would stop violating civil rights by shoving military veterans as such veterans stood legally on empty public sidewalks while Mr. Redmond illegally discriminated against them by preventing them from attending public town hall meetings that the Mayor held. While asking him that question, I was referring to myself as such a military veteran who was illegally shoved and discriminated against as I referred to the public town hall meeting that the Mayor held on 4/27/17 in Long Island City in Queens. In response, Mr. O'Neill was blatantly evasive and deceitful by claiming that different issues applied to that question. When he asked what I was talking about in particular in regards to my question, I told him that I was talking about public meetings, New York State's Open Meetings Law, the U.S. Supreme Court decision that was issued in _Wood v. Moss_, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) that concerns viewpoint discrimination, and what was then Mr. Redmond's ongoing status as the primary defendant in _Sherrard v. City of New York_, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018).

c.   I also asked Mr. O'Neill about why Mr. Redmond was still being allowed to be a member of the NYPD since he was violating my civil rights after he had violated Mr. Sherrard's civil rights. _Sherrard v. City of New York_ concerns an incident that occurred on 9/17/12 in which Mr. Redmond flagrantly violated Mr. Sherrard's constitutional rights on video before Mr. Redmond blatantly lied about that during a

deposition on 5/19/17 and as he testified in that case in June of 2018. When Mr.

O'Neill told me during that meeting that he would need to talk with Mr. Redmond

about what I discussed with him (Mr. O'Neill) during it and that he wasn't aware of

*Sherrard v. City of New York*, as he left that meeting, I offered to give him a printout

that I had with me and that contained information shown on its docket sheet that

listed the case number for *Sherrard v. City of New York* and other information about

that case. I believe that I handed that information instead to NYPD Detective James

Byrne as he escorted Mr. O'Neill out of that meeting and gave me his business card

then that appears as follows:



7.      A critically significant point about my conversation with Mr. O'Neill on 6/26/17 is that I

clearly put him on notice then that members of the Mayor's NYPD security detail were violating

my civil rights at public forums that the Mayor had been conducting and that Mr. O'Neill told

me in response that he would need to talk with Mr. Redmond about what I then discussed with

him about Mr. Redmond. As the NYPD's Commissioner, he certainly had the authority to issue a

standing order to Mr. Redmond to make certain that he and the rest of the Mayor's NYPD

security detail immediately stop violating the civil rights of New Yorkers at public forums. Hindsight clearly confirms that Mr. O'Neill either didn't issue such an order or that such an order was violated at my expense repeatedly and flagrantly thereafter by Mr. Redmond and other members of the Mayor's NYPD security detail and others. On 4/27/17, Mr. Redmond told me at the site of the Mayor's town hall then that he reported to Mr. O'Neill. The preceding discussion is sufficient to establish that this Court's determinations about claims that I am asserting against Mr. O'Neill in this pleading for supervisory liability must be in my favor because additional illegal acts and omissions were committed against me in violation of my civil rights by Mr. Redmond and other members of the Mayor's NYPD security detail after 6/26/17 at public forums that Mr. O'Neill certainly had a realistic opportunity to prevent from occurring.

8.      The following relevant facts apply to what I discussed with Mr. O'Neill during that meeting:

   a.   I later discovered from a written transcript and video recording that the New York City Law Department provided to me that concerned _Sherrard v. City of New York, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018)_ that Mr. Redmond committed perjury on 5/19/17 during a sworn deposition that he gave as he lied about a critically significant fact. The next screenshot shows the questions that were asked and the responses to them that were given that appear between lines 11 and 17 that appear on page 20 within the written transcript that was prepared from the deposition that Mr. Redmond gave on 5/19/17 in connection with _Sherrard v. City of New York, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018)_. That transcript was provided to me by the New York City Law Department in response to a FOIL demand that I submitted to it and is available on the Internet at

https://drive.google.com/open?id=12ATFhN0RVkrvlTjpINTPet57K1D4poiz. The

answers shown on lines 13, 14, and 17 in that screenshot were answers that Mr.

Redmond gave to the questions that are shown in it.

```
11      Q      The question is, why did you stop at
12  that location?
13      A      Because I was blocked by
14  bicyclists.
15      Q      And was Mr. Sherrard any of those
16  bicyclists that were blocking you?
17      A      Yes.
```

b.   The New York City Law Department also provided me a critically significant video

recording that is available on the Internet at

https://drive.google.com/open?id=13dteIym5B27WAHrR2b_vrb68X8IDT_Ye in

response to a FOIL demand that I submitted to it that was recorded on 9/17/12 in

Manhattan on Lafayette Street by Leonard Street as Mr. Redmond recklessly drove a

black car with just one hand on its steering wheel in the middle of the roadway in the

direction of New York City Hall by the New York City Civil Court and New York

City Family Court. That video recording was presumably recorded by a member of

the NYPD who joined Mr. Redmond and other members of the NYPD in stalking

Kalan Sherrard and other bicyclists on 9/17/12. Kalan Sherrard was the plaintiff in

*Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018). The

next screenshot corresponds to what appears in the video that I just discussed at the

elapsed time of 10 seconds and confirms that **a)** Mr. Redmond was reckless driving a

black car with left hand off of its steering wheel in **the middle** of a roadway and **b)**

Mr. Sherrard was lawfully riding a bicycle on the **far-left** side of that roadway ahead of 4 other bicyclists shown on the left as he appears in the top-left corner in that screenshot. At that point, the distance between Mr. Redmond's car and the back of Mr. Sherrard's bicycle clearly exceeded the lengths of 2 cars that appear on the right side of that road as Mr. Sherrard rode his bike directly next to the right of an area in which construction or renovation work was being done and may have endangered his safety as a bicyclists because of debris that may have possibly been in a bicycle lane that he was not required by law to use then. The fact that the sidewalk next to that bicycle lane was closed then because of construction or renovation work suggests that Mr. Sherrard was being courteous to pedestrians by letting them use that bicycle lane to offset the closure of that sidewalk.



c.  The next screenshot is from that same video and corresponds to the elapsed time of 18 seconds. The following is shown in it:

    i.    Mr. Redmond is shown in the lower-right area as he exited his car with a radio in his left hand.

    ii.    Mr. Sherrard is shown sitting on his bicycle while illegally stopped by 2 members of the NYPD on scooters or motorcycles in violation of his constitutional rights. The tires on those scooters or motorcycles were clearly wider than the tires on Mr. Sherrard's bicycle. This is relevant because thin tires on bicycles don't withstand coming in contact with debris on roadways as well as wider and thicker tires. One of the members of the NYPD who illegally stopped Mr. Sherrard drove through the bicycle lane on wide and thick tires to reach him. Also, this screenshot more clearly confirms by the existence of orange netting and barriers next to that bicycle lane that construction or renovation work was then taking place near it.



9.    On 6/21/17, Defendant Nieves was recorded on video as he stood in front of the building

that hosted the town hall meeting that the Mayor conducted in Chinatown in Manhattan and illegally harassed an Asian woman as she was trying to lawfully attend that town hall with literature that she had. That video recording clearly shows Defendant Nieves illegally confiscating literature from her in violation of her First Amendment and Fifth Amendment rights. That video is available on the Internet at https://www.youtube.com/watch?v=KRur-_QvbC0. What follows are a few screenshots from it. The next screenshot shows Mr. Nieves giving that woman a hand signal to have her step toward him at the elapsed time of 32 seconds.



10.    The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed time of 35 seconds as what clearly appears to be a press credential hung from her neck.



11.     The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed time of 1 minute and 6 seconds as she held papers that she had been carrying prior to meeting Mr. Nieves as he also then had his hands on those papers after she met him. She is shown standing next to Jane Meyer of the Mayor's office who was then looking at those papers.



12.     The next screenshot shows Mr. Nieves at the elapsed time of 1 minute and 9 seconds as he carried that Asian woman's papers after she left his wretched company



13.    On 6/23/17, a news organization named DNAInfo published a news article on the Internet

at https://www.dnainfo.com/new-york/20170623/lower-east-side/mayor-de-blasio-town-

hallmargaret- chin-aaron-foldenauer that is entitled "Security Swiped Political Pamphlets at

Mayor's Town Hall, Attendees Say" and was written by a journalist named Allegra Hobbs. That

article addressed the fact that multiple people who tried to attend the town hall meeting that the

Mayor conducted on 6/21/17 in Chinatown in Manhattan had literature illegally confiscated by

members of the NYPD as they underwent a security screening process to enter the building that

hosted that town hall.

14.    On 7/18/17, I was recorded on video during the public resource fair meeting that the

Mayor conducted in Kew Gardens in Queens with other government officials as I talked with the

Mayor face-to-face. That conversation occurred as I stood near Mr. Banks, Jessica Ramos, and in

front of a whistleblower news censor in journalism named Gloria Pazmino as well as Mr.

Gartland. Although the Mayor's office arranged to have a video recording to be recorded of that

public resource fair and that video recording certainly is a public record, the Mayor's office has

illegally concealed that video recording. It was only because I submitted a FOIL demand to the

Mayor's office that it provided me a link to that video recording on the Internet prior to illegally

removing that video recording from the Internet or otherwise disabling access to it. Prior to doing

so, I downloaded a short clip from that video. The following is a link to that video clip on the

Internet:

https://drive.google.com/open?id=1-ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc

15.     Everything that I talked with the Mayor and Mr. Banks during that meeting were matters

about which I intended to engage in protected whistleblowing against them and others about

during the Mayor's 9/14/17 town hall. The next screenshot is from the elapsed time of 1 minute

and 31 seconds in that video and pertains to a discussion that I had with the Mayor that was

about having him cancel the City of New York's business that taxpayers pay for that is with a

company named NTT Data, Inc. that still subjects me to illegal wage-theft, fraud, and retaliatory

employment blacklisting that dates back to 2012. Instead of cancelling that business, the Mayor's

administration has unconscionably opted to extend it that keeps too much money in the wrong

hands as people are now mightily struggling to make ends meet in New York City due to the

Coronavirus pandemic and shouldn't have to support businesses that commit wage-theft. HRA

has contracts with NTT.



16.    The next screenshot from that video corresponds to the elapsed time of 1 minute and 4 seconds in it as I asked the Mayor a question in a poorly phrased way as I meant to ask him if her could direct Mr. Banks to resolve my litigation against HRA in some way that was fair. The Mayor instead stonewalled me as he told me that his administration has a lot of litigation and "that is how we do things". That answer confirmed to me that he and his administration needed to be fired immediately.



17.     The next screenshot from that video corresponds to the elapsed time of 1 minute and 57 seconds in it as I apprised the Mayor that Mr. Redmond illegally prevented me from attending his 4/27/17 **town** hall meeting and that he was also then defending a federal civil rights lawsuit. In response, he claimed that he didn't' know anything about that and that he wouldn't talk with me further about lawsuits. That response further confirmed to me that he and his administration needed to be fired immediately. I was then referring to _Sherrard v. City of New York_.



18.     The next screenshot from that video corresponds to the elapsed time of 2 minute and 10 seconds and clearly shows both the Mayor and an unknown Black male member of his NYPD security detail harassing me and subjecting me to what is known as "simple assault" under applicable law. It shows this as a result of it showing that the Mayor tried to illegally reach over toward me and touch me near my right shoulder as the Black male member of his NYPD security detail put his right hand on my backpack before illegally pushing me away. That push was assault. Neither of them gave me a reasonable opportunity to first leave their wretched company without being illegally coerced by them to do so. The Mayor's illegal acts against me then confirmed that he supports and condones illegal acts by the NYPD. During that meeting, I also

handed him a report again that I previously handed to him on 7/16/17 in Clement Clarke Moore

Park in the Chelsea district in Manhattan in front of Mr. Gartland and other whistleblower news

censors in journalism. That report contained screenshots from video recordings that summarized

illegal acts and omissions that were committed against me partly by members of his NYPD

security detail since 4/27/17 at public forums that he conducted. The Mayor lied to my face on

7/16/17 in that park by fraudulently telling me that he supports civil rights and military veterans

in response to questions that I then asked him about that to put him on the spot in front of

whistleblower news censors in journalism.



19.     The following is a link to the video recording on the Internet that the Mayor's office

arranged to be recorded of the Mayor's 7/25/17 publicity stunt publicity stunt that the Mayor

illegally conducted next to a staircase on 7/25/17 inside of the MTA subway station located in

Manhattan below Broadway near City Hall by Warren Street:

 https://www.youtube.com/watch?v=Hq2Q4tPrN2A

20.     On 7/25/17, Mr. Redmond flagrantly and illegally violated my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment in retaliation for my having lawfully engaged in protected whistleblowing activity in the immediate vicinity of a large group of whistleblower news censors in journalists, the Mayor, members of the Mayor's staff, and members of the public inside of the subway station that I have discussed above.

21.     The next screenshot was created from what is shown at the elapsed time of 10 minutes and 18 seconds in the video that I just discussed.



22.     The preceding screenshot shows Mr. Redmond flagrantly assaulting me behind a metal partition near the Mayor and Eric Phillips while Mr. Phillips worked a mouthpiece for the Mayor. Mr. Redmond assaulted me then by illegally grabbing my left arm and dragging me by it along the subway platform where I had been standing as I was lawfully conducting myself while engaging in whistleblowing near and against the Mayor, his administration, and its business

partners. I did so then within earshot of many whistleblower news censors in journalism that quite fittingly were assembled together like rats and snakes. Mr. Redmond's assault against me then occurred behind the vertical metal partition shown in that screenshot. By deliberately making physical contact with me and dragging me in that subway station on 7/25/17, Mr. Redmond violated 18 U.S.C. 245(b)(5), NYPL §240.26, NYPL §240.20, and NYPL §195.00 in the process of causing irreparable harm to my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and the MTA's Rules of Conduct to continue to lawfully engage in protected whistleblowing near the Mayor from where I had been standing on that subway platform. The MTA's Rules clearly prohibited the Mayor from conducting his publicity stunt in that subway station because it was conducted next to a staircase, involved the use of a microphone, and impeded the movements of those in that subway station. Those same MTA Rules authorize public speaking in subway stations however and that is exactly what I was doing when Mr. Redmond illegally seized my left arm and criminally assaulted me by doing so. By doing so then and so publicly, he caused me enormous embarrassment and justifiable rage. Upon leaving that subway station, I received an unexpected telephone call from a civil rights attorney named Norman Siegel. He immediately told me during that call that I had a legal right to scream and shout in that subway station. In response, I told him that I hadn't done so and had instead merely projected my voice with my lungs in that subway station. I did so then to compete against the Mayor's use of a microphone during his illegal publicity stunt and noise from subway trains.

23.     Along with other information, what I discussed above confirms that I was engaged in protected activity against Defendant Redmond and other members of the Mayor's NYPD security detail prior to the Mayor's 9/14/17 town hall. The information discussed next further

confirms that I continued to engage in protected activity against them leading up to the Mayor's

9/14/17 town hall and that such protected activity was broader that just the Mayor's NYPD

security detail.

24.     Leading up to 9/14/17, I actively participated in all the following types of protected

conduct and otherwise tried to do so as I was illegally prevented from doing so on both 8/30/17

and 9/8/17 by members of the NYPD at the Mayor's 8/30/17 town hall and the Mayor's 9/8/17

public hearing:

      a.   Commencing Article 78 proceedings and attending public meetings and hearings.

      b.   Circulating a petition.

      c.   Testifying to a government body while engaging in a free discussion of governmental

          affairs that was partly about the manner in which government should be operated

          instead of how it was being operated.

      d.   Appealing a decision by a city agency.

      e.   Petitioning for government reforms.

      f.   Appealing the denial of public assistance benefits.

25.     I engaged in protected whistleblowing against Defendant and other members of the

Mayor's NYPD security detail during discussions that I had with a whistleblower news censor in

journalism named Michael Gartland on 5/23/17 inside of the Bronx Supreme Court while that

was recorded on video and on 7/16/17 after he and other whistleblower news censors in

journalism witnessed a conversation that I had with the Mayor in a small park named Clement

Clarke Moore Park in the Chelsea District of Manhattan that another whistleblower news censor

in journalism named Grace Rauh was also then in.

26.     I engaged in protected whistleblowing against the Mayor's NYPD security detail and

New York State Court officers who illegally prevented me from attending the Mayor's 4/27/17 town hall and 5/23/17 resource fair on 5/23/17. I did so by promptly telling Jumaane Williams and Brad Lander during a meeting that was conducted in lower Manhattan near 200 West Street that I was illegally prevented from attending the Mayor's 5/23/17 resource fair by members of the Mayor's NYPD security detail. Back then, Mr. Williams was a member of the City Council. He is now the New York City Public Advocate and I have no reason to believe that he took any appropriate action in response to my complaints against members of the Mayor's NYPD security detail.

27.     I engaged in protected whistleblowing against the Mayor's NYPD security detail and New York State Court officers who illegally prevented me from attending the Mayor's 4/27/17 town hall and 5/23/17 resource fair on 5/24/17 during a meeting that Eric Schneiderman conducted with New York State Assemblywoman Liz Krueger that was conducted at the CUNY Graduate Center that is located at the intersection of Fifth Avenue and 34th Street in Manhattan. Mr. Schneiderman was then the New York State Attorney General. I did so then by writing questions about that on a comment card I was given during that meeting that I handed back to see if Mr. Schneiderman would address my questions on that card. While serving as the moderator for that meeting, Ms. Krueger didn't ask him anything about what was written on the comments card that I submitted. Prior to submitting that comments card, I recorded the questions that I wrote on that card in a Microsoft Word file largely because I presciently anticipated that either Mr. Schneiderman would prove to be too spineless to answer my questions during that meeting or Ms. Krueger would be too spineless to ask them during it.

28.     I reported entirely valid complaints to the DOJ on 6/5/17 against Mr. Redmond, Mr. Gerola, Mr. Nieves, and other members of the NYPD before I received letter dated 8/28/17 from

Lara Eshkenazi in her capacity as the co-chief of the DOJ's civil rights unit for the U.S.

Attorney's Office for the Southern District of New York in which she lied by claiming that the

complaints that I reported to the DOJ didn't appear to implicate a violation of federal civil rights

laws over which her office had jurisdiction. Contrary to that lie, her office had jurisdiction over

aspects of my complaints that corresponded to violations of 42 USC §242, 42 USC §1985 and 42

USC §1986. This is further confirmed by 34 U.S.C. §12601. Also, the criminal division of the

U.S. Attorney's Office for the Southern District of New York had jurisdiction over aspects of my

complaints that corresponded to violations of 18 USC §245(b)(5), 18 USC §241, and other

applicable laws. I thereafter reported new and entirely valid complaints to the DOJ on 9/1/17

against Defendants Redmond, Nieves, and other members of the NYPD after they illegally

caused me to be ejected from the Mayor's 8/30/17 town hall.

29.     I engaged in protected whistleblowing against Mr. Gerola and members of the Mayor's

staff on 6/8/17 as I talked with New York State Assemblyman Andrew Hevesi directly in front of

the building that hosted the town hall meeting that the Mayor conducted on that date in Rego

Park in Queens before that town hall began and shortly after it ended. A whistleblower news

censor in journalism named Jon Cronin witnessed my conversation with Mr. Hevesi after that

town hall ended. Mr. Gerola was personally involved with others on 6/8/17 in having illegally

prevented me from attending that town hall from within the room in which it was conducted in

spite of the fact that I conducted myself in an entirely lawful manner throughout the entire time

that I was at the site of that town hall on that date.

30.     I testified against Mr. Gerola and other members of the Mayor's NYPD security detail on

6/14/17 during the public hearing that the City Council's Committee on Public Safety conducted

that was recorded on video and transcribed in writing. The video recording of that hearing is

available on the Internet at https://councilnyc.viebit.com/player.php?hash=YXl0VS6f0vsZ. My testimony in that video begins at the elapsed time of 2 hours, 54 minutes, and 42 seconds and lasted less than 4 minutes.

31.     I engaged in protected whistleblowing against Defendant Redmond and other members of the Mayor's NYPD security detail during conversations that I had with whistleblower news censors in journalism named Marcia Kramer and Juliet Papa on 6/15/17 during a town hall meeting that CBS New York conducted in Corona in Queens that another whistleblower news censor in journalism named Erin Durkin attended while that town hall was recorded on video.

32.     I engaged in protected whistleblowing against Mr. Redmond, Mr. Gerola, and Mr. Nieves in communications that I had with a whistleblower news censor in journalism named Graham Rayman between 6/28/17 and 7/4/17 that were largely by e-mail.

33.     Prior to 9/14/17, I reported entirely valid complaints to the CCRB against Mr. Redmond, Mr. Gerola, Mr. Nieves, and other members of the NYPD on 4/27/17, 6/1/17, 6/9/17, 6/24/17, 9/1/17, and 9/13/17.

34.     I reported entirely valid complaints to DOI and IAB on 5/25/17 against Mr. Redmond, Mr. Gerola, Mr. Nieves, and other members of the NYPD.

35.     I engaged in protected whistleblowing on 6/6/17 against the Mayor's NYPD security detail in an e-mail message that I sent to former New York City Councilwoman Melissa Mark-Viverito who moderated the Mayor's 9/28/17 town hall, Lourdes Rosado while she headed the NYAG's civil rights division, and the New York City Public Advocate's office.

36.     I engaged in protected whistleblowing on 9/1/17 against the Mayor's NYPD security detail in e-mail messages that I sent to Brooklyn District Attorney Eric Gonzalez and Jumanne Williams that concerned my having been illegally ejected from the Mayor's 8/30/17 town hall.

37.     I engaged in protected whistleblowing on 9/1/17 and 9/9/17 against the Mayor's NYPD

security detail in e-mail messages that I sent to Lourdes Rosado.

38.     Defendant Nieves and Mr. Redmond were personally involved with other members of the

NYPD in having caused me to be illegally ejected from the gym on 8/30/18 in which the

Mayor's 8/30/17 town hall was conducted shortly thereafter in retaliation for protected speech

and expressive association that I lawfully engaged in while talking with other members of the

public near me that was largely against Mr. Redmond and Mr. Nieves. Back then, I recall telling

female members of the public who were seated near me that Defendant Redmond was then the

defendant in _Sherrard v. City of New York_, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018) as I

briefly provided them a summary of what that lawsuit was about. I also recall having then told

them about how members of the public illegally had literature that they sought to bring with

them into the public town hall meeting that the Mayor conducted on 6/21/17 in Chinatown in

Manhattan confiscated by members of the NYPD as members of the public tried to enter the

building that hosted that town hall. That referred to the discussion that I presented earlier in this

complaint about the illegal acts that Defendant Nieves was recorded on video having committed

at the Mayor's 6/21/17 town hall.

39.     My illegal ejection from the gym that hosted the Mayor's 8/30/17 town hall occurred as I

lawfully sat in a seat in it. In response to my having lawfully exercised my First Amendment

right to try to embarrass Mr. Redmond as he happened to walk by where I was then seated in that

gym by pointedly asking him while I was seated about how well _Sherrard v. City of New York_

was progressing against him, he promptly, illegally, and deliberately initiated physical contact

with my body with neither my consent nor any legal justification whatsoever as I immediately,

lawfully, and angrily voiced my objections to him about making physical contact with my body

without any justification. I immediately then ordered him to get away from me, continue to go about his business elsewhere, and to leave me alone. A short time after he eventually walked away, Defendant Nieves approached where I continued to lawfully sit as I was continuing to lawfully conduct myself as I continued to engage in protected whistleblowing against Mr. Redmond and others. Defendant Nieves then illegally coerced me to leave that gym by illegally making physical contact with my body and illegally seizing my backpack. Prior to doing so, Mr. Nieves told me that he wanted to have a talk with me about something outside. In response, I told him that he and I could instead have that conversation where he and I then were while I was then seated in front of other members of the public who could thereafter serve as eyewitnesses about how he and I interacted. At that time, I expected that he and other members of the NYPD were about to yet again violate my constitutional rights and other applicable laws in relation to my constitutional right to attend that public forum. That is precisely why I then opted to lawfully remain in my seat and give Mr. Nieves and other members of the NYPD to prove my expectation about that criminal mob to be right as he and they quickly and illegally coerced me to leave that gym while I was conducting myself in an entirely lawful manner in stark contrast to that Nazi mob. As members of that mob coerced me to leave that gym, they did so by illegally pushing me from behind towards an exit that was entirely unnecessary. In hindsight, I genuinely regret having not exercised my legal right to self-defense by immediately physically disabling Mr. Nieves and other members of that criminal mob in front of the members in that gym. Hindsight confirms that I certainly should have done precisely that and without any hesitation. Findings in *Wright v. Musanti*, No. 14-cv-8976 (KBF)(S.D.N.Y. Jan. 20, 2017) confirm that the physical contact that was made with my body by members of the NYPD while I was in that gym on 8/30/17 constituted assault against me because I regarded that contact as offensive. It's

objectively reasonable to believe that one of the reasons why I was illegally prevented by

Defendant Nieves and others from being able to attend the Mayor's 9/14/17 town hall from

within the room in which it was conducted was because Defendant Nieves didn't want me to

have the opportunity to engage in protected whistleblowing against him and other members of

the NYPD about my having been illegally ejected from the gym that hosted the Mayor's 8/30/17

town hall shortly before that town hall was conducted in it.

40.    Defendant Cruz was personally involved in having illegally prevented me from walking

past him on 9/8/17 to enter City Hall to attend and testify against the NYPD and Mayor during

the Mayor's 9/8/17 public hearing at 2 pm in the Blue Room in City Hall. Mr. Cruz did so then

while he was assigned to the NYPD guardhouse that is located just inside of the entrance to City

Hall by Park Row. The NYPD thereafter illegally didn't provide me video recordings from its

video security cameras in that area in response to a timely FOIL demand that I submitted for

those public records. Instead, the NYPD illegally destroyed that evidence. While I was being

illegally prevented from attending the Mayor's 2 pm public hearing on 9/8/17, Defendant Nieves

approached me as I thereafter waited by the Broadway entrance to City Hall. At that time, he

asked to see literature that I had with me that contained protected whistleblowing information

against him, other members of the NYPD, and others that I brought with me to distribute and

testify about during that 2 pm public hearing and continue to distribute inside of and otherwise

within the immediate vicinity of City Hall thereafter to members of the press and others. While I

was being illegally prevented from attending that 2 pm public hearing, I recorded a video

recording of Defendant Nieves with my cell phone at 2:14 pm on 9/8/17 with my cell phone of

Defendant Nieves as he looked in my direction while he wore a suit, tie, and eyeglasses and

appeared to then be using a cell phone as he stood in an area of City Hall's compound where

people park their cars. The next screenshot is from that video that shows him in it on the right as he stood behind a door to the NYPD guardhouse that is located just inside of the Broadway entrance to City Hall. It's objectively reasonable to believe that one of the reasons why I was illegally prevented by Defendant Nieves and others from being able to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted was because Defendant Nieves didn't want me to have the opportunity to engage in protected whistleblowing against him and other members of the NYPD about having been illegally been barred from attending the Mayor's 9/8/17 2 pm public hearing. That hearing was partly about proposed legislation that concerned reforming the NYPD. I intended to testify during that hearing about that specific proposed legislation.



41.    Prior to trying to attend the Mayor's 9/14/17 town hall, I was actively involved in litigation activity against the City of New York and the defendants. On 9/5/17, New York State

Supreme Court Judge Alexander Tisch issued an order in my HRA lawsuit in which he flagrantly violated my First Amendment and Fourteenth Amendment rights to then be able to effectively petition for redress, have access to the courts, and be accorded proper due process by him in a manner would be in full accordance with _Goldberg v. Kelly_, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970) clearly expressed is required of due process. _Goldberg v. Kelly_ requires due process to be granted at a meaningful time in a meaningful way that is tailored to an individual's circumstances and capacity to be heard. The order that Judge Tisch issued on 9/5/17 in my HRA lawsuit was in response to an order to show cause application that I submitted in that case while New York State Supreme Court Judge Nancy Bannon was on vacation and could not hear that application then for that reason. He also issued that order while Judge Bannon was then running for re-election as a judge and after she behaved in the following ways while she was assigned to my HRA lawsuit:

   a. She illegally granted an illegal ex-parte adjournment application that an attorney for HRA named Jeffrey Mosczyc caused to be faxed to her chambers on 4/5/17 in which he asked her to adjourn the oral arguments hearing that she set on 1/26/17 to be conducted on 4/12/17 in my HRA lawsuit. She illegally granted that in spite of the fact that I was never given any notice of that application before she illegally granted it. I certainly had a First Amendment and Fourteenth Amendment right to have submitted opposition in response to that illegal ex-parte adjournment application and to have my opposition fully and properly considered by her prior to her making a decision about Mr. Mosczyc's illegal ex-parte adjournment application. Instead, Judge Bannon's court clerk left me a voicemail message at 9:56 am on 4/11/17 in which he apprised me of the fact that Judge Bannon illegally granted Mr. Mosczyc's

illegal 4/5/17 ex-parte adjournment application. I instantly knew that Mr. Mosczyc

had engaged in illegal gamesmanship by submitting his illegal 4/5/17 adjournment

application in an ex-parte manner that is explicitly prohibited by the New York State

Court System's regulations, Judge Bannon's written rules of practice, and my First

Amendment and Fourteenth Amendment rights. I immediately knew all of that

largely because my HRA lawsuit was then parallel litigation with respect to related

litigation that I was engaged in against HRA about identical claims that was assigned

to OTDA. On 4/11/17, OTDA conducted a fair hearing between HRA and I by

telephone that both OTDA and I recorded on audio. My audio recording of that

hearing was among the exhibits that I stored on the USB thumb drive that I submitted

in my HRA lawsuit in conjunction with my 5/19/17 order to show cause application.

The sum and substance of what is heard in that audio recording confirms that Judge

Bannon in her 8/10/17 decision by claiming that I hadn't exhausted my administrative

remedies for claims that I asserted against HRA as she then referred to OTDA as the

New York State administrative appellate forum for claims asserted against HRA. An

attorney for HRA named Marin Gerber both lied about material matters during that

4/11/17 OTDA fair hearing and flagrantly violated res judicata for matters that were

already decided in my favor against HRA in relation to the fair hearing decision that

OTDA issued in my favor against HRA on 9/15/16 that OTDA illegally thereafter

refused to fully enforce and HRA refused to fully comply with. Also, the OTDA

administrative law judge who presided over my 4/11/17 fair hearing with HRA

confirmed that she wouldn't allow that hearing to address additional claims that I

asserted against HRA that Jackie Donovan of OTDA's compliance division had

added to the agenda for that 4/11/17 fair hearing. I'm referring to additional claims that I apprised OTDA about in a 62-page fax that I faxed to OTDA on 2/9/17 in order for it to perform its legal duty to have fair hearings conducted within 30 days thereafter to address those claims against HRA. OTDA instead illegally never conducted a fair hearing about those additional claims and continued to illegally bar me from its offices located at 14 Boerum Place in Brooklyn where it conducts fair hearings in flagrant violation of my constitutional rights while never granting me any due process to allow me to challenge the lack of validity for that ban and discrimination. OTDA has been illegally barring me from that office ever since an OTDA administrative law judge illegally terminated a fair hearing that I participated in at that office on 7/5/16 while OTDA recorded it on audio. That audio recording confirms that administrative law judge illegally terminated that fair hearing while I was in the middle of trying to lawfully answer a question that I was asked during it.

b.  She illegally ignored material and admissible evidence that I submitted in that case on 5/19/17 in conjunction with an order to show cause application. That evidence was stored on a USB thumb drive and mostly consisted of relevant audio and video recordings.

c.  She ignored an application that I made in my 5/19/17 order to show cause application to have my HRA lawsuit unsealed, the City of New York ordered to enable me to attend public meetings that the Mayor and Mr. Banks would thereafter continue to conduct, and the City of New York ordered to preserve video recording evidence that was recorded on 4/27/17 at the site of the Mayor's 4/27/17 town hall at which I was illegally prevented from attending the Mayor's 4/27/17 town hall. My HRA lawsuit

was sealed in January of 2017 at my request and I sought for it to be unsealed on

5/19/17 largely to be able to be able to better publicize Judge Bannon's misconduct in

my HRA lawsuit and the illegal acts and omissions that members of the Mayor's

NYPD security detail, other members of the NYPD, and members of the Mayor's

staff had been committing against me since the Mayor's 4/27/17 town hall. In short, I

sought to lawfully use the sum and substance of my HRA lawsuit as a weapon to

engage in large-scale character assassinations to ruin the re-election hopes of the

Mayor, Judge Bannon, members of the City Council, and other government officials

in 2017 largely by engaging in word-of-mouth advertising about its entirety while

attending public forums that members of the public conducted in a collaborative

manner with the Mayor, Mr. Banks, other government officials, and journalists in the

rooms in which they were conducted as they were conducted, shortly before they

began, and shortly after they ended while they were recorded on video that was

broadcast over the Internet.

d.  She lied in the decision that she issued on 8/10/17 in that case. In that decision, she

lied partly by suggesting that I had claimed that HRA stole wages of mine in spite of

the fact that I never claimed that and I never worked for HRA. She also severed

claims that I asserted in that case from her jurisdiction through that decision that

caused those matters to be reassigned to Judge Tisch, who then arbitrarily,

capriciously, and illegally refused to begin dealing with those severed and transferred

claims until after 9/1/18 in flagrant violation of my First Amendment and Fourteenth

Amendment rights. Judge Tisch instead illegally referred those transferred back to

Judge Bannon through his 9/5/17 order while essentially treating them like the

Coronavirus and a hot potato that he wanted to have absolutely nothing to do with.

e.  She **a)** lied in her 1/31/18 decision in my HRA lawsuit by fraudulently claiming that

there wasn't anything that she overlooked and misapprehended in issuing her 8/10/17

decision and **b)** illegally disposed of my HRA lawsuit in its entirety in spite of the

fact that I continued to have claims that were pending to be addressed in it by virtue

of the fact that she previously severed them from her jurisdiction in her 8/10/17

decision. Judge Tisch thereafter illegally waited until 9/17/18 to issue an order that

reinstated my HRA lawsuit. He thereafter illegally did nothing to adjudicate my

claims in my HRA lawsuit that Judge Bannon caused to be assigned to him.

42.    The next screenshot is from the last page of Judge Bannon's 8/10/17 decision in my HRA

lawsuit. The remarks that she expressed in it refer to my having been illegally prevented from

attending the Mayor's 4/27/17 town hall and the Mayor's 5/23/17 resource fair meeting partly by

Defendants Nieves, Gerola, and Atcheson while I was conducting myself lawfully.

unlawfully precluded the petitioner/plaintiff from attending certain public meetings, and seek both damages and injunctive relief, are severed, and the matter is referred to the Trial Support Office for reassignment to a City Part of this court.

　　　This constitutes the Decision, Order, and Judgment of the Court.

Dated: August 10, 2017　　　　ENTER: _____

　　　　　　　　　　　　　　　　　　　　　J.S.C.

　　　　　　　　　　　　　　　　　　HON. NANCY M. BANNON

_____

Clerk

43.　　　If garbage in New York City's fake news industry that included the following people and many more in 2017 had opted to responsibly stop wrongfully subjecting me to whistleblower news censorship as they instead served as dutiful and subservient accomplices of the Mayor's administration and the NYPD to rig the outcomes of the 2017 New York City government elections for the benefit of the Mayor's administration, City Council, other government officials, and NYPD by engaging in behavior that is tantamount to voter suppression, voter fraud, viewpoint discrimination, and whistleblower retaliation, then I wouldn't have needed to try to attend public forums that the Mayor and other government officials conducted in 2017 after 3/15/17 as much to try to overcome and equitably expose their censorship that proximately enabled widespread terrorism by the NYPD across New York City since May of this year:

　　　Grace Rauh, Gloria Pazmino, Michael Gartland, Graham Rayman, Erin Durkin, Jillian Jorgensen, Errol Louis, Courtney Gross, Mara Gay, David Goodman, Matthew Chayes, Ben Max, Julia Marsh, Madina Toure, Yoav Gonen, Jeff C. Mays, Gwynne Hogan,

Jessica Layton

44.      I recall Julia Marsh having told me during a telephone call that she threw away a copy of

my 5/19/17 order to show cause application in my HRA lawsuit after I asked her if I could get it

back from her after she informed me that the New York Post wouldn't pursue any reporting

about my HRA lawsuit. That occurred after I was recorded on video on 5/23/17 as I talked with

Mr. Gartland on 5/23/17 face-to-face inside of the Bronx Supreme Court as I was being illegally

prevented from attending the Mayor's 5/23/17 resource fair as I clearly told him then that I was

illegally prevented from attending the Mayor's 4/27/17 town hall as well and that I was a

whistleblower against the Mayor's administration and the NYPD as I also then had an ongoing

lawsuit against HRA. During that meeting, I showed him a copy of my 5/19/17 order to show

cause application that I brought with me to discuss with Mr. Banks, the Mayor, journalists, and

members of the public while attending the Mayor's 5/23/17 resource fair. I also wrote down the

index number of my HRA lawsuit and my contact information on a notepad that he handed to me

as we sat next to one another on a bench in that courthouse on 5/23/17 to enable him to follow-

up with me about my HRA lawsuit. The next 2 screenshots are from a video recording that was

recorded on 5/23/17 by a video security camera that OCA controls that was then installed above

the entrance to Room 105 on the first floor of the Bronx Supreme Court. OCA provided me that

video recording in response to a FOIL demand that I submitted to it. Those screenshots

correspond to parts of that video that were recorded between 9:30 am and 10 am on 5/23/17 as

the Mayor's 5/23/17 resource fair was conducted in the Veterans' Memorial Hall chamber

located in that courthouse during the U.S. Navy's annual "Fleet Week" event in New York City,

and while I continued to be a Navy veteran that the Mayor's administration and NYPD were

stabbing in the back by flagrantly violating my constitutional rights at public forums to steal the

2017 New York City government elections by doing their utmost to illegally silence and prevent valid criticism against the Mayor's administration, its business partners, and members of the NYPD at public forums that the Mayor, Mr. Banks, members of the City Council, and other government officials jointly conducted with the public, journalists, and whistleblower news censors in journalism. These screenshots show me as I **a)** took a notepad from Mr. Gartland for the purpose that I discussed above and **b)** showed him the copy of my 5/19/17 order to show cause application in my HRA lawsuit that was in a large white bag of mine.

 

45.     On 2/19/20, a leader and trailblazer named David Rem lawfully and awesomely performed a key civic duty by standing up during the public town hall meeting that the Mayor conducted in Forest Hills in Queens as he told the Mayor that he was New York City's worst Mayor ever while that town hall meeting was recorded on video as a result of arrangements that the Mayor's office made. That video is available on the Internet at

https://www.youtube.com/watch?v=5le6DCaxiG8. Mr. Rem is shown in that video at the elapsed time of 1 hour, 37 minutes, and 55 seconds as he told the Mayor that he was New York City's worst Mayor ever. In response to that criticism, Mr. Rem received cheers and applause from members of that town hall's audience as one of those people rose from his seat to applaud Mr. Rem and pay proper respect to him for his leadership and outspokenness while taking the gloves off so to speak at the Mayor's expense in such a refreshing way during that public forum. This proves that the finding in _Cohen v. California_, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) that states that "it is nevertheless often true that one man's vulgarity is another's lyric" is true during public forums that the Mayor conducts. This discussion also confirms that I had a First Amendment and Fourteenth Amendment right to beat Mr. Rem to the punch on 9/14/17 by attending the Mayor's 9/14/17 town hall within the room in which it was conducted and similarly criticizing the Mayor, Mr. Banks, members of the Mayor's NYPD security detail, members of the Mayor's staff, and many others while doing so. It's worth pointing out that Mr. Rem was illegally retaliated against in violation of his First Amendment rights on 2/19/20 as the Mayor used a hand signal to illegally direct Mr. Redmond and others to coerce Mr. Rem to abruptly leave that town hall.

46.    Just 2 weeks after I was illegally prevented from attending the Mayor's 9/14/17 town hall from within the room in which it was conducted, Defendants Gerola and Mason were personally involved on 9/28/17 with other members of the NYPD and members of the Mayor's staff in illegally preventing me from attending the Mayor's 9/28/17 town hall that was conducted in Harlem while I was conducting myself in an entirely lawful manner throughout the entire time that I was at the site of that town hall on that date. That occurred after I recorded Defendant Gerola on video on 9/26/17 at the site of the town hall that the Mayor conducted on that date as

Mr. Gerola told me by the entrance to the school that hosted that town hall that he was definitely not letting me attend that town hall while I yet again was then conducting myself in an entirely lawful manner in stark contrast to him. That occurred as Defendants Mason, Nieves, and others were also personally involved in illegally preventing me from attending that town hall. Mr. Gerola and other members of the NYPD then illegally prevented me from attending the Mayor's 9/27/17 public resource fair meeting in Manhattan while I again conducted myself in an entirely lawfully manner in contrast to those criminals.

47.     By having illegally prevented from attending the Mayor's 9/28/17 town hall, Defendants Gerola, Mason, and others illegally prevented me from lawfully exercising my First Amendment and Fourteenth Amendment right to thank members of the public who loudly criticized the Mayor during that town hall that caused the to be illegally ejected from it by Defendants Gerola, Redmond, and other members of the NYPD.

48.     The discussion that follows about illegal acts that Defendants Gerola, Redmond, and other members of the NYPD committed against members of the public who attended the Mayor's 9/28/17 town hall is being presented here mainly to showcase their apparent addiction to domestic terrorism by committing crimes partly against the First Amendment, Fourteenth Amendment, and federal Hatch at public forums that the Mayor conducts with others.

49. The Mayor' office arranged to have the Mayor's 9/28/17 town hall recorded on video. That video recording is available on the Internet at

https://www.youtube.com/watch?v=4s9fYZNLK8o.

50. The next screenshot is from the elapsed time of 1 hour, 50 minutes, and 37 seconds in the video that the Mayor's office arranged to be recorded of the Mayor's 9/28/17 town hall. That screenshot shows a fantastic woman as she stood up and assertively addressed the Mayor

while lawfully criticizing his rezoning and affordable housing policies as other members of

that audience certainly supported her. At that time, she was a teacher and was schooling the

Mayor about his lack of honesty, transparency, accountability, and leadership. I would have

loved to have witnessed her addressing the Mayor as she did then firsthand by having been

permitted to exercise my constituonal right to have attended that town  hall from within the

room in which it was conducted and seen her face that is not shown in that video recording.

If I had been able to attend that town hall within that room, I would have tried to lawfully

thank her for her criticism of the Mayor and recorded a video of her as she delivered her

remarks to the Mayor then. I had a First Amendment and Fourteenth Amendment right to

have recorded her conversation with the Mayor on video in a way that showed her face and

the defendants in this action.



day you have sold huge parcels of
city-owned land in East Harlem

51. The next screenshot is from the elapsed time of 1 minute, 51 minutes, and 58 seconds in that

same video as it shows an unknown bald male as he looked in the direction of the video

camera that recorded that video and stood near the woman who had just schooled the Mayor

about his rezoning policies. That bald man whio is shown wearing a pink shirt and dark

colored sportscoat was recorded on video as he was present on 4/27/17 at the site of the

Mayor's 4/27/17 town hall near its entrance as I was being illegally prevented from attending

it by members of the NYPD as well as Defendant Miller and Pinny Ringel of the Mayor's

CAU. That bald man who wore the pink shirt during the Mayor's 9/28/17 town hall illegally

didn't make any effort on 4/27/17 to allow me to attend the Mayor's 4/27/17 town hall as he

was aware that I was being prevented from attending it. The totality of the circumstances on

9/28/17 strongly suggests that he was then in the middle of harassing that woman in response

to her remarks to the Mayor then in spite of the fact that her remarks to the Mayor then had

been protected speech about matters of public concern.



52. The next screenshot is from the elapsed time of 1 minute, 52 minutes, and 19 seconds in that

same video as it shows an unknown Black woman harassing the teacher who schooled the

Mayor about his rezoning policies. In this screenshot, that teacher was continuing to lawfully

engage in protected conduct against both the Mayor and Melissa Mark-Viverito about the

Mayor's rezoning policies that Ms. Mark-Viverito approved of. That teacher's behavior then

was entirely in accordance with findings from *Piesco v. City of New York, Dept. of*

*Personnel*, 933 F.2d 1149 (2d Cir. 1991) that appear in the Legal Standards section in this complaint. That court decision explicitly confirms that a discussion about "the manner in which government is operated or should be operated" is protected speech. The totality of the circumstances strongly suggests that that teacher was then being harassed by the Black woman who leaned over to her and stood to her right in response to the fact that that teacher felt that she hadn't received a suitable response to questions and remarks to the Mayor during that town hall as she lawfully then petitioned the Mayor for appropriate redress in accordance with her First Amendment rights.



53. The next screenshot is from the elapsed time of 1 minute, 52 minutes, and 7 seconds in that same video as it shows an unknown Black woman harassing the teacher who schooled the Mayor about his rezoning policies. The bald man who was then wearing a pink shirt and dark colored sportscoat that I just discussed also appears in that screenshot as he also appeared to then be harassing that teacher. Another reason why what appears in this screenshot is signfiicant is because it confirms that Ms. Mark-Viverito then made remarks to that teacher that hindsight confirms were patently disingenuous in regards to the First Amendment right

that people had to lawfully attend and express themselves during that town hall from within the room in which it was conducted. This stems from the fact that she was then recorded on video as she claimed that everyone had the right to express their point of view during that town hall before I had a conversation as she left that building af the end of that town hall during which I apprised her of the fact that I had been illegally prevented from attending it in flagrant violation of my First Amendment rights. Ms. Mark-Viverito was also recorded on video during that 9/28/17 town hall around that same time as she acknowledged that everyone had the right to express themselves during that town hall as well as the right to disagree with others during it.



54. A very short time later, that teacher and other members of the public who attended that town hall were illegally ejected by Defendant Gerola and other members of the Mayor's NYPD security detail from that town hall in violation of their constitutional rights, 18 U.S.C. §245(b)(5), 18 U.S.C. §241, 42 USC §1985, 42 USC §1986, NYPL §240.20, NYPL §240.26, NYPL §120.45, 5 U.S.C. §1502(a)(1) and other applicable laws in retaliation for their protected First Amendment expression during that town hall as it didn't appear that any

member of the public who attended that town hall voiced an objection about how the people who were then illegally ejected from that town hall had conducted themselves in it. They were illegally coerced to leave that town hall in response to an order that Defendant Redmond appears to have verbally issued to cause that to occur as he was recorded on video as he engaged in behavior that made it appear that he then issued that order.

55. The next screenshot is from the elapsed time of 1 minute, 52 minutes, and 53 seconds in that same video and shows Defendant Redmond as he appeared to make remarks in a radio communications device that he then had installed near his left wrist to cause that teacher and other members of the public near her to be illegally ejected from that town hall by other members of the Mayor's NYPD security detail that included Defendant Gerola.



56. The next screenshot is from the elapsed time of 1 minute, 53 minutes, and 26 seconds in that same video and shows Defendant Gerola as he and other members of the NYPD acted in concert with Defendant Redmond, Jeff Lynch of the Mayor's office, Ms. Mark-Viverito, and the Mayor in illegally causing and otherwise condoning the fact that the teacher who schooled the Mayor about his rezoning policies during that town hall and lack of honesty and transparency during it was ejected from that town hall with other members of the public who supported her viewpoints. That screenshot shows numerous empty blue seats in that town hall that I then had a First Amendment, Fifth Amendment, and Fourteenth Amendment right to lawfully sit in to attend that town hall. However, no reasonable accommodation was offered to me to then attend that town hall from within that room.



57. After the Mayor's 9/28/17 town hall ended, the New York Post published a news article on the Internet at https://nypost.com/2017/09/28/residents-tossed-out-of-de-blasio-town-hall-over-zoning-spat/ that is entitled "Residents Tossed from De Blasio Town Hall over 'Racist' Zoning Feud" and was written by Rich Calder. In short, that news article reported that the teacher who schooled the Mayor during that 9/28/17 and her fans were coerced by security personnel to leave that town hall in retaliation for their criticism against the Mayor during

that town hall.

58. On a related note, Spectrum News published a news report entitled "East Harlem Residents Get Rowdy at Mayor's Rezoning Town Hall" on the Internet on 9/29/17 at https://www.ny1.com/nyc/all-boroughs/news/2017/09/30/east-harlem-residents-get-rowdy-at-mayor-s-rezoning-town-hall that one of its reporters named Bobby Cuza prepared. Like many others in New York City's journalism business, Mr. Cuza is a whistleblower news censor in that business as far as I'm concerned. I first met him on 4/27/17 at the site of the Mayor's 4/27/17 town hall meeting and apprised him of the fact that I was illegally prevented from attending that public forum. He and Spectrum News thereafter never reported any information about that as they cemented their credentials as garbage in journalism by not doing so that facilitated the abilities that the Mayor's NYPD security detail and members of the Mayor's staff had to continue to commit crimes against my constitutional rights and those of other New Yorkers at public forums that the Mayor continued to conduct thereafter with other government officials as the Mayor's NYPD security detail and members of the Mayor's staff continued to do so to steal the 2017 New York City government elections for the mutual benefit of the Mayor, members of the City Council, and themselves partly to safeguard their collective job security that is now belatedly threatened by consequences of the ongoing coronavirus COVID-19 pandemic that they may best be able to equitably come to grips with simply by taking a deep breath to instill New York values. The news report that he prepared about the Mayor's 9/28/17 town hall contains a video recording that is comprised of clips from video recordings that were recorded on 9/28/17 during the Mayor's 9/28/17 town hall that show how it was conducted within the room in which it was conducted. The next screenshot is from the elapsed time of 1 minute and 57 seconds in the video recording in that

news report that shows Defendant Gerola as he was personally involved with Defendant Redmond and at least one other member of the Mayor's NYPD security detail in illegally violating 18 USC §245(b)(5), 18 USC §241, 42 USC §1985, 42 USC §1986, 5 U.S.C. §1502(a)(1), NYPL §240.20, NYPL §240.26, and the First Amendment, Fifth Amendment, and Fourteenth Amendment rights of the teacher who schooled the Mayor about his rezoning policies during that town hall and her fans as they lawfully attended that town hall from within the room in which it was conducted as it was conducted by coercing them to leave that town hall in retaliation for lawful First Amendment expression that I discussed above and would have loved to have witnessed firsthand in accordance with my First Amendment and Fourteenth Amendment rights to have then lawfully done so. This screenshot shows an unknown bald male member of the Mayor's NYPD security detail on the far-left side as he illegally and deliberately made physical contact with his right hand on the back of someone he was illegally coercing to leave that town hall. Through their illegal acts against those demonstrators then, Defendants Gerola, Redmond, and the unknown bald male member of the Mayor's NYPD security detail also violated my First Amendment rights, those who attended that town hall, and others who watched video recordings of how it was conducted with respect to our rights to have continued to hear what those demonstrators may have otherwise continued to have had to lawfully say and otherwise express during that town hall by having been able to continue to lawfully attend it from within the room in which it was conducted. This is true because the First Amendment also includes the right to receive information and to engage in expressive association.



59. The next screenshot is from the elapsed time of 1 hour, 26 minutes, and 6 seconds in the video that the Mayor's office arranged to be recorded of the town hall meeting that the Mayor conducted on 9/28/17 as a fantastic unknown Black woman whose first name may be Krista expressed her First Amendment right to speak and take the floor in the process in the center of the room in which that town hall was being conducted in a collaborative manner with the Mayor. She did so then after other government officials who attended that town hall had earlier urged that town hall's audience while those officials were in that room as it was being conducted to be outspoken during that public forum. This is confirmed by remarks that New York City Councilman Bill Perkins stated at the elapsed time of 5 minutes and 32 seconds as he was recorded on video by the video recording that the Mayor's office arranged to be recorded of the Mayor's 9/28/17 town hall. Mr. Perkins then explicitly told the audience of that town hall that he and others who attended it didn't want the members of that audience to be restrained in their remarks during that town hall. The following is a screenshot from the video recording that the Mayor's office arranged to be recorded of the Mayor's

9/28/17 town hall that shows Mr. Perkins as he stood in front of the Mayor as he made those remarks as I played back that video with the closed-captioning feature active:



60. The next screenshot is from that same video that shows Mr. Perkins as he clearly continued to urge that town hall's audience not to be shy with their questions and remarks during that public forum. That screenshot corresponds to the elapsed time of 5 minutes and 35 seconds in that video.



61. The next screenshot is from that same video that shows Mr. Perkins as he urges that town hall's audience not to shout out what was on their minds during that town hall in relation to questions that they would ask and remarks that they would make to the Mayor and other governent officials during that town hall. That screenshot corresponds to the elapsed time of 5 minutes and 38 seconds in that video.



acting shy tonight you got something on your mind shout it out let me hear

62. The woman to whom I just referred above and whose first name may be Krista. then made it abundantly clear through her remarks that she was very critical of the Mayor's administration. The manner in which that woman conducted herself during that town hall and the extent to which she was outspoken during it as the Mayor, Defendant Redmond, and other members of the NYPD and other government personnel were tolerant of that instead of promptly ejected her from that town hall sufficinetly confirms that I had a Fourteenth Amendment due process and equal protection right as well as a First Amendment right to have attended both the Mayor's 9/14/17 town hall and the Mayor's 9/28/17 town hall meetings from within the rooms in which they were conducted as they were conducted and to behave exactly as she behaved while she attended the Mayor's 9/28/17 town hall instead of

having been illegally barred from attending them from within the rooms in which they were conducted as they were conducted and totally barred from attending the Mayor's 9/28/17 town hall . The woman to whom I just referred is Black and is shown standing on the right in that screenshot as she wore what appeared to be a blue denim jacket while she had a bag over her stomach and had her mouth open. Defendant Redmond appears in the upper-left area in that screenshot. The Mayor was then objecting to the fact that she stole the stage from him during that public forum as no member of the public who attended that town hall appeared to have also objected to that. The Mayor, his NYPD security detail, and those who otherwise worked for the Mayor were all then estopped from being able to object to that woman's behavior on account of the fact that I was then being illegally prevented from attending that town hall by members of the Mayor's NYPD security and members of his staff. The bald man who is shown wearing a pink shirt and a dark colored sportscoat on the far-left in that screenshot is the same person who I discussed a short time ago in this complaint. Christopher Fowler of the Mayor's NYPD security detail appears on the far-right in that screenshot as the back of his head faced the video camera that recorded that video. In addition to what I discussed about him earlier in this complaint that concerns 7/25/17 and a subway station, he was among members of the Mayor's NYPD security detail who illegally ejected me from the Mayor's 8/30/17 town hall while I was conducting myself in a lawful manner.



breaking in that's ma'am this is not how
people act at town hall meetings

63. The next screenshot is from the elapsed time of 1 hour, 59 minutes, and 49 seconds in that same video as I played it back with the closed-captioning feature active and yet not vey accurate about what was being stated during that town hall. That screenshot shows the same fantastic unknown Black woman whose first name may be Krista that I just discussed above resumed expressing her First Amendment right to speak while attending that town hall meeting from within the room in which it was conducted as it was conducted as she then addressed the Mayor in her remarks that were highly charged in nature that I certainly would have loved to have witnessed firsthand by having been permitted to exercise my constitutional right to have attended that town hall from within that room then. Her remarks then were also very critical of the Mayor and his administration. In response to how boisterous she was then, Defendant Redmond and other members of the NYPD illegally coerced her to leave that town hall in violation of her constitutional rights, New York State's Open Meetings Law, other applicable law, and the findings in **a)** _Matal v. Tam_, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017) and **b)** _McCutcheon v. Federal Election Com'n,_ 134 S. Ct. 1434, 572 U.S. 185, 188 L. Ed. 2d 468 (2014) that concern viewpoint

discrimination that appear in the Legal Standards section in this complaint.



64. The next screenshot is from the preceding one and shows an enlarged version of the area in it where that unknown Black woman appeared next to Defendant Redmond as she addressed the Mayor as she and Defendant Redmond stood on the far-let side of that room. Mr. Redmond's back then faced the video camera that recorded that video as he then wore a dark colored suit.



65.     In this complaint's Legal Standards section, I include an excerpt from *Ragbir v. Homan*,

923 F.3d 53 (2d Cir. 2019) that addresses retaliation that an activist named Ravidath Ragbir experienced in retaliation for his efforts to receive news coverage about matters of public concern.

66.     The retaliation that Mr. Ragbir experienced in retaliation for his efforts to receive news coverage is comparable to illegal acts and omissions that were committed against me on 9/14/17 by the defendants that prevented me from attending the Mayor's 9/14/17 town hall in the room in which it was conducted. I believe that those acts and omissions were partly driven by efforts that I undertook to attract news coverage partly about **a)** my HRA lawsuit and **b)** illegal acts and omissions that members of the Mayor's NYPD security detail, other members of the NYPD, members of the Mayor's staff, the Mayor, Defendant O'Neill had been committing against me since 4/27/17 in relation to my efforts to lawfully attend public forums that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, other government personnel, whistleblower news censors in journalism, and journalists within the rooms in which they were conducted as they were conducted.

67.     Concerning what I just discussed, I received a 374-page PDF file from the Mayor's office on 2/15/19 in response to a FOIL demand that I submitted to it. That PDF file includes e-mail messages that senior members of the Mayor's staff, Mr. Redmond, and others sent about me in 2017 about illegal acts and omissions that were committed against me by themselves, Mr. Redmond, and others in relation to my efforts to lawfully attend public forums that consisted of public town hall meetings and public resource fair meetings in the rooms in which they were conducted as they were conducted that were conducted on 4/11/17, 4/27/17, 5/23/17, 6/8/17 by members of the public in a collaborative manner with the Mayor, Mr. Banks, members of the City Council, other government officials, whistleblower news censors in journalism, and

members of the press. Redactions were applied to the many of the e-mail messages shown in that PDF file before I received it. That PDF file includes e-mail messages that were sent on 6/28/17 and 6/29/17 about me between **a)** Erin Durkin while she then worked for the New York Daily News and **b)** Defendant Ramos and the Mayor's former mouthpiece, Eric Phillips. E-mail messages in that PDF file also confirm that the following members of the Mayor's administration communicated updates on 4/10/17 and 6/28/17 to other members of the Mayor's administration about the status of my HRA lawsuit and related litigation that was assigned to OTDA that I pursued against HRA before Defendant Ramos blatantly lied to Ms. Durkin about that on 6/28/17 at 5:42 pm as she committed defamation against me in the process:

a.      Raquel Lucas of HRA on 4/10/17 at 5:24 pm. That e-mail message served to help those who received it to engage in damage-control and intense screening against me partly in preparation for my planned attendance on 4/11/17 at the Mayor's public resource fair meeting that he would conduct in Staten Island then. That e-mail message was sent after Jeffrey Mosczyc of HRA submitted an illegal ex-parte adjournment application on 4/5/17 in my HRA lawsuit through which he and Judge Bannon used a fraudulent pretext to flagrantly commit obstruction of justice and witness tampering against me as they criminally stole my First Amendment and Fourteenth Amendment right to testify as originally scheduled in the oral arguments hearing on 4/12/17 in my HRA lawsuit. That damage-control and screening was also about **a)** my fair hearing with OTDA against HRA on 4/11/17 and **b)** whistleblowing that I engaged in as I talked with the Mayor on 3/15/17 during the town hall meeting he conducted and in an e-mail message that I sent to Shauna Stribula of the Mayor's CAU on 3/16/17 at 10:54 pm after I met

her during that 3/15/17 town hall that both Mr. Gartland and Mr. Redmond

attended as well before Mr. Gartland nor any other whistleblower news censor in

journalism reported anything about what I talked with the Mayor about during

that town hall. That e-mail message from Ms. Lucas on 4/10/17 appears on pages

211 and 212 within that PDF file and has redactions applied to it in numerous

areas. Ms. Lucas then worked as a special assistant for Mr. Banks. The subject

line of that e-mail message is: "Staten Island Resource Fair 4/11 Re: Towaki

Komatsu". The next screenshot from that e-mail message confirms that Ms. Lucas

apprised the recipients of that e-mail message of confidential litigation matters

that were between HRA and I that concerned my 4/11/17 OTDA fair hearing in

violation of applicable privacy laws that include New York State Social Services

Law §136(2) and 18 NYCRR §357:

In addition to his claims for legal services, he has also made a claim for reimbursement for three months in 2016 ███████████████ His claim is subject to a fair hearing before the state tomorrow.

Also, the fact that e-mail message was sent by Ms. Lucas to the following people

naturally raises a question about what were the specific, credible, legitimate, and

justifiable reasons why 6 senior members of the Mayor's administration that

included a Harvard Law School graduate paid such special attention to me **a)** one

day before I would engage in litigation against HRA that was assigned to OTDA,

**b)** 2 days before I was then scheduled to engage in related litigation against HRA

while presenting oral arguments publicly against HRA in my HRA lawsuit while

the scope of my claims in it were far more extensive and damaging to the Mayor's

administration and its business partners, and **c)** one day before I would attend the

Mayor's 4/11/17 public resource fair meeting outside of which Mr. Banks yet
again flat-out lied to my face about my efforts to obtain pro-bono legal
representation or legal assistance from HRA's legal services partners through
referrals that I received to them by HRA as he refused to talk with me if I
recorded that conversation on video:

    i.   Mr. Banks.

    ii.   Marco Carrion, who was then and remains the commissioner of the
Mayor's Community Affairs Unit that Defendant Atcheson then worked
for.

    iii.   Rachel Lauter. According to her career profile on the LinkedIn web site
that is available on the Internet at https://www.linkedin.com/in/rachel-
lauter/, she then worked for the Mayor's office as a Deputy Chief of Staff
and graduated from Harvard Law School.

    iv.   Kayla Arslanian. She was then the Deputy Director of Intergovernmental
Affairs within the Mayor's office.

    v.   Jaclyn Rothenberg. She appears to have been a spokeswoman for the
Mayor between April of 2017 and May of 2017.

    vi.   Jennifer Yeaw. According to her career profile on the LinkedIn web site
that is available on the Internet at https://www.linkedin.com/in/jennifer-
yeaw/, she then worked for the New York City Department of Social
Services as its Chief of Staff.

b.    Jaclyn Rothenberg on 6/28/17 at 5:18 pm. That e-mail message appears on page
365 in the 374-page PDF file. Ms. Rothenberg then worked as a spokeswoman for

the Mayor or in a very similar role. The next screenshot is of that e-mail message

and confirms that it was sent to Defendant Ramos, Mr. Redmond after he illegally

prevented me from attending the Mayor's 4/27/17 town hall, Emma Wolfe (the

Mayor's Chief of Staff), Marco Carrion, and other senior members of the Mayor's

administration. Ms. Rothenberg's remarks in that e-mail message refer to the oral

arguments hearing that was conducted on 6/7/17 in my HRA lawsuit to make up

for the 4/12/17 oral arguments hearing that Judge Bannon and Mr. Mosczyc's

criminally stole from me. Ms. Rothenberg also referred to an order to show cause

application that I served upon HRA on 6/6/17 at its office located at 150

Greenwich Street in Manhattan. That address is also known as 4 World Trade and

"4WTC".

---

**From:** Rothenberg, Jaclyn
**Sent:** Wednesday, June 28, 2017 17:18
**To:** Ramos, Jessica
**Cc:** Phillips, Eric; Redmond, Howard DI.; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
**Subject:** RE: town halls

Confirmed that he appeared at 4WTC on June 6 and served an Order to Show Cause. That OSC and another pending matter were submitted to the court for a decision on June 7. HRA is still waiting for the written decision.

---

68.     After sending that e-mail message at 5:18 pm on 6/28/17 about me, Ms. Rothenberg sent

another e-mail message on 6/29/17 at 9:43 am that appears on pages 361 and 362 in the 374-page

PDF file, is heavily redacted, and was also about me and town halls as confirmed by the subject

line in both of those e-mail messages.  That 6/29/17 9:43 am e-mail message was sent to the

following people:

Defendant Ramos, Mr. Carrion, Ricky Da Costa, Andrea Hagelgans, Eric Phillips, Mr. Redmond, Michael Casca, Kayla Arslanian, Emma Wolfe, Jeff Lynch, and Shauna Stribula

69.     I recorded Ms. Stribula on 4/27/17 in the immediate area of where I was near the entrance to the school that hosted the Mayor's 4/27/17 town hall as I was being illegally prevented from entering that school to have to resort to watching how that town hall was conducted on a television screen in an overflow room instead of within the room in which it was conducted after I was issued an admission ticket to access that overflow room by a female member of the Mayor's staff on 4/27/17 at that site. I recorded Ms. Stribula then largely because I observed her behaving in a manner that suggested that she was part of a criminal conspiracy that then existed between Mr. Redmond and Andrew Berkowitz of the Mayor's NYPD security detail as well as Harold Miller and Pinny Ringel of the Mayor's CAU to illegally prevent me from attending that town hall in violation of **a)** 18 U.S.C. §245(b)(5), 18 U.S.C. §241, NYPL §240.20, NYPL §240.26, NYPL §175.25, 5 U.S.C. §1502(a)(1), **b)** my constitutional rights, and **c)** other applicable laws.

70.     On 6/24/17, an eyewitness of mine sent an e-mail message at 4:26 pm to a whistleblower news censor in journalism named Graham Rayman who works for the New York Daily News about what that witness and I experienced on 6/8/17 as we tried to lawfully attend the Mayor's 6/8/17 town hall from within the room in which it was conducted as it was conducted. What follows shows **a)** the header section from that e-mail message without the sender's information and **b)** 2 excerpts from the body of that e-mail message. Since I previously agreed to respect that witness' privacy, I'm not disclosing the identity nor gender of that witness who then worked for the New York State Attorney General's office and I had just met by chance for the first time on 6/8/7. In that e-mail message, "the guard" refers to Defendant Gerola and the "Mayor's staff

member" refers to Ms. Stribula.

> **Subject:** Re: Information about police misconduct on 6/8 at Mayor's public town hall meeting in Rego Park
> **Date:** June 24, 2017 at 4:26:20 PM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Cc:** "Rayman, Graham" <grayman@nydailynews.com>
>
> a.  "I would just like to add that I was allowed to write my question on a card, after which the guard told me they would allow me in to ask the question after they reviewed it and people emptied the room. As the room emptied, they did not let me in saying that the room was full even though we saw empty seats in the TV screens. When I asked a Mayor's staff member why they wouldn't let me in, she explained it was because I was associated with Towaki and he was a "harasser", but did not explain anything else to me."
>
> b.  "I just met him that day. I also think maybe they did not let me in because they did not like my question which was about police accountability, but I'm not sure about that since I know someone else in the room was allowed to ask a question about broken windows policing. Also, please keep my name anonymous. Thanks."

71.    Contrary to a fraudulent remark that Ms. Stribula expressed to that witness that appears I that e-mail message by claiming that I was a "harasser", I was certainly a whistleblower against the Mayor's administration, the NYPD, HRA, Mr. Banks, and HRA's business partners then after I had been criminally harassed by members of the Mayor's NYPD security detail, other members of the NYPD, members of the Mayor's staff, HRA, and HRA's business partners leading up to that date at public forums and in other ways that enabled me to be viciously assaulted on 7/2/16. T hat 7/2/16 assault involved me having been brutally punched on my head near my left temple more than 15 times by my former roommate (Ronald Sullivan) in the living room of where I reside. That caused me to sustain a concussion that in turn cost me my ability to perform well during a job interview that I had on 8/18/16 for a job that offered to pay $450 daily. That assault was enabled by HRA having criminally and jointly subjected me to a bait-and-switch fraud and forgery with Urban that concerned the binding and fully-enforceable apartment

lease agreement that I signed on 2/16/16 in HRA's offices located at 33 Beaver Street in

Manhattan with Lisa Lombardi of Urban. I signed that agreement in front of witnesses to be

issued sole possession of apartment 4C in the building in which I reside with no roommate and in

a fully-furnished condition shortly thereafter

72.      Records that HRA has maintained about me and provided to me confirm that HRA

illegally altered that lease agreement within 2 days after I signed it. Urban's personnel thereafter

issued me a patently invalid and fraudulent lease on or about 3/7/16 that included a photocopy of

the signature page that was from the actual lease that I signed on 2/16/16. While doing so on or

about 3/7/16, Urban's personnel issued me shared possession of apartment 4B within the

building in which I reside that included a time bomb named Ronald Sullivan as a roommate.

HRA's records also confirm that I reported that illegal bait-and-switch fraud and forgery to HRA

on 3/16/16 prior to realizing that HRA illegally altered my lease within 2 days after I signed it. I

also met with HRA's ombudsman's staff on 3/10/16 in its offices located at 33 Beaver Street

during which I reported that illegal bait-and-switch fraud and forgery. However, HRA illegally

failed to remedy that that illegal bait-and-switch fraud and forgery that it criminally perpetrated

against me.

73.      Prior to assaulting me on 7/2/16 in the living room of our shared apartment, Mr. Sullivan

tried to do precisely that on 5/12/16 in that living room while we were in the immediate presence

of one of Urban's personnel named Thomas Fair. However, Mr. Fair physically restrained him as

he suddenly rushed toward me to assault me. He tried that right after he had been making verbal

threats to do so in Mr. Fair's presence. Although I promptly sent cell phone text messages on

5/12/16 to someone Molly McCracken to have her function as an intermediary between Urban

and I to convey my demands to Urban for it to immediately evict Mr. Sullivan because he just

proved that he was a clear threat to my safety where I resided, Ms. McCracken informed me that

my demands were rejected. Ms. McCracken then worked for an organization named Services for

the Services, Inc. ("SUS") that is a business partner of HRA. On 5/19/16, I had telephone

conversations with Ms. Lombardi and Ronald Abad of Urban to try to persuade them to

immediately evict Mr. Sullivan. They refused. Urban's personnel were required by applicable

law to immediately notify both HRA and OTDA in response to Mr. Sullivan's attempted assault

against me on 5/12/16 and his actual assault against me on 7/2/16. His 7/2/16 assault against me

was both foreseeable and preventable by them and Urban. Also, though 18 NYCRR §491.9(c)

prohibited Mr. Sullivan from residing in the building in which I reside without OTDA's approval

because of the threat that he posed to my comfort and safety in it, he was able to do so even after

he viciously assaulted me on 7/2/16 until I was finally issued an order of protection against him

on or about 10/6/6 by the Bronx District Attorney's office. In fact, the NYPD unconscionably

released Mr. Sullivan on 7/11/16 after arresting him then for having assaulted me on 7/2/16

where I reside.

74.     To wrap up this discussion of Mr. Sullivan, the Bronx District Attorney's office engaged

in prosecutorial misconduct as it prosecuted Mr. Sullivan for assaulting me on 7/2/16. It did so

by not presenting any witness other than me in that case in spite of the fact that Mr. Sullivan

made incriminating remarks to another tenant on 7/2/16 in the building I which I reside as Mr.

Sullivan fled from the building in which I reside. Mr. Sullivan told that witness that he had just

assaulted me in our apartment and described how he did so. The Bronx District Attorney's office

also engaged in misconduct by not pursuing an appeal as far as it could have of the arbitrary and

capricious ruling that Bronx Criminal Court Judge Cori Weston issued in the criminal case

against Mr. Sullivan for assaulting me on 7/2/16. That ruling suppressed information from an

admissible security log that was maintained by Urban's personnel who worked inside of the building in which I reside. Information in that log included remarks by Urban's personnel on 7/2/16 about the fact that they observed Mr. Sullivan appearing angry as he fled from the building in which he had just assaulted me. The Mayor appointed Cori Weston as a judge. Due to what I just discussed, Mr. Sullivan was fraudulently found not guilty by Judge Weston in February of 2017. _Johnson v. NYC HEALTH & HOSPS, 246 A.D.2d 88, 676 N.Y.S.2d 38, 676 N.Y.S. 38 (App. Div. 1998)_ established a precedent that confirmed that security logs are admissible evidence in criminal cases.

75.     What follows shows e-mail messages that I sent to and received from Graham Rayman on 6/28/17 that concerned a news article that he claimed he was working on that would be about my having been illegally prevented from attending public town hall and public resource fair meetings that the Mayor conducted with others since 4/27/17. Nothing was ever reported about that by him nor anyone else who then worked for the New York Daily News in spite of the fact that an eyewitness confirmed to him that it had occurred on 6/8/17 and Jessica Ramos confirmed to Ms. Durkin on 6/28/17 that it had occurred as she lied to Ms. Durkin about why it occurred. Mr. Rayman was then working with Ms. Durkin about that possible news article. Also, nothing was ever reported about that in spite of the fact that a photojournalist for the New York Daily News named Jefferson Siegel took photographs of me in front of the NYPD's headquarters for the news article that Mr. Rayman expressed to me that he was working on.

> **From:** "Rayman, Graham" <grayman@nydailynews.com>
> **Subject:** Re: My RSVP for 5/23 Bronx Resource Fair!
> **Date:** June 28, 2017 at 6:16:01 PM EDT
> **To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
>
> Ok thanks. Will continue working on it tomorrow.

Sent from my iPhone

On Jun 28, 2017, at 6:09 PM, Towaki_Komatsu <towaki_komatsu@yahoo.com> wrote:

By the way, I've got a video of NYPD Officer Gerola telling me on 4/27 after 10 pm that it was the Mayor's staff that was responsible for having kept me out of that event. Unfortunately, my phone was pointed at the ground as I accidentally recorded that video. Also, I then talked with both Nic Gulotta and Harold Miller of his staff to try to get an explanation about why I had been discriminated against by Redmond on 4/27. I met Harold Miller on 4/11 in Staten Island's Borough Hall after Mr. Banks lied to me outside that building.

On Jun 28, 2017, at 5:41 PM, Rayman, Graham <grayman@nydailynews.com> wrote:


Was it the resource fair you were barred from, or the mayor's Bronx town hall? Those were two separate events.


76.     Similarly, what follows shows an e-mail message that I received from Mr. Gartland on 7/16/17 at 3:31 pm as well as an e-mail message that I sent to him on that date at 3:26 pm. Mr. Gartland clearly expressed to me then that the New York Post was planning to issue a news report about my having been illegally barred from public forums since 4/27/17 that the Mayor and others had been conducting. However, neither he nor anyone else who then worked for the New York Post ever reported anything about that and wasted my time instead while proving to be useless.

**From:** Michael Gartland <mgartland@nypost.com>
**Subject:** Re: 4-27-17 audio clip of NYPD Officer Gerola (badge #: 6577) proving Jessica Ramos lied to Jill Jorgensen
**Date:** July 16, 2017 at 3:31:27 PM EDT
**To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>

We're planning a story for tomorrow. Pls keep your cell handy.


On Jul 16, 2017, at 3:26 PM, Towaki_Komatsu <towaki_komatsu@yahoo.com> wrote:

Hi Michael,

As discussed, attached is a video recording I accidentally recorded on 4-27-17 while talking with NYPD Officer Gerola at about 10:20 pm right outside of the school in Long Island City that hosted the Mayor's town hall on that date.

Although Mr. Gerola isn't seen in the video (except for his shoes and leg) because I didn't mean to be recording, he can be heard in it clearly expressing that the Mayor's staff controls who is allowed to attend his town halls. That remark directly contradicts Jessica Ramos' remark in Jill Jorgensen's article I shared with you.

Also, the video clip is part of a longer recording I made shortly after I was shoved 3 times in the chest by NYPD Officer Beato (badge #: 13326) of the 108th Precinct. Prior to shoving me, he illegally ordered me to move from where I legally stood on the sidewalk adjacent to that school in order to ask the Mayor from a sufficient distance away what he was willing to do about the fact that the head of his security detail (Howard Redmond) illegally subjected me to viewpoint discrimination by not letting me attend that town hall.

Since I was standing roughly 45 feet away from where the Mayor later left that building to ask him this question before Mr. Beato shoved me and Mr. Gerola let me stand within roughly 15 feet of him on April 11th in Staten Island, it was entirely clear I had a legal right to remain where I stood on the sidewalk to ask the Mayor my question.

People who witnessed Mr. Beato shoving me were Lieutenant Nieves, a 2nd ordinary NYPD officer, and Mr. Gerola.

Regards,

Towaki

Tel: 201-315-5484

77.     What I have discussed above about whistleblowing and litigation I engaged in were among other things that I intended to engage in protected whistleblowing and political speech and expression about that were of public concern while attending the Mayor's 9/14/17 town hall partly to try to prevent others from suffering similar hardships largely by trying to have those responsible for them to be immediately fired and criminally prosecuted.

78. Defendant Ramos communicated fraudulent pretexts to Ms. Durkin about why I was illegally

barred partly by members of the Mayor's NYPD security detail from attending public forums

that the Mayor conducted with others since 4/27/17 as she pointed out to Ms. Durkin in an e-

mail message that she sent to her on 6/28/17 at 3:27 pm that appears on pages 369 and 370 in

the 374-page PDF file that I would continue to be illegally barred from attending public town

hall meetings that the Mayor conducted with others with respect to my ability to attend them

from within the rooms in which they would be conducted as they were conducted. A relevant

excerpt from that e-mail message in which Ms. Ramos stupidly and blatantly lied by

claiming that I never registered ("RSVP'd) to attend a town hall that the Mayor conducted

appears next. That practice indisputably was illegal "pre-emptive censorship" and a prior

restraint against my constitutional rights.

**From:** Ramos, Jessica
**Sent:** Wednesday, June 28, 2017 3:27 PM
**To:** Erin Durkin
**Cc:** Phillips, Eric
**Subject:** RE: town halls

Hi Erin,

Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.

79.     The use of such fraudulent pretexts by despicable criminals that include Defendant

Ramos, members of the NYPD, and others to violate the constitutional rights of members of the

public that include members of the press relates to why the decisions that were issued in *Karem*

*v. Trump*, No. 19 Civ. 2514 (D.D.C. Sep. 3, 2019), *Cable News Network, Inc. v. Trump*, No. 18

Civ. 2610 (D.D.C. Nov. 16, 2018), and *Nicholas v. Bratton*, No. 15-CV-9592 (JPO) (S.D.N.Y.
May 23, 2019).  Those court decisions concerned fraudulent pretexts that were employed by the
White House and NYPD to violate the First Amendment, Fifth Amendment, and Fourteenth
Amendment rights of journalists named Brian Karem, Jim Acosta, and Jason Nicholas in regards
to their ability to use press credentials partly to gain access to meetings conducted by despicable
government officials who **a)** disavow civil rights, **b)** benefit from voter fraud and voter
suppression and **c)** are devoid of values and integrity. Ultimately, Donald Trump, the White
House, and the NYPD lost and otherwise relented in response to those lawsuits by returning
press credentials to Mr. Karem, Mr. Acosta, and Mr. Nicholas. Press credentials are functionally
equivalent to admission tickets that are issued to members of the public that grant them access to
town hall meetings that the Mayor conducts within the rooms in which they're conducted. In
particular, findings in *Nicholas v. Bratton*, No. 15-CV-9592 (JPO) (S.D.N.Y. Feb. 27, 2017) is
quite pertinent because it discusses both a fraudulent pretext that the NYPD used against Mr.
Nicholas and his contention that that practice amounted to "pre-emptive censorship" against him.

## LEGAL STANDARDS AND ADDITIONAL BACKGROUND FACTS

1.  I incorporate by reference the statements that I made in all of the preceding paragraphs as
    though fully set forth herein.

2.  The following excerpts from *Brown v. Board of Regents of University of Nebraska*, 640
F. Supp. 674 (D. Neb. 1986) and *Nichols v. Hager*, No. 3: 04-CV-0559-LRH-LRL (D. Nev. Aug.
1, 2012) confirm that I had a First Amendment right to have attended the Mayor's 9/14/17 town
hall from within the room in which it was conducted shortly before it began, as it was conducted,
and shortly after it ended:

   ***Brown v. Board of Regents of University of Nebraska***:

"The First Amendment not only safeguards free speech and press, but public places for purposes of expressive activity. A constitutional right of access to a public forum is guaranteed to all."

***Nichols v. Hager*, No. 3: 04-CV-0559-LRH-LRL (D. Nev. Aug. 1, 2012)**:

"Nichols has thus shown sufficient evidence that her constitutional right to attend a public meeting was violated."

3.      To honor Ruth Bader Ginsburg's legacy in the wake of her having recently passed away, I'll next discuss remarks that she and former fellow U.S. Supreme Court Justice Antonin Scalia made on 4/17/14 about what the First Amendment stands for as both of them were being interviewed by a journalist. Their remarks during that interview are shown and heard in a video recording on C-Span's web site in a report that is entitled, "Justices Scalia and Ginsburg on the First Amendment and Freedom". That report and video recording is available on the Internet at https://www.c-span.org/video/?318884-1/conversation-justices-scalia-ginsburg-2014. At the elapsed time of 9 minutes and 57 seconds in that video, Justice Ginsburg made the following remarks about the First Amendment:

"This says, "Congress shall make no law abridging the freedom of speech or of the press" so it's…it's directed to government and it says, "Government, hands off. These rights already exist and you must not touch them.""

4.      The next screenshot is from that video and shows Justice Ginsburg as she made the preceding remarks:



5.      At the elapsed time of 19 minutes and 6 seconds in that video, Justice Scalia made the

following remarks about the First Amendment:

> "I think if you had to pick…and you probably shouldn't have to….but if you had to pick
> one freedom that was…that is the most essential to the, uh…functioning of a democracy,
> it has to be freedom of speech because democracy means persuading one another and
> uh…and then ultimately voting and the majority…the majority rules. You can't run such
> a system if uh…if if …there is uh…muzzling of uh…one point of view. So, it's a
> fundamental freedom in a democracy…much more necessary in a democracy than in any
> other system of government. I guess you could run an effective monarchy without
> freedom of speech. I don't think you could run an effective democracy without it."

6.      The next screenshot is from that video and shows Justice Scalia as he made the preceding

remarks:



7.      The discussion that follows addresses critically significant remarks that former Second

Circuit Judge Christopher Droney stated on 3/26/19 during the oral arguments hearing that was

conducted in _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2019) as

he was recorded on video while making them. Athough the findings that were expressed in the

written decisions that were issued in _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d

226 (2d Cir. 2019) and _Knight First Amendment Institute v. Trump_, 302 F. Supp. 3d 541

(S.D.N.Y. 2018) focused on public forums that exist through the use of Twitter, much of what

was discussed during the oral arguments hearings in those cases addressed public forums that are

conducted in the physical world that include town hall meetings that are conducted inside of

schools. In fact, _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2020)

confirmed that people have and have had a legal right to attend public forums that occur in the

real world apart from Twitter and other social media platforms. The following are a pair of

relevant excerpts from that decision:

a. "A simple analogy to physical public fora makes it clear that the distinction between a tweet and its interactive space is appropriate: **at a town hall meeting held by public officials, statements made by the officials are protected government speech. If, however, public comment is allowed at the gathering—as it is on any tweet posted to the Account—the officials may not preclude persons from participating in the debate based on their viewpoints**. Significantly, that discrimination is impermissible even when the public forum is limited and is "of [the State's] own creation." *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place")."

(boldface formatting added for emphasis)

b. "Excluding people from an otherwise public forum such as this by blocking those who express views critical of a public official is, we concluded, unconstitutional viewpoint discrimination."

8. The Second Circuit's decision in *Knight First Amendment Inst. Columbia v. Trump*, 928 F.3d 226 (2d Cir. 2020) was based upon the earlier decision that it issued in it as well as the decision that U.S. District Judge Norma Reice Buchwald issued in it at the district court level. The term "town hall" appears no less than **11 times** in the written transcript that was prepared from the oral hearing that Judge Buchwald conducted on 3/8/18 in *Knight First Amendment Institute v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) before she issued her 5/23/18 decision in that case.

9. The discussion that follows addresses the oral arguments hearing that the Second Circuit conducted on 3/26/19 in *Knight First Amendment Inst. Columbia v. Trump*, 928 F.3d 226 (2d Cir. 2019) as C-Span recorded that hearing on video. That video recording has accurate closed-captioning available for its playback and is available on the Internet at https://www.c-span.org/video/?459092-1/circuit-hears-oral-argument-presidents-twitter-account-case. The following remark that former Second Circuit Judge Christopher Droney made about First Amendment rights in public forums that exist in such places as streets, sidewalks, and parks

instead of the Internet during that oral arguments hearing was recorded at the elapsed time of 13

minutes and 2 seconds in that video:

> "For the First Amendment, it doesn't really have to be much more burdensome. If it's
> more burdensome at all, if you have to move down the street, that violates the First
> Amendment."

10.     What follows are 4 screenshots from that video as I played it back with closed-captioning

turned on that show Judge Droney as he made the remarks that correspond to the preceding

excerpt and is otherwise heard making them as the video camera that recorded that hearing

turned away from him as he made those remarks. Those screenshots and Judge Droney's

statements during that hearing that apply to them, the First Amendment, public forums, and

being coerced to move down the street in regards to efforts that are taken to lawfully attend

public forums from within the rooms in which they are conducted as they are conducted confirm

that defendants in this action illegally prevented me from attending the Mayor's 9/14/17 town

hall as they subjected me to illegal segregation and discrimination in violation of my rights

pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth

Amendment, New York State's Open Meetings Law, and other applicable laws in relation to my

efforts to lawfully attend the Mayor's 9/14/17 town hall. One of the ways that they did so was by

having illegally coerced me to move away from where I was lawfully waiting in a line with other

members of the public on 9/14/17 to be granted access to the public school that hosted the

Mayor's 9/14/17 town hall to attend that town hall from within the room in which it was

conducted. I recall having arrived to the site of that town hall on 9/14/17 sufficiently early and

prior to 6:15 pm that enabled me to wait near the front of that line for that purpose before that

town hall began.









11.     Prior to becoming a judge of the Second Circuit, Denny Chin was the U.S. District Judge

who issued the decision in *Million Youth March, Inc. v. Safir*, 63 F. Supp. 2d 381 (S.D.N.Y.

1999) that was commenced in response to decisions that were made by the Mayor's CAU in

relation to **demonstrators** who sought to exercise their First Amendment rights in a public forum

in New York City. Judge Chin addressed standard discretion to violate First Amendment rights

and viewpoint discrimination in that decision. That decision was issued more than 20 years

before members of the Mayor's CAU that is comprised of both members of the NYPD and

members of the Mayor's office resumed committing flagrantly illegal acts and omissions as they

did so against me on and after long after 4/27/17 that violated my constitutional rights and other

applicable laws in relation to my efforts to lawfully attend public town hall and public resource

fair meetings within the rooms in which they were conducted as they were conducted that

members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and

other City of New York and State of New York personnel as public forums. The following is a

relevant excerpt from that decision about illegal prior restraints that were imposed on those

demonstrators that led to them being granted an injunction against the NYPD to allow them to

exercise their constitutional rights in a public forum:

> "The right to free speech, however, applies not only to politically correct statements but
> also to statements that we may disagree with and that, indeed, we may abhor. At least as
> frightening as the rhetoric of Mr. Muhammad is the possibility of a society where
> freedom of speech is not respected, and where the right to speak publicly can be denied
> on the basis of administrative whim, personal dislike, or disapproval of anticipated
> content."

> MYM's motion for a preliminary injunction is granted to the extent ordered by the
> Second Circuit last year in _Million Youth March, Inc. v. Safir,_ 155 F.3d 124, 126 (2d
> Cir.1998)."

12.     The following is a relevant excerpt from the related decision that the Second Circuit

issued in _Million Youth March, Inc. v. Safir_, 155 F.3d 124 (2d Cir. 1998) in which it also briefly

addressed standardless discretion to violate First Amendment rights.

> In granting the injunction, the District Court properly recognized that "any permit
> scheme controlling the time, place, and manner of speech must not be based on the
> content of the message, must be narrowly tailored to serve a significant governmental
> interest, and must leave open ample alternatives for communication." _Forsyth County
> v. Nationalist Movement,_ 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).
> The District Court found as a fact that the City denied the plaintiff's application in the
> exercise of authority pursuant either to the so-called "Activity Rules" of the Street
> Activity Permit Office of the Community Affairs Unit of the Office of the Mayor or a
> combination of the Activity Rules and the parade permit rules of Section 10-110 of
> the New York City Administrative Code. The Court also concluded that the Activity
> Rules accorded administrators unfettered discretion contrary to well established First
> Amendment limitations. _See Shuttlesworth v. City of Birmingham,_ 394 U.S. 147, 89
> S.Ct. 935, 22 L.Ed.2d 162 (1969). Since the City's denial was issued by the

> Community Affairs Unit, without any reference to Section 10-110, the record plainly supports the finding that the Activity Rules were either the exclusive authority invoked for the denial of the application or at least a substantial part of such authority. At this stage of the litigation, we have no basis to question the Court's conclusion that the standardless nature of the Activity Rules rendered the denial a violation of the First Amendment.

13.     *Kittay v. Giuliani*, 112 F. Supp. 2d 342 (S.D.N.Y. 2000) explicitly states "that individuals have a right to communicate directly to government officials". Acts and omissions that are committed by government personnel that prevent people from attending public forums by being in the same room as government officials with whom they then seek to exercise their rights pursuant to the First Amendment and Fourteenth Amendment to "communicate directly to government officials" directly violates this finding from *Kittay v. Giuliani* because such illegal prior restraints on First Amendment rights of peaceable assembly, expressive association, speech and other forms of expression, petitioning for redress, and receiving information illegally block direct communication with government officials by those who are barred from such rooms.

14.     *Citizens United v. Schneiderman*, 203 F. Supp. 3d 397 (S.D.N.Y. 2016) addressed illegal prior restraints on First Amendment rights as follows:

> "A prior restraint on speech violates the First Amendment if it places "unbridled discretion in the hands of a government official or agency." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)."

15.     In *Elrod v. Burns*, 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976), the U.S. Supreme Court stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury".

16.     The following excerpt from *Hartman v. Moore*, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006) confirms that government personnel are prohibited from subjecting people to reprisals in response to protected conduct:

> "Official reprisal for protected speech "offends the Constitution [because] it threatens

to inhibit exercise of the protected right," *Crawford-El v. Britton,* 523 U. S. 574, 588, n. 10 (1998), and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out, *id.,* at 592; see also *Perry* v. *Sindermann,* 408 U. S. 593, 597 (1972) (noting that the government may not punish a person or deprive him of a benefit on the basis of his "constitutionally protected speech"). Some official actions adverse to such a speaker might well be unexceptionable if taken on other grounds, but when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution. See *Crawford-El, supra,* at 593; *Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S. 274, 283-284 (1977)"

17.     Findings in *Piesco v. City of New York, Dept. of Personnel*, 933 F.2d 1149 (2d Cir. 1991)

and *Hampton Bays Connections, Inc. v. Duffy*, 127 F. Supp. 2d 364 (E.D.N.Y. 2001) explicitly

confirm that all of the following are constitutionally protected activities:

  a.     Commencing Article 78 proceedings and attending public meetings and hearings.

  b.     Circulating a petition.

  c.     Testifying to a government body while engaging in a free discussion of

         governmental affairs that was partly about the manner in which government

         should be operated instead of how it was being operated.

  d.     Appealing a decision by a city agency.

  e.     Petitioning for government reforms.

  f.     Appealing the denial of public assistance benefits.

18.     The following excerpt from *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117

S. Ct. 2329, 138 L. Ed. 2d 874 (1997) relates to how protected speech of public concern that I

engaged in and sought to continue to engage in against the Mayor, Mr. Banks, HRA, HRA's

business partners that include Urban and NTT, the Mayor's NYPD security detail, other

members of the NYPD, other government personnel, whistleblower news censors in journalism,

OTDA, Judge Bannon and other judges, New York State court officers could be amplified by

having me attend public forums that the Mayor and other government officials conducted on and after 3/15/17 while they were recorded on video that was broadcast over the Internet, attended by members of the public who took photographs and recorded video recordings while doing so and otherwise reported about what was discussed during them, and attended by members of the press who reported about matters that were discussed during them:

> "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer. As the District Court found, "the content on the Internet is as diverse as human thought." 929 F. Supp., at 842 (finding 74). We agree with its conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium."

19.     The following are relevant excerpts from _Piesco v. City of New York, Dept. of Personnel_ that underscore what I have discussed above:

> a.     A statement that is made about the competency of a police officer "clearly is a matter of public concern" because "the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry".
>
> b.     "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, _the manner in which government is operated or should be operated_, and all such matters relating to political processes."
>
> c.     "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government."
>
> d.     The "first amendment guarantees that debate on public issues is "`uninhibited, robust, and wide open'".
>
> e.     Speech "on matters of public concern is that speech which lies `at the heart of the First Amendment's protection'".
>
> f.     "A court is required to accept as true a plaintiff's allegation that retaliatory actions by the City of New York were precipitated by prior testimony he or she gave to a committee."

g.    "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations."

h.    Summary "judgment is inappropriate when `questions of motive predominate in the inquiry about how big a role" "protected behavior played in" causing an adverse action to occur.

20.    The following excerpt from _McCutcheon v. Federal Election Com'n_, 134 S. Ct. 1434, 572 U.S. 185, 188 L. Ed. 2d 468 (2014) also addresses illegal prior restraints on First Amendment rights:

a.    "The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, ... in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." _Cohen v. California,_ 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). As relevant here, the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association. See _Buckley,_ 424 U.S., at 15, 96 S.Ct. 612."

b.    "First Amendment rights are important regardless whether the individual is, on the one hand, a "lone pamphleteer[] or street corner orator[] in the Tom Paine mold," or is, on the other, someone who spends "substantial amounts of money in order to communicate [his] political ideas through sophisticated" means. _National Conservative Political Action Comm.,_ 470 U.S., at 493, 105 S.Ct. 1459. Either way, he is participating in an electoral debate that we have recognized is "integral to the operation of the system of government established by our Constitution." _Buckley, supra,_ at 14, 96 S.Ct. 612."

21.    The following excerpt from _New York Times Co. v. United States_, 403 U.S. 713, 91 S. Ct. 2140, 29 L. Ed. 2d 822 (1971) addresses illegal prior restraints on First Amendment rights:

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." _Bantam Books, Inc._ v. _Sullivan,_ 372 U. S. 58, 70 (1963); see also _Near_ v. _Minnesota,_ 283 U. S. 697 (1931). The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." _Organization for a Better Austin_ v. _Keefe,_ 402 U. S. 415, 419 (1971). The District Court for the Southern District of New York in the _New York Times_ case and the District Court for the District of Columbia and the Court of Appeals for the District of Columbia Circuit in the _Washington Post_ case held that the Government had not met that burden. We agree."

22.   The following is a relevant excerpt from *Doe v. City of New York*, No. 18-cv-670

(ARR)(JO) (E.D.N.Y. Jan. 9, 2020) that confirms that I had a First Amendment right to criticize

all government personnel who were at the site of the Mayor's 9/14/17 town hall without being

retaliated against for doing so:

> ""[t]he right to criticize public officials is at the heart of the First Amendment's right of
> free speech." *Kaluczky v. City of White Plains,* 57 F.3d 202, 210 (2d Cir. 1995) (citing
> *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 282 (1964)). Indeed, the "right to criticize the
> police without reprisal" is "clearly" an "interest protected by the First Amendment,"
> *Kerman v. City of New York,* 261 F.3d 229, 241-42 (2d Cir. 2001), as "[t]he First
> Amendment protects a significant amount of verbal criticism and challenge directed at
> police officers[,]" *id.* at 242 (quoting *City of Houston v. Hill,* 482 U.S. 451, 461 (1987)).
> Thus, on summary judgment, the Second Circuit has held that a plaintiff established a
> First Amendment retaliation claim when he proffered facts showing that police officers
> retaliated against him for making derogatory comments to the officers and for threatening
> to sue them. *Kerman,* 261 F.3d at 241-42.[3]""

23.   The following excerpt from *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226 (E.D.N.Y.

2009) reinforces the preceding findings from *Doe v. City of New York*:

> "Plaintiff must first allege that she engaged in protected activity to state a First
> Amendment claim of retaliation. The First Amendment protects the right of access to
> the courts, and an individual's right to complain to public officials. *Lewis v. Casey,*
> 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (right of access); *Monsky
> v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) (right of access); *Patriots Way, LLC v.
> Marconi,* 2007 WL 988712 *4 (D.Conn.2007); *see Colondres v. Scoppetta,* 290
> F.Supp.2d 376, 381 (E.D.N.Y.2003) (right of access is "bound up" with the First
> Amendment right to petition the government); *Gagliardi,* 18 F.3d at 194-95 (right to
> complain to public officials protected by First Amendment). These First Amendment
> rights include the right to be free from retaliation for their exercise. *Colondres,* 290
> F.Supp.2d at 382; *see Patriots Way,* 2007 WL 988712 *6."

24.   *Hershey v. Kansas City Kansas Community College*, No. 2: 16-cv-2251-JTM (D. Kan.

Feb. 17, 2017) includes the following findings about standardless discretion that is used to

violate constitutional rights at public forums and confirms that those who are denied access to a

public forum in violation of their constitutional rights as a result of standardless discretion aren't

required to establish that he or she was discriminated against in that way because of the content

of his or her expression with respect to the First Amendment:

> "Because plaintiff has alleged that access to the public forum is based on "standardless discretion" of College officials, he need not show that he was discriminated against based on the content of his materials. **A government regulation that allows arbitrary application is `inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'"** Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 130 (1992)"

> (boldface formatting added for emphasis)

25.  *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001) also addresses standardless

discretion as follows:

> "Courts have also been reluctant to accept policies based on subjective or overly general criteria. "`[S]tandards for inclusion and exclusion' in a limited public forum `must be unambiguous and definite' if the `concept of a designated public forum is to retain any vitality whatever.'" *Christ's Bride,* 148 F.3d at 251 (quoting *Gregoire v. Centennial Sch. Distr.,* 907 F.2d 1366, 1375 (3d Cir.1990)). Absent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship. *See Board of Educ. v. Mergens,* 496 U.S. 226, 244-45, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (generalized definition of permissible content poses risk of arbitrary application); *Putnam Pit, Inc. v. City of Cookeville,* 221 F.3d 834, 845-46 (6th Cir.2000) ("broad discretion [given] to city officials [raises] possibility of discriminatory application of the policy based on viewpoint"); *Cinevision Corp. v. City of Burbank,* 745 F.2d at 560 (9th Cir.1984) (vague standard has "potential for abuse"); *Gregoire,* 907 F.2d at 1374-75 ("virtually unlimited discretion" granted to city officials raises danger of arbitrary application); *see also City of Lakewood v. Plain Dealer Publ. Co.,* 486 U.S. 750, 758-59, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (absence of express standards in licensing context raises dual threat of biased administration of policy and self-censorship by licensees). Therefore, "the more subjective the standard used, the more likely that the category will not meet the requirements of the first amendment." *Cinevision,* 745 F.2d at 575; *see also Christ's Bride,* 148 F.3d at 251 (suppression of speech under defective standard requires closer scrutiny)."

26.  In *Matal v. Tam*, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017), the U.S. Supreme

Court stated the following about viewpoint discrimination:

> "Giving offense is a viewpoint. The "public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572. Pp. 1761-1764.

27.  On a related note, the following findings that the Second Circuit issued in *Ragbir v.*

_Homan_, 923 F.3d 53 (2d Cir. 2019) address viewpoint discrimination and acts committed by

government personnel against a leading activist named Ravidath Ragbir in retaliation for efforts

that he undertook to try to attract news coverage against ICE:

> ""It is a fundamental principle of the First Amendment that the government may
> not punish or suppress speech based on disapproval of the ideas or perspectives
> the speech conveys." _Matal v. Tam,_ ____ U.S. ____, 137 S.Ct. 1744, 1765, 198
> L.Ed.2d 366 (2017). "Such discriminat[ion] based on viewpoint is an `egregious
> form of content discrimination,' which is `presumptively unconstitutional.'"[24]
> _Id._ at 1766 (quoting _Rosenberger v. Rector & Visitors of Univ. of Va.,_ 515 U.S.
> 819, 829-30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). The Supreme Court has
> further described viewpoint discrimination as a "blatant" "violation of the First
> Amendment." _Rosenberger,_ 515 U.S. at 829, 115 S.Ct. 2510.
>
> Ragbir's plausible allegations and evidence, which we must accept as true at this
> juncture, support that the Government singled him out for deportation based not
> only on the viewpoint of his political speech, but on the public attention it
> received. In a declaration by Micah Bucey, a New York City minister, Bucey
> asserts that ICE's New York City Field Office Director, Scott Mechkowski, stated
> that Ragbir and Jean Montrevil were ICE's two most prominent cases in New
> York City and complained that the activists' protests and comments to the press
> negatively portrayed ICE to the public and to others in the Government.
> According to Bucey, Mechkowski stated: "Nobody gets beat up in the news more
> than we do, every single day. It's all over the place, ... how we're the Nazi squad,
> we have no compassion." App'x 252. Mechkowski then stated that he had heard
> Ragbir's New Sanctuary cofounder Montrevil (whom ICE had also just detained)
> "ma[ke] some very harsh statements. I'm like, `Jean, from me to you... _you don't
> want to make matters worse by saying things._" App'x 252 (emphasis added).
> Mechkowski then turned to Ragbir specifically, stating that it "bother[ed]" him
> that "there isn't anybody in this entire building that doesn't ... know about Ravi."
> App'x 253. "Everybody knows this case," Mechkowski stated, "[n]o matter where
> you go." App'x 253. Ragbir's counsel Alina Das also submitted a declaration
> stating that she spoke with Mechkowski, who expressed "resentment" about the
> events of the March 9, 2017 check-in and disapprovingly mentioned that he had
> heard Ragbir's statements to the press. App'x 55-56, 123.
>
> A plausible, clear inference is drawn that Ragbir's public expression of his
> criticism, and its prominence, played a significant role in the recent attempts to
> remove him."

28.    The following are a pair of excerpts from _Elrod v Burns,_ 427 US 347 (1976) about First

Amendment rights that include the right to lawfully assemble in a public forum that

include town hall meetings, public resource fair meetings, and public hearings:

a.     "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

b.     "The timeliness of political speech is particularly important. See *Carroll v. Princess Anne*, 393 U. S. 175, 182 (1968); Wood v. Georgia, 370 U. S. 375, 391-392 (1962)."

29.     The following is a relevant excerpt from *Walsh v. Enge*, 154 F. Supp. 3d 1113 (D. Or. 2015) that makes it clear that the judge who issued it refused to accept the practice of prospectively barring someone from public forums without due process being accorded:

"This case requires the Court to decide whether the First Amendment allows a Mayor or his or her designee, acting pursuant to a city ordinance, to exclude a person, potentially indefinitely, from attending future City Council meetings to which the public is otherwise invited to attend and present their opinions simply because the person has been disruptive at previous meetings. The First Amendment protects, among other things, "freedom of speech" and "petitioning for a governmental redress of grievances." U.S. Const. amend. I. The First Amendment is incorporated into the Fourteenth Amendment and thus applies to the states and local governmental bodies. *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). No appellate opinion of which this Court is aware has ever held that the First Amendment permits prospective exclusion orders from otherwise public city council meetings. A presiding officer may remove a disruptive individual from any particular meeting, and a sufficiently disruptive person may even be prosecuted for such conduct if public law permits. But no matter how many meetings of a city council a person disrupts, he or she does not forfeit or lose the future ability to exercise constitutional rights and may not be prospectively barred from attending future meetings. Our democratic republic is not so fragile, and our First Amendment is not so weak."

30.     The following is a pertinent excerpt from *In re Kaiser,* 722 F.2d 1574 (2d Cir. 1983) about mendacity that is particularly applicable to my claims in this pleading and lies that Ms. Ramos expressed to Ms. Durkin about me in e-mail messages that appear in the 374-page PDF file:

"the cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required"

31.     The following excerpt from *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct.

2742, 125 L. Ed. 2d 407 (1993) further discusses mendacity in the context of discriminatory

intent:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination,[4] and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required*, " 970 F. 2d, at 493 (emphasis added). But the Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the "ultimate burden of persuasion.""

32.     The following is a pertinent excerpt from *Regional Economic Community v. City of*

*Middletown*, 294 F.3d 35 (2d Cir. 2002) that concerns discriminatory intent and how it may be

inferred:

> "Discriminatory intent may be inferred from the totality of the circumstances, including ... the historical background of the decision ...; the specific sequence of events leading up to the challenged decision ...; [and] contemporary statements by members of the decision-making body...." *LeBlanc,* 67 F.3d at 425 (citations and internal quotation marks omitted)."

33.     *Nicholas v. Bratton,* No. 15-CV-9592 (JPO) (S.D.N.Y. Mar. 26, 2019) includes the

following finding that concerns the right to engage in discovery by obtaining non-redacted

copies of e-mail messages in order to uncover discriminatory intent and fraudulent pretexts:

> "The Court previously ordered that portions of the email chain at Docket Number 188-24, referred to by the Parties as "Exhibit 27," be redacted and filed under seal. (*See* Dkt. Nos. 189, 192.) "Because of the importance of th[is] sealed material to [the] disposition of this matter, [the Court] order[s] that [this email chain now] be unsealed." *Cox v. Onondaga Cty. Sheriff's Dep't,* 760 F.3d 139, 150 (2d Cir. 2014).

34.     In *Trump v. Vance*, 591 S. Ct. (U.S. 2020), the U.S. Supreme Court stated the following

about discovery:

> "In our judicial system, "the public has a right to everyman's evidence.""

35.   *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d

346 (1976) includes the following relevant findings about the mutual right to communicate and

receive information from speakers that applies to the Mayor's 9/14/17 town hall in relation to my

efforts to have attended it within the room in which it was conducted and communicated quietly

in a non-disruptive manner with those who would have otherwise been seated near me and been

willing to do so with me before that town hall began, as it was conducted, and shortly after it

ended as well as my right to have talked with government officials in that room shortly after that

town hall ended:

   a.   "we acknowledged that this Court has referred to a First Amendment right to
        "receive information and ideas," and that freedom of speech " `necessarily
        protects the right to receive.'"

   b.   "Freedom of speech presupposes a willing speaker. But where a speaker exists, as
        is the case here,[14] the protection afforded is to the communication, to its source
        and to its recipients both. This is clear from the decided cases."

36.   *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939)

confirms that people have a First Amendment to peaceably assemble and distribute literature in a

public forum when and where they choose to do so in the absence of a government restriction

that is objectively valid in stark contrast to a self-serving and fraudulent pretext manufactured by

the NYPD and Mayor's office to prevent and otherwise minimize criticism for the sake of optics.

37. The following is an excerpt from *Karem v. Trump*, No. 19-CV-5255 (D.C. Cir. June 5, 2020)

   that addressed what is required of due process in the context of a denial of access to

   government officials through the revocation of a press credential:

        "A fundamental principle in our legal system," the Supreme Court observed in *FCC
        v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), "is that laws which regulate
        persons or entities must give fair notice of conduct that is forbidden or required." *Id*.
        at 253. Such "[e]lementary notions of fairness," the Court explained in *BMW of North
        America, Inc. v. Gore*, 517 U.S. 559 (1996), "dictate that a person receive fair notice
        not only of the conduct that will subject him to punishment, but also of the severity of

the penalty that [the government] may impose." *Id.* at 574. "This requirement of clarity[,] . . . essential to the protections provided by the Due Process Clause of the Fifth Amendment," *Fox Television*, 567 U.S. at 253, "is implicated" whenever the government imposes "civil penalties," *Gore*, 517 U.S. at 574 n.22 (emphasis omitted). Where such penalties "threaten[] to inhibit the exercise of constitutionally protected rights[,] . . . a more stringent vagueness [and fair-notice] test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).

That "essential . . . protection[]" of fair notice applies here. *Fox Television*, 567 U.S. at 253. As we explained in *Sherrill*, "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." 569 F.2d at 130–131. And because "any deprivation" of a protected liberty interest must "be effected pursuant to constitutionally adequate procedures," *Brandon v. District of Columbia Board of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987), a duly issued hard pass may not be suspended without due process. Accordingly, "[e]lementary notions of fairness" required that Karem "receive fair notice not only of the conduct that [would] subject him to punishment, but also of the . . . magnitude of the sanction that [the White House] might impose." *Gore*, 517 U.S. at 574. Furthermore, because the suspension of a hard pass, like the denial of a hard pass, "implicate[s]" "important first amendment rights," *Sherrill*, 569 F.2d at 130, we evaluate Karem's suspension under a particularly "stringent vagueness [and fair-notice] test," *Village of Hoffman Estates*, 455 U.S. at 498–99.

Applying that test, we think Karem's due process claim is likely to succeed because, on this record, nothing put him on notice of "the magnitude of the sanction"—a month-long loss of his White House access, an eon in today's news business—that the White House "might impose" for his purportedly unprofessional conduct at the non-press-conference event. *Gore*, 517 U.S. at 574.

38.     The following pertinent excerpt from the U.S. Supreme Court's decision in <u>Buckley v. American Constitutional Law Foundation, Inc.,</u> 525 U.S. 182, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999) that concerns whistleblowing, government accountability, and transparency:

"[a] public armed with information . . . is better able to detect" wrongdoing. See *id.,* at 67; see also <u>Grosjean</u> v. <u>American Press Co.,</u> 297 U. S. 233, 250 (1936) (observing that an "informed public opinion is the most potent of all restraints upon misgovernment"). "'Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.' " <u>Buckley v. Valeo, supra,</u> at 67, and n. 80 (quoting L. Brandeis, Other People's Money 62 (1933))."

39. The following are relevant excerpts from <u>Housing Works, Inc. v. Turner</u>, 00 Civ. 1122

(LAK)(JCF) (S.D.N.Y. Sept. 15, 2004) that address proving retaliation and violations of equal protection:

a. "A plaintiff's circumstantial evidence of retaliation could include the timing of the defendant's actions, such as when the alleged retaliation closely follows the plaintiff's speech. Morris, 196 F.3d at 110; McCullough v. Wyandanch Union Free School District, 187 F.3d 272, 280 (2d Cir. 1999). The plaintiff can also proffer evidence of unequal treatment, or an ongoing campaign of retaliation. Hampton Bays Connections, Inc. v. Duffy, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001); Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000) (citing Gagliardi v. Village of Pawling, 18 F.3d 188, 195 (2d Cir. 1994))."

b. "To prove an Olech-type equal protection claim, the plaintiff must show that there was "no rational basis" for the differential treatment it suffered. Wantanabe, 315 F. Supp. 2d at 396. The Second Circuit has not decided whether an Olech claim also requires a showing a illicit motive or intent on the part of the defendant."

40.    *Housing Works, Inc. v. Turner* was a case that was partly about First Amendment retaliation that senior HRA personnel allegedly committed in response to an Article 78 proceeding that was commenced against HRA and complaints that were reported against HRA. My claims in this action are similarly about First Amendment retaliation that I experienced at the Mayor's 9/14/17 town hall that was partly conducted by Mr. Banks while I had ongoing litigation against HRA that was a hybrid proceeding that was comprised of article 78 claims and plenary claims.

41.    In its decision in *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2000), the Second Circuit confirmed that a plaintiff can prevail with claims about agents who engage in retaliation explicitly or implicitly upon the orders of a superior in response to a plaintiff's protected activities while such agents don't necessarily need to know about a plaintiff's protected activities while subjecting a plaintiff to adverse treatment. The following relevant excerpt from that decision clarifies and confirms this:

"The lack of knowledge on the part of particular *individual agents* is admissible as some

evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment. *See Alston,* 14 F.Supp.2d at 312-13. A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge. *See id.* at 311. This is so, moreover, regardless of whether the issue of causation arises in the context of plaintiff's satisfaction of her *prima facie* case or as part of her ultimate burden of proving that retaliation "played a motivating role in, or contributed to, the employer's decision." *Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 222 (2d Cir.1997)

Accordingly then, to the extent that the district court charged the jury that the very *agents* of the Board who engaged in retaliatory actions against Gordon had to know of her protected activity, it erred."

42.     In the relevant excerpt shown next that is from *Henry v. Wyeth Pharmaceuticals, Inc.,* 616 F.3d 134 (2d Cir. 2010), the Second Circuit cited *Gordon v. New York City Bd. of Educ.* as it reinforced its findings. Of particular significance in *Henry v. Wyeth Pharmaceuticals, Inc.* is the fact that it confirms that it's not necessary for supervisor who has knowledge of a plaintiff's protected activities" to have ordered an agent to impose an adverse action against a plaintiff in response to protected activities that plaintiff engaged in. Instead, that case confirms that a causal connection is sufficiently demonstrated if an agent who decides to impose an adverse action against a plaintiff but is ignorant of the plaintiff's protected activity acts pursuant to encouragement by a superior (who has knowledge of a plaintiff's protected activities) to disfavor the plaintiff.

We believe the court erred in this instruction. In *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000), we stated, "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." We then rejected the argument that in order to satisfy the causation requirement, a plaintiff must show that the particular individuals who carried out an adverse action knew of the protected activity. *Id.* at 117. Instead, we indicated that a jury may

find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting

explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.

*Id. See also Gorman-Bakos v. Cornell Coop Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001) (noting that a plaintiff can establish causation by showing protected activity was closely followed in time by adverse employment action); *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 210 (2d Cir.2006).

*Gordon* directly addressed the situation in which a corporate agent *carries out* an adverse employment action on the *orders,* explicit or implicit, of a superior with knowledge that the plaintiff has engaged in a protected activity. However, in order to show causation in the sense required by *McDonnell Douglas* — that is, a causal connection between the protected activity and the adverse employment action — it is not necessary that the supervisor who has knowledge of the plaintiff's protected activities have *ordered* the agent to impose the adverse action. A causal connection is sufficiently demonstrated if the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity acts pursuant to *encouragement* by a superior (who has knowledge) to disfavor the plaintiff.

43.     *Hansen v. Harris*, 619 F.2d 942 (2d Cir. 1980) includes the following relevant findings

about estoppel:

"The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

44.     *Barboza v. D'Agata,* 151 F. Supp. 3d 363 (S.D.N.Y. 2015) includes the following

relevant findings that confirms that people are permitted to use crude and offensive speech in the

context of complaining about government activity:

"The Court of Appeals found this was in the scope of protected speech because defendant's messages were crude and offensive but made in the context of complaining about government action on a telephone answering machine set up for the purpose, among others, of receiving complaints from the public. Mangano 571. That decision is on all fours with this case. It dealt with offensive language used to express to government employees dissatisfaction with government action"

45.     *Hammock v. Pierce*, No. 15-CV-09052 (NSR) (S.D.N.Y. May 7, 2018) contains the

following findings that addresses proving a retaliatory motive:

"retaliatory motive may be inferred from a number of circumstantial factors, including, *inter alia, "(i)* the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at

a hearing on the matter, and (iv) statements by the defendant concerning his motivation." *Burton v. Lynch,* 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)"

46.    According to *Jovanovic v. City of New York*, 04 Civ. 8437 (PAC) (S.D.N.Y. Aug. 17, 2006), "malice may be inferred from the lack of probable cause."

47.    The following is a pertinent excerpt from *Frain v. Baron*, 307 F. Supp. 27 (E.D.N.Y. 1969):

> "Fear of disorder, which the City cites to justify its policy, has been ruled out as a ground for limiting peaceful exercise of First Amendment rights. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)."

48.    What follows are several relevant excerpts from *Wright v. Musanti*, No. 14-cv-8976 (KBF)(S.D.N.Y. Jan. 20, 2017) that confirm the following:

   a.    Offensive physical contact is assault under New York State law.

   b.    An initial aggressor between 2 parties is responsible for all subsequent assaults and batteries that occur between them. This should similarly be interpreted to also mean that those who committed illegal acts and omissions against me in relation to my efforts to lawfully exercise my constitutional rights to attend public forums that the Mayor conducted prior to 9/14/17 are responsible for all subsequent hostilities that occurred between us at the sites of public forums that the Mayor conducted as I lawfully attempted to attend them and engage in protected whistleblowing against them while doing so.

   c.    Punitive damages can be calculated based upon a household's total assets.

   • Excerpts from *Wright v. Musanti*:

| a | "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 n.9 (1986); see also Loughry v. Lincoln First Bank, N.A., 494 N.E.2d 70, 74 (N.Y. 1986) (explaining that punitive damages |

"serve the societal purposes of punishing and deterring the wrongdoer, as well as others, from similar conduct in the future.") (citation omitted). Under New York law, "the standard for imposing punitive damages is a strict one and punitive damages will be awarded only in exceptional cases", Marinaccio v. Town of Clarence, 986 N.E.2d 903, 906 (N.Y. 2013), such as those "involving `gross, wanton, or willful fraud or other morally culpable conduct'", Action S.A. v. Marc Rich & Co., 951 F.2d 504, 509 (2d Cir. 1991) (quoting Borkowski v. Borkowski, 355 N.E.2d 287, 287 (N.Y. 1976)); see also Marinaccio, 986 N.E.2d at 906 (noting that "the conduct justifying [a punitive damages] award must manifest `spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton'") (quoting Dupree v. Giugliano, 982 N.E.2d 74, 76 (N.Y. 2012)); Ross v. Louise Wise Servs., Inc., 868 N.E.2d 189, 196 (N.Y. 2007) ("Punitive damages are permitted when the defendant's wrongdoing is not simply intentional but `evince[s] a high degree of moral turpitude and demonstrate[s] such a wanton dishonesty as to imply a criminal indifference to civil obligations") (quoting Walker v. Sheldon, 179 N.E.2d 497, 499 (N.Y. 1961)).

Although the factfinder has discretion to determine whether to award punitive damages and, if so, in what amount, Nardelli v. Stamberg, 377 N.E.2d 975, 977 (N.Y. 1978), punitive damages must "bear some reasonable relation to the harm done and the flagrancy of the conduct causing it". Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 886 N.E.2d 127, 131 (N.Y. 2008) (citation omitted). In arriving at the appropriate amount, the factfinder may consider the defendant's financial circumstances. Brink's Inc v. City of N.Y., 717 F.2d 700, 706-07 (2d Cir. 1983)("Under New York law, evidence of a defendant's wealth is admissible on the issue of the amount of punitive damages.") (citations omitted); see also Softel, Inc. v. Dragon Med. & Sci. Commc'ns Ltd., 891 F. Supp. 935, 945 (S.D.N.Y. 1995); Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228, 267-68 (S.D.N.Y. 1999).

Here, the Court finds that defendant's conduct reflects the sort of willful disregard of the interests of others that justifies imposing punitive damages, see, e.g., Marinaccio, 986 N.E.2d at 906, both as a general and specific deterrent, see Memphis Cmty. Sch. Dist., 477 U.S. at 306 n.9. A $10,000 award is appropriate here. In arriving at this amount, the Court considers the financial circumstances of defendant, as it is entitled to do. See Brink's Inc., 717 F.2d at 706-07; Softel, Inc., 891 F. Supp. at 945; Greenbaum, 67 F. Supp. 2d at 267-68. At trial, the Court specifically questioned defendant regarding her financial circumstances for the stated purpose of identifying an appropriate amount of punitive damages to impose, if any. (See Tr. 80:10-84:25.) The Court repeatedly invited defendant to bring any information she thought might be relevant to the Court's attention. (Id. 83:20-84:25.) During the course of that exchange, defendant testified regarding her and her husband's salaries, as well as their family planning, and primary assets and debts, as described below.

| b | "Under New York law, "'[a]n `assault' is an intentional placing of another person in fear of imminent or offensive contact.'" <u>Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001)</u> (quoting <u>United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993)</u>); <u>Farash v. Cont'l Airlines, Inc., 337 F. App'x 7, 9-10 (2d Cir. 2009)</u> (same). "The plaintiff must show that the defendant intended `either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact.'" |
|---|---|

| c | "Under these circumstances, defendant's kick clearly altered the tenor of the parties' interaction, shifting the encounter from an ordinary, nonaggressive interaction between two pedestrians to something more akin to a street brawl. As a result, defendant served as the initial aggressor at the outset of the encounter, rendering her liable to plaintiff for all ensuing assaults and batteries" |
|---|---|

49.    The following is a pertinent excerpt from *Jackson v. City of New York*, 939 F. Supp. 2d 235 (E.D.N.Y. 2013) that confirms that people have a legal right to engage in self-defense against members of the NYPD:

> "As discussed *supra*, Plaintiff successfully removed a male police officer from her back by means of physical force. See Pl.'s Dep. Tr. at 106:713. However, Plaintiff alleges that her physical struggle was in self-defense and was therefore justified. See *Jocks. v. Tavernier, 316 F.3d 128, 13637 (2d Cir. 2003)* (holding, on plaintiffs version of the facts, that plaintiff was acting in self-defense such that his actions were not criminal and could not create probable cause to justify his malicious prosecution); see also *People v. Carneglia, 63 A.D.2d 734, 735, 405 N.Y.S.2d 298, 299 (N.Y.App.Div. 2d Dep't 1978)* (holding that "reasonable acts of self-defense" are justifiable in response to "an unprovoked police assault")."

50.    The following is a relevant excerpt from *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012) that concerns having a court issue an order that restrains acts that may otherwise be lawful due to a propensity and proclivity to commit unlawful conduct:

> "a district court has authority to issue a broad injunction in cases where "a proclivity for unlawful conduct has been shown." *See McComb v. Jacksonville Paper Co., 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949)*. The district court is even permitted to "enjoin certain otherwise lawful conduct" where "the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment." *Russian Media Grp., LLC v. Cable America, Inc., 598 F.3d 302, 307 (7th Cir.2010)* (citing authorities). If a party has violated the governing statute, then a court may in appropriate circumstances enjoin conduct that allowed the prohibited actions to occur, even if that conduct "standing alone,

would have been unassailable." *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir.1994) (internal quotation omitted)."

51.     The excerpts that appear next are from *People v. Alba*, 81 A.D.2d 345, 440 N.Y.S.2d 230

(App. Div. 1981) and *Dotson v. Farrugia*, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26, 2012). Both

of them confirm that an unofficial arrest occurs in violation of the Fourth Amendment when

individuals have their ability to freely move about curtailed by a show of authority without a

legal justification. This is applicable to the efforts that I undertook on 9/14/17 to lawfully attend

the Mayor's 9/14/17 town hall.

   a.   **Excerpt from *People v. Alba***:

        "The majority finds that, although defendant was told that he was "under arrest",
        no arrest, in fact, took place. We disagree. "Whenever an individual is physically
        or constructively detained by virtue of a significant interruption of his liberty of
        movement as a result of police action, that individual has been seized within the
        meaning of the Fourth Amendment". (*People v Cantor*, 36 NY2d, at p 111; see
        *Terry v Ohio*, 392 US, at p 16.)"

   b.   **Excerpt from *Dotson v. Farrugia***:

        ""A person is seized by the police and thus entitled to challenge the government's
        action under the Fourth Amendment when the officer, by means of physical force
        or show of authority terminates or restrains his freedom of movement through
        means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (internal
        quotations marks and citations omitted) (emphasis in original); see also *Terry*, 392
        U.S. at 19 n.16"

52.     In *DK BY LK v. Teams*, No. 16-CV-3246 (PAE)(S.D.N.Y. Jul. 5, 2017), U.S. District

Judge Paul A. Engelmayer articulated the legal standard that applies to confirming personal

involvement of a defendant for 42 U.S.C. §1983 claims in the following way:

        "The personal involvement of a defendant sued in his or her individual capacity is a
        requirement for liability under § 1983; a defendant's supervisory authority is insufficient
        in itself to create liability under § 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.
        2003). "To proximately cause a ... due process violation ... a defendant must be
        personally involved in the violation. A plaintiff may establish such personal involvement
        by making any one of five showings (the `Colon factors')." *Warren v. Pataki*, 823 F.3d
        125, 136 (2d Cir. 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

These showings are as follows: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation *354 through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information that unconstitutional acts were occurring." Id. (quoting _Colon_, 58 F.3d at 873); _see also Patterson v. Cty. of Oneida, N.Y._, 375 F.3d 206, 229 (2d Cir. 2004) (" [A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his [or her] individual capacity under § 1983. Personal involvement ... includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations were occurring.") (citations omitted))."

53.    The following is a pertinent excerpt from _Marom v. City of New York_, No. 15-cv-2017 (PKC) (S.D.N.Y. Mar. 7, 2016) that addresses the legal duty that all law-enforcement personnel that includes lawmakers have to intervene to protect constitutional rights against infringement:

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [] (2) that a citizen has been unjustifiably arrested [] or (3) that any constitutional violation has been committed by a law enforcement official []." Id. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.""

54.    The following is a pertinent excerpt from _Marom v. NYPD Sergeant Fior Blanco,_ No. 15-cv-2017 (PKC) (S.D.N.Y. July 25, 2019) that acknowledged that the scope of personal involvement in violating constitutional rights exceeded how it was described in _Marom v. City of New York_, No. 15-cv-2017 (PKC) (S.D.N.Y. Mar. 7, 2016):

"A defendant is also considered "personally involved" if he or she fails to intervene despite having a realistic opportunity to prevent the constitutional violation from occurring. Harris v. City of New York, No. 15-cv-8456 (CM), 2017 WL 6501912, at *3 (S.D.N.Y. Dec. 15, 2017); see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)."

55.    The following is a pertinent excerpt from _Bleiwas v. City of New York_, No. 15 Civ. 10046

(ER) (S.D.N.Y. Aug. 14, 2017) that lists the elements for a claim based upon negligence:

> "To demonstrate that a defendant acted with negligence under New York law, a plaintiff must show `1) the existence of a duty flowing from defendant to plaintiff; 2) a breach of this duty; 3) a reasonably close causal connection between the contact and the resulting injury; and 4) actual loss, harm or damage."

56. What follows is a pertinent excerpt from *US v. Basey*, 816 F.2d 980 (5th Cir. 1987) about the guilt of those who participate in conspiracies and clearly confirms that defendants that I have listed in this pleading's caption have been involved in a conspiracy to violate my constitutional right to attend the Mayor's 9/14/17 town hall.

> **Excerpt from *US v. Basey*:**
>
> "Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a co-conspirator, even though that party does not participate in the substantive offense or have any knowledge of it. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180 [1184] 90 L.Ed. 1489 (1946). Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, the defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners. *United States v. Sullivan,* 578 F.2d 121, 122-23 (5th Cir.1978)."

57. The following is a pertinent excerpt from *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988) that presents a useful discussion about co-conspirators in conspiracies:

> "This court has several times observed that statements "that apprise a coconspirator of the progress of a conspiracy," *United States v. Rahme,* 813 F.2d 31, 36 (2d Cir.1987), or that "brief [a coconspirator] on the scheme," *United States v. Mangan,* 575 F.2d 32, 44 (2d Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978), are statements made in furtherance of a conspiracy. *See United States v. Paone,* 782 F.2d 386, 391 (2d Cir.1986), *cert. denied,* ___ U.S. ___, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987). *See also United States v. Persico,* 832 F.2d 705, 716 (2d Cir.1987). The Third Circuit has likewise observed that statements by coconspirators that "inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met." *United States v. Ammar,* 714 F.2d 238, 252 (3d Cir.) (citations omitted), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)."

58. In *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999), the Court addressed conspiracies to violate civil rights and a legal standard that governs whether litigants should be allowed to file

an amended pleading. In short, the excerpts from that case shown below confirm that Court ruled

that **a)** "conspiracies are by their very nature secretive operations" that "may have to be proven

by circumstantial, rather than direct, evidence" and **b)** though futility "is a valid reason for

denying a motion to amend", that is "true only where it is "beyond doubt that the plaintiff can

prove no set of facts in support" of his amended claims."

    a.   "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

    b.   "While "conclusory allegations" of a § 1983 conspiracy are insufficient, _Dwares v. City of New York,_ 985 F.2d 94, 99-100 (2nd Cir.1993) (citing cases), we have recognized that such "conspiracies are by their very nature secretive operations," and may have to be proven by circumstantial, rather than direct, evidence. _Rounseville v. Zahl,_ 13 F.3d 625, 632 (2d Cir.1994)."

    c.   "while "futility" is a valid reason for denying a motion to amend, _John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp._, 22 F.3d 458, 462 (2d Cir.1994), this is true only where it is "beyond doubt that the plaintiff can prove no set of facts in support" of his amended claims. _Ricciuti v. N.Y.C. Transit Auth._, 941 F.2d 119, 123 (2d Cir.1991)"

59.    The following are excerpts from _Vann v. City of New York_, 72 F.3d 1040 (2d Cir. 1995)

that addresses municipal liability:

    a.   A § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference. _See, e.g., Fiacco v. City of Rensselaer,_ 783 F.2d 319 (2d Cir.1986), _cert. denied,_ 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); _see id._ at 326-27 (municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating").

    b.   To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. _See Canton v. Harris,_ 489 U.S. at 390, 109 S.Ct. at 1205. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to

forestall further incidents. *See, e.g.,* <u>*Ricciuti v. N.Y.C. Transit Authority,*</u> 941 F.2d at 123; <u>*Fiacco v. City of Rensselaer,*</u> 783 F.2d at 328

60.     The Mayor's 9/14/17 town hall was conducted in violation of New York City Department of Education regulations that are discussed in <u>*Bloomberg v. The New York City Department of Education*</u>, No. 17 Civ. 3136 (PGG) (S.D.N.Y. Sept. 24, 2019). In order for the Mayor and New York City Councilman Chaim Deutsch to have been able to lawfully conduct the Mayor's 9/14/17 town hall within the school in which it was conducted, invitations would have needed to have been issued to their political rivals who sought to replace them through the 2017 New York City government elections. No valid reason exists to believe that prerequisite was met. The following is a relevant excerpt from that court decision:

> Regulation D-130 (the "Regulation") "governs the use of school buildings by candidates, elected officials, and political organizations and the conduct of school employees and officers with respect to political campaigns and elections." (Regulation D-130 (Abstract) (Dkt. No. 79-3)) The Regulation's introduction provides:
>
> School buildings are not public forums for purposes of community or political expression. The following sets forth the rules which govern: (1) the use of, or access to, Department of Education school buildings by elected officials, candidates for elective office, or organizations working on behalf of such officials or candidates, both during school and non-school hours; (2) use of school facilities, equipment and supplies for political purposes by school employees, personnel, or staff members and officials; and (3) conduct of school employees, personnel, or staff members and officials with respect to political campaigns and elections.
>
> (Id. (Introduction) (footnote omitted)).
>
> Section I.B of the Regulation addresses the use of school facilities, equipment, and supplies, and provides that — generally — these resources "may not be used on behalf of any candidate, candidates, slate of candidates, or political organization/committee." (Id. at § I(B)) In particular,
>
> 1. The use of any Department of Education school during school/business hours by any person, group, organization, committee, etc., on behalf of, or for the benefit of any elected official, candidate, candidates, slate of candidates or political organization/committee is prohibited.
> 2. No rallies, forums, programs, etc., on behalf of, or for the benefit of any elected official, particular candidate, candidates, slate of candidates or political

organization/committee may be held in a school building.
3. No material supporting any candidate, candidates, slate of candidates or political
organization/committee may be distributed, posted, or displayed in any school building....

## STATEMENT OF FACTS

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The following shows an e-mail message that I received on 9/27/17 at 9:49 am from a CCRB investigator named Judith Lê in which she explicitly stated that the Mayor's CAU and the Mayor's staff are in charge of admittance to public town hall meetings that the Mayor conducted:

> **From:** "Le, Judith (CCRB)" <JLe@ccrb.nyc.gov>
> **Subject:** RE: New viewpoint discrimination by NYPD's Howard Redmond & Lt. Nieves at Mayor's 8/30 town hall in Brooklyn
> **Date:** September 27, 2017 at 9:49:27 AM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
>
> Hi Mr. Komatsu,
>
> As we previously discussed, unfortunately, admittance in and out of the Town Hall events falls outside the jurisdiction. Again, if you'd like, I can forward the complaint to Internal Affairs, or recommend that you speak to the Mayor's staff/Community Affairs office, as they are in charge of admittance to the Town Halls.
>
> Best,
>
> Judith Lê
>
> Investigator, Squad 8
> Civilian Complaint Review Board
> 100 Church Street, 10th Floor
> New York, NY 10007
> (212) 912-2081

3. The following shows the e-mail message that I sent on 9/10/17 at 9:23 pm to RSVP for the Mayor's 9/14/17 town hall:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** RSVP for 9/14/17 public Town Hall meeting with New York City's Mayor
> **Date:** September 10, 2017 at 9:23:48 PM EDT
> **To:** townhallrsvp@cityhall.nyc.gov
>
> My name is Towaki Komatsu
>
> This e-mail serves as my RSVP for the 9/14/17 public Town Hall meeting New York City's Mayor will hold.
>
> Pursuant to New York State's Open Meetings Law, I have a legal right to attend that public town hall meeting.
>
> Any attempt to hinder my ability to attend it will constitute a violation of both that law and the federal criminal statute that concerns obstruction of justice, specifically 18 U.S.C. 1512.
>
> Any such attempt to hinder my ability to attend that public meeting will be severely dealt with from a legal standpoint.

4.    The New York City public school that hosted the Mayor's 9/14/17 is the P.S. K811 Connie Lekas School that is controlled by the New York City Department of Education. New York City Councilman Chaim Deutsch served as the moderator for the Mayor's 9/14/17 town hall. Mr. Deutsch is a staunch supporter of the NYPD in spite of how often and how brazenly its members violate applicable laws. He is also the chairman of the New York City Council's Committee on Veterans who has repeatedly proven in a variety of ways that he does not support fundamental civil rights that include the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment. He also pays lip-service to supporting military veterans. In that respect, he and the Mayor are quite similar and unworthy of respect.

5.    Prior to attending the Mayor's 9/14/17 town hall, Defendant Cruz was among people who illegally prevented me from attending and testifying in the public hearing that the Mayor conducted at 2 pm in the Blue Room in City Hall that was partly about proposed legislation that concerned reforming the NYPD. I intended to engage in protected whistleblowing about that fact

as well as the sum and substance of the testimony against the NYPD that I would have otherwise given during that 9/8/17 public hearing while attending the Mayor's 9/14/17 town hall in the room in which it was conducted.

6.

7.  On 9/9/17 at 9:50 pm, I sent an e-mail message to the following people and others that was partly about the fact that Defendant Cruz illegally prevented me from attending the Mayor's 9/8/17 2 pm public hearing that I just discussed:

    a.  Defendant Miller.

    b.  Shauna Stribula and Paola Ruiz of the Mayor's office.

    c.  Lourdes Rosado while she was then the head of the civil rights division of the New York State Attorney General's office.

    d.  Jennifer Levy and Muhammad Khan while they were then attorneys who then worked for the New York City Public Advocate's office. They now work for the New York State Attorney General's office.

    e.  Other attorneys.

    f.  Melissa Ms. Mark-Viverito while she was then the Speaker of the City Council.

    g.  Additional members of the City Council.

8.  A copy of that e-mail message is shown next. I sent that e-mail message to inform those who received it that I was illegally prevented from attending the public hearing that the Mayor conducted on 9/8/17 in the Blue Room inside of City Hall that partly addressed proposed legislation that was about NYPD misconduct about which I had intended to testify during that hearing. I made it clear in that e-mail message that by having been illegally prevented from attending that public hearing, those who were responsible for having caused that to

occur were doing so as an ongoing illegal practice against me that was "being carried out by the NYPD and Mayor's office in violation of viewpoint discrimination" in light of valid misconduct complaints that I filed against the NYPD that included Defendant Redmond. That e-mail message also confirms that I specifically asked Ms. Rosado to arrange to have those who had been illegally preventing me from attending public forums that the Mayor had been conducting to be criminally prosecuted for that. I also pointed out in that e-mail message that I intended to file a supplemented complaint with the U.S. Attorney's office for the Southern District of New York in response to having been illegally been prevented from attending the Mayor's 9/8/17 public hearing. It's objectively reasonable to infer from the totality of the circumstances that the illegal acts and omissions that were committed against me that caused me to have been prevented from attending the Mayor's 9/14/17 town hall meeting from within the room in which it was conducted as it was conducted was in retaliation for the clearly protected activity that I confirmed through that e-mail message that I was then engaged in against the NYPD.

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Re: Flagrantly illegal exclusion from 2 pm public meeting in City Hall yesterday
> **Date:** September 9, 2017 at 9:50:28 PM EDT
> **To:** lourdes.rosado@ag.ny.gov
> **Cc:** "Ruiz, Paola" <PRuiz@cityhall.nyc.gov>, sstribula@cityhall.nyc.gov, "Miller, Harold" <HMiller@cityhall.nyc.gov>, rcornegy@council.nyc.gov
> **Bcc:** gethelp@pubadvocate.nyc.gov, mmark-viverito@council.nyc.gov, khan@pubadvocate.nyc.gov, jlevy@pubadvocate.nyc.gov, ulrich@council.nyc.gov, ecrowley@council.nyc.gov, Norman Siegel <nsiegel@stellp.com>, Aaron Foldenauer <aaron@aaronforcitycouncil.com>
>
> Dear Ms. Rosado,
>
> As per the voicemail message that I left for you yesterday, please ensure that the member of members of the Mayor's office and/or NYPD that illegally prevented me from attending the public meeting at 2 pm that was held in the Blue Room in City Hall yesterday are prosecuted to the fullest extent of all applicable law.

Keeping me out of public meetings has is an ongoing illegal practice being carried out by the NYPD and Mayor's office in violation of viewpoint discrimination, particularly in light of the fact that I have valid misconduct complaints filed against the NYPD - including the Mayor's head of his security detail.

The following is a link to the video of the meeting I was denied access to yesterday:

https://www.youtube.com/watch?v=UrGcTV3n2Jc

One of the bills that the Mayor signed yesterday was about NYPD misconduct and he made it clear during that meeting that testimony from the audience would have been possible.

Due to this new incident of discrimination, I will file a new Notice of Claim with the New York City Comptroller's office on Monday and a supplemented complaint with the U.S. Attorney's office for the Southern District.

Regards,

Towaki Komatsu

9.      Everything that I have discussed thus far in this complaint about whistleblowing and litigation that I engaged in were matters about which I intended to engage in protected whistleblowing about while attending the Mayor's 9/14/17 town hall largely to try to engage in word-of-mouth advertising against the Mayor's administration and its business partners that I hoped would spread quickly, widely, and sufficiently enough as I hoped its sum and substance would persuade enough people to fire the Mayor in the 2017 New York City government elections that would give New Yorkers leadership instead all that the Mayor and his administration represent. By having New Yorkers throw out Bill de Blasio and his administration like a disease by the power of their votes, I hoped that new management at the Mayor's office would clean house across New York City's government and with its business partners to usher in proper governance. Among other things, that would require Urban's contract with HRA to be cancelled.

10.     On 9/14/17, as I lawfully stood on a public sidewalk while waiting in line with other members of the public to be issued an admission ticket for the Mayor's town hall that would enable me to attend it from within the room in which it was conducted, I had a brief conversation with Defendant Atcheson as she held a tablet computer. During that conversation, she fraudulently told me that I wasn't on the list of people who registered to attend that town hall and refused to issue me an admission ticket for it in violation of my Fifth Amendment rights to property and Fourteenth Amendment due process and equal protection rights as well as the prohibitions against discrimination and selective-enforcement. In doing so, she also violated New York State's Open Meetings Law and subjected me to an abuse of process. In response to her behavior, I remained in that line while I remained intent on attending that town hall lawfully in accordance with my constitutional rights irrespective of whether I would be issued an admission ticket for it. While that was occurring, I recorded video recordings with my cell phone that confirm the following members of the NYPD as well as members of the Mayor's staff that included Harold Miller stood within roughly 40 feet from where I was on that same sidewalk and were aware that I was not being issued an admission ticket for that town hall as the members of the NYPD illegally failed and otherwise refused to perform their Fourteenth Amendment affirmative legal duty to intervene on my behalf to uphold my constitutional rights to receive an admission ticket for it and to be treated like every other member of the public who was in that line with respect to my efforts to attend that public forum within the room in which it would be conducted:

> Defendants Gerola, Nieves, Mason, Cruz, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17

11.     The next screenshot shows Defendant Miller on the far-left as he wore eyeglasses and

stood next to Jane Doe2 9/14/17. She was also present on 4/27/17 in front of the entrance to the school that hosted the Mayor's 4/27/17 town hall as Defendant Miller worked with others to illegally prevent me from attending that public forum after I recorded him on video then that confirms that he then did so.



12.      That screenshot is from a video that I recorded at 6:15 pm on 9/14/17 that has the filename of "IMG_1856.MOV" while I was lawfully conducting myself as I lawfully conducted myself while I was then waiting in a line with other members of the public to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted.

13.     The next screenshot is from that same video and corresponds to the elapsed time of 13

seconds. Defendants Miller, NYPD John Doe4 9/14/17, Jane Doe2 9/14/17, Jane Doe1 9/14/17,

and Defendant Gerola appear from left to right in this screenshot while they then had an inherent

legal duty in accordance with the constitution oaths that they took upon beginning work for the

City of New York to intervene on my behalf to allow me to lawfully attend the Mayor's 9/14/17

town hall from within the room in which it was conducted.



14.     The next screenshot shows Defendant Gerola on the far-left and Defendant Ridener on

the far-right as I stood near the entrance to the school that hosted the Mayor's 4/27/17 town hall.

That screenshot is from the video recording that has the filename of "IMG_1857.MOV" that I

recorded at 6:39 pm on 9/14/17 as I lawfully conducted myself while I was then waiting in a line

with other members of the public where I was illegally coerced to wait by members of the NYPD

to be granted access to the school that hosted the Mayor's 9/14/17 town hall to observe how that

town hall would be conducted while I would be in an overflow room that was setup for that town

hall and be able to watch how it would be conducted from TV screens in that overflow room

while being illegally deprived of my First Amendment right to communicate directly to the

government officials face-to-face who would be in attendance in the room in which that town

hall was conducted while it was conducted, shortly before it began, and shortly after it ended

within the room in which it was conducted that caused irreparable harm to my First Amendment

rights as per _Elrod v. Burns_, 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976), _Kittay v._

_Giuliani_, 112 F. Supp. 2d 342 (S.D.N.Y. 2000), and many other relevant court decisions.



15.     At some point after 6:15 pm on 9/14/17, I was illegally coerced to leave that line by being

threatened with arrest by members of the NYPD if I didn't comply. Defendants Nieves, Gerola,

and Mason were personally involved with NYPD Officer John Doe1 9/14/17 (shield #: 21250),

NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, and other members of the NYPD in

issuing and otherwise condoning that illegal threat that was intimidation and First Amendment

retaliation in response to my lawful assertiveness to remain in that line while exercising my First

Amendment and Fourteenth Amendment rights of assembly, and association for the purpose of

eventually being granted access to that school in order to lawfully walk into the room in which that town hall would be conducted and engage in legal self-defense in the event that anyone made offensive physical contact with me as I lawfully attempted to attend that town hall in that room.

16.     Defendants John Doe1 9/14/17 stood next to Defendant John Doe2 9/14/17 on 9/14/17 in front of and near me on a sidewalk in an area that was near the entrance to the school that hosted the Mayor's 9/14/17 town hall while I was being illegally coerced to leave the line that I was in with other members of the public to attend the Mayor's 9/14/17 town hall from within the room in which it would be conducted to instead wait in the line that was used to grant members of the public access to the overflow room for that town hall. Neither Defendants John Doe1 9/14/17 nor Defendants John Doe2 9/14/17 made an attempt to intervene on my behalf to enable me to attend that town hall from within the room in which it was conducted and to remain in the original line next to the school that hosted that town hall that I waited in for that purpose.

17.     As I lawfully waited in line on 9/14/17 to be granted access to the school that hosted the Mayor's 9/14/17 town hall, I conducted myself in an entirely lawful manner and distributed literature to other members of the public as they waited to be granted access to the school that hosted the Mayor's 9/14/17 town hall that I prepared and contained protected whistleblowing information of public concern against the Mayor's administration and its business partners largely to try to offset the fact that I was again being illegally discriminated against by members of the Mayor's NYPD security detail, members of the Mayor's staff, and other members of the NYPD in violation of my constitutional rights to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted based upon the fact that I registered in advance with the Mayor's office to do so and arrived sufficiently early to the site of that town hall on 9/14/17

to wait on line near the front of the line to be granted access to that town hall from within that

room. In short, I correctly anticipated that I would again be subjected to illegal acts on 9/14/17 in

relation to my efforts to attend the Mayor's 9/14/17 town hall within the room in which it was

conducted. As a result, I prepared whistleblowing literature in advance to bring with me to that

site on 9/14/17 to lawfully distribute to those who attended that town hall before it began and

while I would be in the overflow room that was setup for that town hall.

18.    The next screenshot is from the video recording that the Mayor's office arranged to be

recorded of the Mayor's 9/14/17 town hall while I played it back while I had the closed-

captioning feature enabled. That screenshot reflects what appears in that video at the elapsed

time of 17 minutes and 58 seconds as the Mayor was then making remarks that confirmed that

town hall was subject to New York State's Open Meetings Law as he implicitly confirmed that a

quorum that was comprised of senior members of his administration were then present in that

room and that they would be available at the end of that meeting for the audience to walk to up to

and talk with about whatever was on their mind.



19.     The next screenshot reflects what appears in the video recording that has the filename of "IMG_1868.mov" at the elapsed time of 1 second while Defendant Nieves and I were in auditorium in the school that hosted the Mayor's 9/14/17 town hall. This screenshot confirms the fact that I brilliantly used Mr. Nieves as a backdrop while he slacked off in a chair to record the cover page of whistleblowing literature that I distributed to members of the public during that town hall. That auditorium was used as the overflow room for that town hall on 9/14/17.



20.    To close out this section, it is worth pointing out that the New York City 2017 general

elections were held in November of 2017 and likely heavily factored into the decisions to

commit the illegal acts and omissions against me on 9/14/17 that I have discussed in this

complaint in order to protect the Mayor's re-election interests in violation of the Hatch Act. The

timing of those illegal acts truly matters.


## <u>CAUSES OF ACTION</u>


**CLAIM #1:    Violations of the First Amendment right of access to a public forum, to
protest in a public forum, to record audio and video recordings in a public
forum, to take photographs in a public forum, to receive information in a
public forum, to have the opportunity to talk with journalists in a public
forum, to distribute whistleblowing literature in a public forum, to engage in
lawful assembly in a public forum, to engage in freedom of expression in a
public forum, to otherwise engage in whistleblowing and criticism of
government officials in a public forum, to engage in expressive association,
and to petition government officials in a public forum for redress of
grievances**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Carrion, Ridener, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. I also incorporate by reference as though fully set forth herein the decision that was issued on 5/19/20 in _Dunn v. City of Fort Valley,_ No. 19-cv-287(TES) (M.D. Ga. May 19, 2020) due to relevant findings it contains about First Amendment rights in public forums, supervisory liability, and other pertinent things.

3. My right to lawfully protest in a public forum in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was acknowledged the following remark that Judge Schofield expressed in the decision that she issued in _Gonzalez v. City of New York_, No. 14 Civ. 7721 (LGS) (S.D.N.Y. Sept. 29, 2016):

   > "Two branches of First Amendment claims are relevant to the present case: (a) interference with the right to protest in a public forum and (b) retaliation for exercising First Amendment rights."

4. More importantly, my right to lawfully protest in a public forum in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was confirmed by the following excerpt from _Occupy Nashville v. Haslam_, 949 F. Supp. 2d 777 (M.D. Tenn. 2013):

   > "a state may not restrict First Amendment rights, absent valid time, place, or manner restriction. _See Dean,_ 354 F.3d at 551; _Galvin v. Hay,_ 374 F.3d 739, 751 (9th Cir.2004) (**"As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, speakers may ordinarily— absent a valid time, place and manner restriction—do so in a public**

forum."); ***Childs v. Dekalb Cnty., Ga.*, 286 Fed.Appx. 687, 693-94 (11th Cir.2008)** (denying qualified immunity and stating that, based on Supreme Court precedent, "police officers have known for decades that protestors present on public property have a First Amendment right to peacefully express their view, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech")."

(boldface formatting added for emphasis)

5.   The following defendants were personally involved on 9/14/17 and prior to that date in engaging in illegal acts and omissions against me that caused and otherwise enabled me to have been illegally prevented from being inside of the room in which the Mayor's 9/14/17 town hall was conducted:

> Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Carrion, Ridener, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17, de Blasio, and O'Neill

6.   The following is entirely true, accurate, and relevant about what I just stated:

a.   Defendant City through the illegal acts and omissions of its personnel was continuing to maintain illegal customs, policies, and practices against me that caused me to be prevented from attending the Mayor's 9/14/17 town hall.

b.   The following defendants were personally involved on 9/14/17 at the site of the Mayor's 9/14/17 town hall in engaging in illegal acts and omissions that caused me to be prevented from attending the Mayor's 9/14/17 town hall:

> Defendants Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ridener, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17

c.   The following facts apply to the defendants that I just identified:

i.   Defendants Gerola, Nieves, Mason, NYPD Officer John Doe1 9/14/17 (shield

#: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, and NYPD John Doe7 9/14/17 committed illegal acts and omissions that prevented me from lawfully exercising my First Amendment and Fourteenth Amendment right to remain in the original line in which I waited on 9/14/17 with other members of the public next to the school that hosted the Mayor's 9/14/17 town hall to be granted my constitutional right by them and others to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted as it was conducted by virtue of the fact that I had arrived to the site of that town hall on 9/14/17 sufficiently early that enabled me to be near the front of that line when it first formed on that date for that purpose. The primary way that I was illegally prevented from remaining in that line on 9/14/17 was by having been illegally threatened by members of the NYPD near the entrance to the school that hosted that town hall that I would be arrested if I didn't comply with their illegal orders to me to leave that line and instead wait in a separate line near the entrance to that school that was used to grant people access to the overflow room for that town hall.

ii. Defendants Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ridener, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, and John Doe2 9/14/17 otherwise engaged in illegal acts and omissions against me on

9/14/17 that prevented me from attending the Mayor's 9/14/17 town hall by not allowing me to enter the room in which it was conducted as it was conducted, not issuing me an admission ticket to do so, and not intervening on my behalf to enable me to do so while they were aware on 9/14/17 that I was being prevented from attending that town hall from within that room and while they had a duty to intervene on my behalf to enable me to attend that town hall from within that room pursuant to **a)** their Fourteenth Amendment affirmative legal duty as law-enforcement officials to intervene on my behalf, **b)** the terms of the constitutional oath that they took upon becoming employees of the City of New York and the NYPD to an extent that required them to uphold the U.S. Constitution and do their jobs to the best of their abilities, and/or **c)**  the fact that 42 USC §1986, NYPL §195.00, and .New York City Charter §1116 applied to that circumstance and required them to intervene on my behalf to enable me to attend that town hall from within that room.

iii.  The following Defendants were personally involved in engaging in illegal acts and omissions on 9/14/17 against me prior to 7:14 pm that prevented me from attending the Mayor's 9/14/17 town hall from within the room in which it was conducted and accessing an area in a hallway the school that hosted that town hall where public records were made available by personnel of the City of New York to members of the public who were permitted to attend that town hall from within the room in which it was conducted:

Defendants Gerola, Nieves, Mason, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17,

        NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7
        9/14/17, Atcheson, Miller, Ridener, Jane Doe1 9/14/17, Jane Doe2
        9/14/17, John Doe1 9/14/17, and John Doe2 9/14/17

    iv.  The following Defendants were personally involved in engaging in illegal acts and omissions on 9/14/17 against me after 6:40 pm that prevented me from attending the Mayor's 9/14/17 town hall from within the room in which it was conducted and accessing an area in a hallway the school that hosted that town hall where public records were made available by personnel of the City of New York to members of the public who were permitted to attend that town hall from within the room in which it was conducted:

        Defendants Gerola, Nieves, Mason, Cruz, Mitchell, NYPD John Doe8
        9/14/17, Atcheson, and Redmond

d.  The following defendants were personally involved prior to 9/14/17 in engaging in illegal acts and omissions that proximately enabled me to be prevented from attending the Mayor's 9/14/17 town hall party by tacitly condoning illegal acts and omissions that were committed against me at earlier public forums that the Mayor conducted since 4/27/17 that caused me to be prevented from attending them and otherwise illegally covering-up such illegal acts and omissions that were committed against me at such public forums that the Mayor conducted on and after 4/27/17:

        Defendants City of New York, Redmond, Ramos, Carrion, de Blasio, and
        O'Neill

7.  Due to the facts and circumstances that I have discussed at length and with sufficient particularity in this pleading, I have decisively established that the Defendants identified above were personally involved in having willfully, callously, and wantonly illegally violated my First Amendment rights in relation to my efforts to have attended the Mayor's 9/14/17

town hall within the room in which it was conducted as it was conducted, shortly before it began, and shortly after it ended.

8. I have also established that the defendants that this claim concerns violated my First Amendment right to remain in the original line that I waited in on 9/14/17 outside of the school that hosted the Mayor's 9/14/17 town hall to proceed with other members of the public into that school and then into the room within it that hosted that town hall instead of being illegally coerced to move from where I lawfully stood on a public sidewalk that is a traditional public forum.

9. Ms. Ramos is liable for this cause of action due to her role as co-conspirator in a conspiracy that existed to prevent me from attending town hall meetings that the Mayor conducted from within the rooms in which they were conducted as they were conducted as she illegally deceived Erin Durkin on 6/28/17 and 6/29/17 in e-mail messages that she sent to Ms. Durkin about me and the illegal acts that were committed against me on 4/27/17, 5/23/17, and 6/8/17 in relation to efforts that I lawfully made to attend the public town hall and public resource fair meetings that the Mayor conducted on those dates that caused me to be illegally prevented from attending those public forums within the rooms in which they were conducted in flagrant violation of my constitutional rights and other laws. The lies and misleading remarks that Ms. Ramos expressed to Ms. Durkin in those e-mail messages were in furtherance of a fraudulent scheme to try to illegally cover-up the illegal acts and omissions that were committed against me on 4/27/17, 5/23/17, and 6/8/17 by members of the Mayor's NYPD security detail, other members of the NYPD, members of the Mayor's CAU, and New York State Court Officers in response to my lawful efforts to have attended the town hall and resource fair meetings that the Mayor conducted on those dates from within

the rooms in which they were conducted as they were conducted. Relevant findings that support this assertion about Ms. Ramos' liability exist in the decisions that were issued in *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134 (2d Cir. 2010), *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2000), *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988), *Escalera v. Samaritan Village Men's Shelter*, No. 17-cv-4691 (CM) (S.D.N.Y. Sept. 27, 2019), *US v. Basey*, 816 F.2d 980 (5th Cir. 1987), *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995), *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999), and *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020).

**CLAIM #2:**         **First Amendment Retaliation, Viewpoint
Discrimination, and Standardless Discretion
in Denying Access to a Public Forum**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD
Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3
9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond,
Ramos, Carrion, de Blasio, O'Neill)**

1. I incorporate by reference the information presented in the preceding paragraphs as though fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3. The defendants that this claim concerns are also liable for it partly because I made it abundantly clear to them and others on 9/14/17 at the site of the Mayor's 9/14/17 town hall that I objected to the fact that I was then being illegally prevented by them from **a)** lawfully attending that town hall from within the room in which it was conducted as it was conducted, **b)** remaining in the original line in which I waited to be granted access to that town hall for that purpose, and **c)** being issued an admission ticket for that town hall that was applicable to

the room in which it was conducted. Those objections were clearly protected activity and I further sought to engage in protected activity against the defendants this action concerns while attending that town hall from within the room in which it was conducted by making it widely known that they had been involved in all of the following specific illegal acts against me on 9/14/17:

a. Preventing me from attending that town hall from within the room in which it was conducted.

b. Using coercion against me by illegally threatening to arrest me without any justification in front of the school that hosted that town hall if I didn't move from where I lawfully stood in an area on a public sidewalk that is a traditional public forum that is near the entrance to the school that hosted the Mayor's 9/14/17 town hall while I was being illegally prevented without any valid justification whatsoever from entering that school to lawfully attend the Mayor's 9/14/17 town hall from within the room in which it was conducted.

c. Preventing me from remaining in the line in which I originally waited to be granted access to the school that hosted the Mayor's 9/14/17 town hall.

d. Granting other members of the public access to the school that hosted the Mayor's 9/14/17 town hall before me in spite of the fact that they arrived to that site after me on 9/14/17. That flagrantly violated my Fourteenth Amendment due process and equal protection rights because I was legally entitled to be granted access to that school before them in relation to attending the Mayor's 9/14/17 town hall.

e. Refusing to issue me an admission ticket for the Mayor's 9/14/17 town hall that was for the room in which that town hall was conducted.

4. The defendants that this claim concerns are also liable for it because it's objectively reasonable to infer that their illegal acts and omissions against me on 9/14/17 that resulted in the illegal acts that I just discussed that correspond to the Mayor's 9/14/17 town hall were partly motivated by the desire that at least some of them had in subjecting me to illegal viewpoint discrimination and First Amendment retaliation by preventing me from being able to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted in which I intended to engage in additional protected whistleblowing against them and others for illegal acts and omissions that they and others committed against me in relation to my efforts to have lawfully attended the Mayor's 9/8/17 2 pm public hearing in the Blue Room in City Hall, the Mayor's 8/30/17 town hall, and earlier public forums that the Mayor conducted.

5. The defendants that this claim concerns are further liable for it because it's objectively reasonable to infer that their illegal acts and omissions against me on 9/14/17 that resulted in the illegal acts that I just discussed that correspond to the Mayor's 9/14/17 town hall were partly in retaliation for protected whistleblowing that I was engaged in against them, HRA, HRA's business partners, the Mayor, and others by distributing literature that I prepared and brought with me to the site of the Mayor's 9/14/17 town hall that contained protected whistleblowing information of public concern to members of the public as they **a)** waited in line on 9/14/17 to be granted access to the school that hosted the Mayor's 9/14/17 town hall in relation to attending that public forum and **b)** were otherwise inside of the overflow room that was setup for that town hall.

6. The defendants that this claim concerns are further liable for it because it's objectively reasonable to infer that their illegal acts and omissions against me on 9/14/17 that resulted in

the illegal acts that I just discussed that correspond to the Mayor's 9/14/17 town hall were viewpoint discrimination and First Amendment retaliation for the fact that I was pursuing valid legal claims against them and others in my HRA lawsuit. That lawsuit was a hybrid lawsuit that was multifaceted and very complex in nature in which I asserted claims against Defendants City of New York, Gerola, Nieves, and others that partly concerned illegal acts and omissions that were committed against me on 4/27/17 at the site of the Mayor's 4/27/17 town hall. Claims in that lawsuit also implicating wrongdoing against me by Urban and NTT. Additional claims that I asserted in that lawsuit included, but weren't limited to those about storage expenses that HRA illegally wasn't paying on my behalf in violation of applicable law, my having been viciously assaulted on 7/2/16 due to fraud and negligence by HRA and Urban, and HRA having shirked its legal duty to cause me to be provided pro-bono or low-cost legal representation or legal assistance. E-mail messages shown in the 374-page PDF file that I have discussed in this complaint confirm that senior members of the Mayor's staff received updates about developments in my litigation against HRA **a)** on 4/10/17 immediately before the Mayor's 4/11/17 resource fair meeting and **b)** on 6/28/17.

## CLAIM #3: <u>Violations of the Fourth Amendment</u>

**(Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Carrion, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3.  By demonstrating a show of authority to me on 9/14/17 at the site of the Mayor's 9/14/17 town hall that illegally caused the following to occur, the defendants that this claim concerns flagrantly violated my Fourth Amendment rights against unlawful unofficial arrests of the First Amendment right to freely and peacefully move about and assemble in public forums in relation to that town hall:

    a.  My illegally coerced departure from the original line in which I waited on 9/14/17 to be granted access to the school that hosted the Mayor's 9/14/17 town hall to attend that town hall from within the room in which it was conducted.

    b.  My illegally coerced departure from the specific area on which I lawfully exercised my First Amendment right of peaceful assembly on a public sidewalk that is a traditional public forum that was near the entrance to the school that hosted the Mayor's 9/14/17 town hall.

    c.  The illegal unofficial arrest of my First Amendment right to lawfully enter and attend the Mayor's 9/14/17 town hall from within the room in which it was conducted as it was conducted.

    d.  The illegal unofficial arrest of my First Amendment right to lawfully access an area in a hallway in the school that hosted the Mayor's 9/14/17 town hall where personnel for the City of New York made public records available to members of the public who were permitted to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted.

4.  Defendants Atcheson, Miller, Redmond, Ramos, Carrion, de Blasio, and O'Neill are liable for this claim as well as a result of their acts and omissions against me as co-conspirators that enabled this to occur on 9/14/17 as they acted in concert with those who personally caused

this to occur against me on 9/14/17 at the site of the Mayor's 9/14/17 town hall.

**CLAIM #4:**            **Violations of the Fifth Amendment**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Carrion, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #5:**            **Violations of the Fourteenth Amendment**
                              **Substantive Due Process Rights**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3. Given the fact that the defendants that this claim concerns illegally didn't accord me any due process whatsoever that they were required to accord me and otherwise cause me to be accorded in regards to the following, these defendants are liable for this claim:

   a. I was illegally not accorded any due process whatsoever in regards to the illegal acts and omissions that were committed against me on 9/14/17 in relation to my efforts to

lawfully:

    i.  Attend the Mayor's 9/14/17 town hall from within the room in which it was conducted and exercise the entire array of my rights while doing so.

    ii.  Remain in the original line on 9/14/17 in which I waited outside of the school that hosted the Mayor's 9/14/17 town hall to be granted access to it and the room in which the Mayor's 9/14/17 town hall was conducted.

    iii.  Be issued an admission ticket on 9/14/17 for the room in which the Mayor's 9/14/17 town hall was conducted.

    iv.  Access an area on 9/14/17 in a hallway within the school that hosted the Mayor's 9/14/17 town hall where public records were made available by personnel of the City of New York.

**CLAIM #6:**          **Violations of Procedural Due Process**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #7:**          **Violations of the Fourteenth Amendment
Equal Protection Rights**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3**

**9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #8:          Violations of the Fourteenth Amendment
                     Prohibitions Against Selective-Enforcement**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #9:          Failure to Intervene in Violation of the
                     Fourteenth Amendment**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 1/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #10:**                    <u>**Deliberate Indifference**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #11:**                    <u>**Failure to Train and Supervise**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns were mutually obligated to properly train and supervise one another to different degrees in relation to my efforts to have lawfully attended the Mayor's 9/14/17 town hall from within the room in which it was conducted and otherwise achieve the other things that I sought to achieve in relation to that town hall on 9/14/17 that I have discussed in this complaint.

3. Some of the defendants that this claim concerns had sufficient prior notice from me about the clear need to provide such training and supervision prior to 9/14/17. Other defendants that this claim concerns had sufficient information available to them through their own observations and information that I made available on 9/14/17 at the site of the Mayor's 9/14/17 town hall to cause them to immediately provide proper supervision and training in relation to the illegal acts and omissions that were committed against me then at the site of that town hall. However, those defendants deliberately and impermissibly shirked their legal duties in that regard on 9/14/17.

4. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #12:**          <u>**Violation of the New York State's Open Meetings Law**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.


**CLAIM #13:**               <u>**Abuse of Process**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2**

9/14/17)

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #14:**     <u>**Fraudulent Misrepresentation and Fraudulent Inducement**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Carrion, de Blasio, O'Neill**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3. Also, hindsight confirms that the defendants who were members of the NYPD and other members of the City of New York made fraudulent misrepresentations that had a direct, material, substantial, and adverse impact on my efforts to have lawfully attended the Mayor's 9/14/17 town hall within the room in which it was committed and the other things that I sought to achieve on 9/14/17 in relation to that public forum in their constitutional oaths to become personnel of the City of New York and their oaths to become members of the NYPD in which they clearly expressed commitments that they would act in accordance with the U.S. Constitution in performing their jobs with the City of New York and NYPD and that they would perform their duties in those jobs to the best of their abilities.

4. The defendants that this claim concerns are also liable for it because they fraudulently

induced me to try to attend the Mayor's 9/14/17 town hall through the public notice that was

issued for it that didn't contain any information that indicated that illegal acts and omissions

would be committed against me on 9/14/17 at the site of the Mayor's 9/14/17 town hall.


**CLAIM #15:**          **Violation of New York State General Business Law 349**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

   forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I

   presented in this complaint.


**CLAIM #16:**                    **Negligence**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

   forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I

   presented in this complaint.


**CLAIM #17:**                    **Municipal Liability**

**(Against Defendant City of New York)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Defendant City of New York is liable for this claim due to the information that I presented in this complaint.

**CLAIM #18:      Intentional and Negligent Infliction of Emotional Distress**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint. The illegal acts and omissions that they committed against me on 9/14/17 in relation to the Mayor's 9/14/17 town hall and otherwise previously committed against me that contributed to causing the illegal acts that were committed against me on 9/14/17 at the site of that town hall were committed intentionally to cause me harm and otherwise with reckless indifference as to the likelihood that would cause me harm that is sufficient to establish intent.

**CLAIM #19:            Conspiracy to Violate Civil Rights and Cover-Up Such Abuse**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2**

**9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #20:**                         <u>**Unjust Enrichment**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3. By virtue of the fact that the defendants that this claim concerns were enriched at my expense for work that they performed for the City of New York while they were committing illegal acts and omissions against me that caused and otherwise contributed to the illegal acts and omissions that were committed against me on 9/14/17 at the site of the Mayor's 9/14/17 town hall, the defendants that this claim concerns are liable for unjust enrichment.

**CLAIM #21:**                         <u>**Public and Private Nuisance**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #22:** <u>**Violations of the Hatch Act (see 5 U.S.C. §1502(a)(1))**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe7 9/14/17, NYPD John Doe8 9/14/17, Atcheson, Miller, Redmond, Ramos, Ridener, Carrion, de Blasio, O'Neill, Jane Doe1 9/14/17, Jane Doe2 9/14/17, John Doe1 9/14/17, John Doe2 9/14/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

3. The illegal acts and omissions that were committed against me on 9/14/17 and prior to that date that caused and otherwise contributed to the illegal acts and omissions that were committed against me at the site of the Mayor's 9/14/17 town hall in relation to my efforts to have lawfully attended that town hall from within the room in which it was conducted as it was conducted were committed in furtherance of an illegal scheme to engage in voter suppression, voter fraud, and whistleblower retaliation to steal the results of the 2017 New York City government elections for the mutual benefit of the Mayor and themselves largely to preserve their job security and opportunities to advance their careers. That was a crystal clear and flagrant violation of the Hatch Act by illegally marginalizing and preventing criticism against the Mayor, his administration, the City Council, and the NYPD from

occurring during public forums that the Mayor conducted with others and occurred as the

Mayor, members of the City Council, and other government personnel used the public town

hall meetings, public resource fair meetings, and public hearings that the Mayor conducted

with others in 2017 as campaign events to attract publicity and goodwill that would support

the re-election aspirations of the Mayor, his administration, members of the City Council,

and other New York City government personnel.

## **DEMAND FOR A JURY TRIAL**

1. I demand a trial by jury in this action on each and every one of my damage claims.

## **PRAYER FOR RELIEF**

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me

additional relief by:

1. Causing this Court to exercise supplemental jurisdiction over my X1 lawsuit, my X2 lawsuit,

   my X3 lawsuit, and my X4 lawsuit before then consolidating them with this action that will

   result in this action controlling how all of that litigation is conducted. This request stems

   from a common nucleus of operative fact and is pursuant to FRCP Rule 42.

2. Empaneling a jury to hear and decide this case strictly on its merits.

3. Granting me the following additional relief against the defendants individually and jointly:

   a. Compensation for violations of my constitutional rights, defamation, abuse of process,

      nuisance, unjust enrichment, wire fraud, and fraudulent misrepresentations as well as

      pain, suffering, mental anguish, and humiliation that I experienced due to the illegal acts

      and omissions by the defendants.

   b. Injunctive and equitable relief by ordering Defendant City of New York to immediately

provide me all video recordings within 48 hours in unedited and non-redacted form as an ".avi", ".mp4", or ".mov" computer file that were recorded on 2/14/20 by all video security cameras that it controls that were installed inside of and along the exterior of the school that hosted the Mayor's 9/14/17 town hall between 5 pm and 11 pm that it was legally required to preserve in the wake of an entirely valid and timely complaint that I reported to the CCRB complaint on 9/15/17 about the fact that I was illegally prevented from attending the Mayor's 9/14/17 town hall from within the room in which it was conducted as it was conducted.

c.  Injunctive and equitable relief by ordering Defendant City of New York and those who have been among its personnel between 7/1/17 and the present to immediately provide me within one week all copies of all communications that they have had about me during that period in unedited and non-redacted forum. This includes all communications that they have engaged in by using both electronic equipment that has been made available to them by the City of New York and equipment that they personally own and/or lease. This also includes, but isn't limited to all of the following types of communications that they may have had about me during that period:

     i.  E-mail messages, text messages, social media postings, encrypted communications, faxes, database entries, telephone calls, voicemail messages, and other instant messages.

     ii.  Audio and video recordings.

     iii.  Memorandums and all other written notes and reports.

     iv.  Photographs.

d.  Injunctive and equitable relief by ordering Defendant City of New York to immediately

provide me within one week a report that identifies all members of the NYPD who were assigned duties to perform on 9/14/17 at the site of the Mayor's 9/14/17 town hall, where they stood on 9/14/17 outside of and in the immediate vicinity of the school that hosted that public forum between 5 pm and 10 pm, the other members of the City of New York personnel that they stood next to during that period. Such a report must include clear photographs that were taken recently of their faces in a way to reflect how they appeared on 9/14/17.

e.  Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me within 48 hours copies of all communications that were issued by its personnel that described all of the types of work assignments and duties that its personnel were issued to perform for the Mayor's 9/14/17 town hall that partly includes information about everyone who was involved in issuing those assignments, what those assignments entailed, when those assignments were issued, who was responsible for providing supervision and training for that work, who received those assignments, and how they received that information.

f.  Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me within 24 hours information that provides a complete and objectively credible answers about precisely why Defendant Atcheson told me on 9/14/17 that my name wasn't shown in the list of people who registered in advance with the New York City Mayor's office to attend the Mayor's 9/14/17 town hall that she reviewed on a computer tablet that she carried as she and I stood outside of the school that hosted that town hall on that date after I previously registered in advance with the New York City Mayor's office to attend that town hall.

g.  Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me information within 24 hours that identifies **a)** everyone who was involved in causing my name to not appear among a list of people who registered to attend the Mayor's 9/14/17 town hall that was stored in a computer tablet that Defendant Atcheson carried on 9/14/17 as she stood outside of the school that hosted the Mayors 9/14/17 town hall, **b)** precisely when such actions were committed against me that caused that to occur, and **c)** precisely how such actions were committed against me that caused that to occur.

h.  Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me within 24 hours all "Unusual Occurrence Reports" and related reports that members of the NYPD were required to complete in relation to their acts and omissions against me that caused and otherwise enabled me to have been **a)** prevented from attending the Mayor's 9/14/17 town hall from within the room in which it was conducted and **b)** coerced to leave the original line of people in which I lawfully waited to attend the Mayor's 9/14/17 town hall from within the room in which it was conducted.

i.  Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me within 72 hours unedited and non-redacted copies of all information that has been in its possession and that of its personnel about complaints that I reported in response to my having been **a)** prevented from attending the Mayor's 9/14/17 town hall from within the room in which it was conducted, **b)** coerced to leave the original line in which I waited to attend that town hall from within the room in which it was conducted, and **c)** denied an admission ticket to attend that town hall from within the room in which it was conducted.

j.  Declaratory, injunctive, and equitable relief through the issuance of an order that voids

the results of the 2017 New York City government elections for the jobs of New York

City Mayor, New York City Councilmember, Bronx District Attorney, Queens Borough

President, New York City Comptroller, and New York City Public Advocate primarily

because it is reasonable to believe that results of those elections were materially tainted

by voter fraud, voter suppression, and whistleblower retaliation in violation of 5 U.S.C.

§1502(a)(1) that occurred partly by illegally:

   i.   Preventing whistleblowers from attending public forums that the Mayor conducted

        with them and were partly used as campaign events to attract various types of

        support from voters and prospective voters.

   ii.  Segregating and discriminating against whistleblowers at such public forums.

k.  Declaratory, injunctive, and equitable relief in accordance with findings expressed in

    _Capitol Records, Inc. v. Thomas-Rasset_, 692 F.3d 899 (8th Cir. 2012) through the

    issuance of an order that enjoins Defendant City's personnel and agencies from

    continuing to commit illegal acts and omissions against me that violate my rights.

l.  Further declaratory, injunctive, and equitable relief through the immediate issuance of an

    order that:

      i.   Prohibits all members of the NYPD from deliberately making any physical

           contact with me while I am conducting myself in a lawful manner.

      ii.  Requires all members of the Mayor's NYPD security detail to not come within

           10 feet from me while they are on-duty as members of the Mayor's NYPD

           security detail and I am conducting myself in a lawful manner, unless I

           explicitly grant consent for that to occur.

      iii. Requires all members of the Mayor's CAU to not come within 10 feet from me

while I am conducting myself in a lawful manner and they are on-duty as

members of the Mayor's CAU, unless I explicitly grant consent for that to

occur.

iv.   Prohibits Defendant City's personnel from illegally interfering with my ability

to attend public forums that the Mayor may conduct from within the room in

which he does so as he does so.

v.   Prohibits Defendant City's personnel from illegally interfering with the rights

that other people have to lawfully attend public forums that the Mayor conducts

that may allow others and I to exercise our First Amendment right to observe,

hear, and enjoy lawful speech and other expression that such people may

engage in to criticize the Mayor and others during them.

vi.   Prohibits Defendant City's personnel from illegally interfering with the First

Amendment and Fifth Amendment rights that people have to **a)** bring literature

and signs with them into rooms in which the Mayor conducts public forums, **b)**

lawfully distribute such literature during those meetings without disrupting

those meetings, **c)** distribute such literature and otherwise show it and signs in

the rooms in which the Mayor conducts such meetings before they begin and

after they end, and **d)** Keep such literature and signs with them as the Mayor

conducts such public forums.

vii.   Requires Defendant City to grant access to public forums that the Mayor

conducts inside of buildings based on the order in which members of the public

line up directly outside of those buildings shortly before those meetings begin to

be granted access to the room in which the Mayor conducts such public forums

on those dates.

viii.   Prohibits Defendant City from allowing its personnel to prevent members of the public from attending public forums that the Mayor conducts inside of buildings from within the rooms in which he does so while sufficient seating is available in those rooms.

ix.   Orders Defendant City to immediately cause all members of the NYPD who are present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe to wear body-cameras that are always on and always recording both audio and video recordings.

x.   Orders Defendant City of New York to provide all audio and video recordings from such body-cameras in unedited and non-redacted form along with their audit trail records to allow for an independent forensic analysis within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD wearing those body-cameras.

xi.   Orders Defendant City to immediately **a)** cause clear audio recordings to be recorded of all verbal communications that members of the NYPD have while they are on-duty as members of the NYPD and present in areas where the Mayor conducts public town hall meetings, public resource meetings, public hearings, and press conferences that the public may observe.

xii.   Orders Defendant City of New York to provide all such audio recordings in unedited and non-redacted form that includes information that identifies the date and time when those recordings began to be recorded as well as the speakers

heard in those communications that are personnel of Defendant City within 24 hours of any adverse encounter that occurs between **a)** members of the public and **b)** the members of the NYPD heard in those audio recordings while they are being recorded.

xiii.   Orders Defendant City to immediately cause all other electronic communications (such as e-mail messages, cell phone text messages, and encrypted communications) that are engaged in by those who are part of the Mayor's NYPD security detail to be recorded and preserved for possible use in litigation by people that they commit illegal acts and omissions against.

xiv.   Orders Defendant City to provide all such electronic communications within 24 hours in unedited and non-redacted form that includes information that identifies the date and time when those communications occurred and the identities of those who engaged in them to members of the public who have adverse encounters with members of the Mayor's NYPD security detail to the extent that those communications concern those adverse encounters.

xv.   Orders Defendant City to provide me copies of all communications that its personnel have had about me since 2/1/16 in unedited and non-redacted form. This includes, but is not limited to all of the following:

    1)   All communications that have taken place by using personally-owned devices, personal e-mail accounts, personal encrypted messaging accounts, and personal cell phone plans as well as by using computers and other devices that are owned or leased by Defendant City and e-mail, cell phone, and encrypted messaging accounts that are

administered and/or controlled by Defendant City.

m.  Further declaratory, injunctive, and equitable relief through the immediate issuance of an

order that:

    i.  Orders Defendant City to immediately cause the CCRB and DOI to be provided

all video recordings within 24 hours after a complaint is reported to them about

illegal acts and omissions that are committed by members of the NYPD and

other personnel of Defendant City that are recorded by video security cameras

that Defendant City controls. This includes, but is not limited to illegal acts that

are related to public forums that the Mayor conducts and occur on the dates and

at the locations where the Mayor conducts them.

    ii.  Further orders Defendant City to make those video recordings available within

24 hours in unedited and non-redacted form to those who report such illegal acts

and omissions to the CCRB and DOI.

    iii.  Orders that the following Defendants are also required to be fired at the earliest

possible instead of practical or convenient time from the jobs that they hold

with Defendant City of New York largely pursuant to Section 1116 of the New

York City Charter in response to the illegal acts and omissions that they

committed against me in relation to my efforts to have lawfully attended the

Mayor's 9/14/17 town hall and that they are prohibited from being employed by

Defendant City again:

> Defendants Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John
> Doe1 9/14/17 (shield #: 21250), Atcheson, Ramos, de Blasio, O'Neill,
> NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4
> 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD
> John Doe7 9/14/17, NYPD John Doe8 9/14/17

iv.  Orders Defendants Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John

Doe1 9/14/17 (shield #: 21250), Atcheson, Ramos, de Blasio, O'Neill, NYPD

John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17,

NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7

9/14/17, and NYPD John Doe8 9/14/17 to immediately and fully reimburse

those who were their employers on and after 9/14/17 with pre-judgment and

post-judgment interest for the total value of pay and benefits that they received

that directly correspond to the length of time during which they were involved

in the illegal acts and omissions that were committed against me in relation to

my efforts to have attended the Mayor's 9/14/17 town hall.

v.  Restrains Defendant City's personnel and agencies from continuing to commit

illegal acts and omissions against me that violate my rights, especially in all

areas that are public forums.

vi.  Declares that the ban that the Mayor announced that prohibits large gatherings

of people in New York City and protests from being conducted is overly broad,

pretextual, void, and unenforceable largely because it impermissibly violates

core First Amendment rights as well as Fifth Amendment and Fourteenth

Amendment rights that pertain to due process, selective-enforcement, equal

protection, and liberty.

vii.  Further declares that though it may possibly be advisable to wear a face mask

in New York City, no one is required to do so partly because doing so impedes

the flow of oxygen to healthy people and impermissibly infringes upon the First

Amendment rights that people have to engage in freedom of expression, such as

by having people see them smiling, expressing affection by kissing, being able to yawn without having to wear a face mask, and having other facial expressions that they make seen by others. Although it is potentially dangerous to one's health to engage in a wide variety of other activities that include driving a car because of the possibility that a drunk driver may pass by and having a drink in a bar because there is a possibility to breathe in second-hand smoke, bans on driving and visiting bars have not been imposed due to such risk factors.

viii.   Similarly declares that the social-distancing restrictions in New York State are overly broad, void, and unenforceable for the same reasons just discussed and declares that those restrictions have been selectively-enforced by the NYPD in violation of the Fourteenth Amendment.

n.   Declaratory relief by declaring that the Mayor's 9/14/17 town hall was a public forum that was subject to New York State's Open Meetings Law and that all actions that were taken as a result of that town hall having been conducted are void pursuant to Section 107 of New York State's Public Officer Law because that town hall was conducted in violation of New York State's Open Meetings Law.

o.   Injunctive and equitable relief by ordering Defendant City to immediately provide me the following in unedited and non-redacted form:

i.   Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel inside of the building that hosted the Mayor's 9/14/17 town hall between the time when **a)** the first member of the public entered that building on 9/14/17 in relation to attending

that town hall and **b)** everyone who attended the Mayor's 9/14/17 town hall exited that building.

    ii.   Copies of all records that have been in the possession of Defendant City's personnel that pertain to the deliberations, planning, coordination, execution, and cover-up that took place in regards to my having been illegally prevented from attending the Mayor's 9/14/17 town hall.

    iii.   Copies of all records that have been in the possession of Defendant City's personnel that describe staff assignments that were issued for the Mayor's 9/14/17 town hall.

    iv.   Copies of all records that have been in the possession of Defendant City's personnel that consist of the names and contact information for the members of the public who registered to attend the Mayor's 9/14/17 town hall as well as the names and contact information for the journalists who attended the Mayor's 9/14/17 town hall.

p.   Injunctive and equitable relief by ordering Defendant City of New York to immediately provide me all video recordings as an ".avi", ".mp4", or ".mov" computer file that were recorded on 2/19/20 by all video security cameras that were installed in the school and are controlled by DOE that hosted the town hall meeting that the Mayor conducted on that date between the times when the first member of the public was allowed into that school for the purpose of attending that town hall until everyone who attended that town hall exited that school.

q.   Injunctive, equitable, and proactive relief by ordering Defendant City of New York to permanently do the following to serve as an effective deterrent against illegal acts and

omissions in violation of the U.S. Constitution, New York State's Open Meetings Law, and other laws that personnel of the City of New York may commit at public forums that personnel of the City of New York conduct:

    i. Cause a laminated and easily legible 8.5 inch by 11 inch report to be prominently displayed directly outside of the entrance to the buildings and rooms in which the City of New York's personnel conduct public town hall meetings, public resource fair meetings, and public hearings on the dates when they're conducted throughout the entire duration of those public forums in addition to having that displayed for 2 hours immediately before and after those public forums begin and end that contains the following information in that report:

        1) A reminder that appears prominently shown in large type on the first page in that report that serves to apprise all who attend such public forums that all members of the public have a legal right to engage in self-defense against any government official that includes all members of the NYPD who deliberately initiate undesirable and offensive physical contact with them without an objectively valid legal justification.

        2) A reminder that appears prominently shown in large type on the first page in that report that serves to apprise all who seek to attend such public forums that all law-enforcement officials have an affirmative Fourteenth Amendment legal duty to intervene on behalf of people whose constitutional rights are violated in their immediate presence

and that they otherwise receive timely information about such

violations that provides them a realistic opportunity to intervene on

their behalf to immediately end that abuse and prevent further such

abuse against them.

3) A reminder that appears prominently shown in large type on the first

page in that report that serves to apprise all who attend such public

forums that they have a First Amendment and Fourteenth Amendment

right to:

a)  Assassinate the character of all government officials who

attend such public forums by harshly and publicly criticizing

them while attending them without being retaliated against for

doing so.

b) Bring literature with them into those public forums and to

distribute that literature during them without interference by

any government official as long as that doesn't objectively

disrupt how those public forums are conducted.

c) Bring signs with them into those public forums both within the

rooms in which they're conducted and overflow rooms without

interference by any government official as long as those signs

don't objectively disrupt how those public forums are

conducted.

4) Clear images of the faces of the City of New York's personnel from

photographs that were taken of them within one week prior to such

public forums with respect to those personnel that will be limited to those personnel who **a)** are present at the sites of public forums on the dates when they're conducted, **b)** perform duties there that pertain to admitting members of the public access to them, denying them such access, and otherwise restricting such access, and **c)** supervise those personnel.

5) The full names of the personnel that I just discussed.

6) The names of the entities within the City of New York's government for which those personnel then work.

7) The names of the people who are responsible for providing them with proper training and supervision for the duties that they perform in relation to public forums that are conducted by City of New York personnel as well as information that identifies the entities within the City of New York's government for which such supervisors then work.

8) The names of the people who assigned them the duties that they perform in relation to public forums that are conducted by City of New York personnel as well as information that identifies the entities within the City of New York's government for which those other people work.

r. Injunctive and equitable relief by ordering Defendant City of New York to permanently include the preceding information about what is to be included in a laminated report in all public notices as well that are issued and announce when and where its personnel will

conduct public town hall meetings, public resource fair meetings, and public hearings.

s.  Compensation for all costs and attorney fees that are related to my pursuit of this civil action.

t.  Equitable and injunctive relief that authorizes me and others that I may ask to help me to paint, write, or draw any message or image of any size indefinitely throughout New York City without needing pre-approval from anyone on any public street, sidewalk, public passageway, concourse, and park indefinitely by using resources that will be provided to me by the City of New York for that purpose.

u.  Equitable and injunctive relief that orders the City of New York to cause its NYPD to accord whatever messages and images that I may paint, write, or draw in public areas throughout New York City to receive equal law-enforcement protection that is accorded to Black Lives Matter signs on streets in New York City, especially the one located in front of Trump Tower in Manhattan.

v.  An award of damages against Defendants City of New York, Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), Atcheson, Ramos, de Blasio, O'Neill, NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John Doe6 9/14/17, NYPD John Doe7 9/14/17, and NYPD John Doe8 9/14/17 pursuant to 18 U.S.C. §1986 for having not intervened on my behalf in relation to my effort to have attended the Mayor's 9/14/17 town hall.

w.  An award of damages against Defendants Gerola, Nieves, Mason, Cruz, Mitchell, NYPD Officer John Doe1 9/14/17 (shield #: 21250), O'Neill, NYPD John Doe2 9/14/17, NYPD John Doe3 9/14/17, NYPD John Doe4 9/14/17, NYPD John Doe5 9/14/17, NYPD John

Doe6 9/14/17, NYPD John Doe7 9/14/17, and NYPD John Doe8 9/14/17 pursuant to New York State General Business Law §349 for deception in relation to my efforts to have attended the Mayor's 9/14/17 town hall and how those defendants conducted themselves as criminal accomplices instead of the law-enforcement personnel that they technically were on 9/14/17.

x.  An award of punitive damages for all of my claims set forth in this pleading.

y.  An award of pre-judgment and post-judgment interest.

z.  Declares that the Mayor's 9/14/17 town hall was illegally conducted inside of a public school.

aa. Equitable and injunctive relief that orders the City of New York to remove all obstructions from public sidewalks, public streets, public parks, and public concourses within 24 hours that the NYPD has set up and to not setup such obstructions again in such public areas without prior approval. Such obstructions impede pedestrian and bicycle traffic by people who are conducting themselves lawfully and may have various disabilities that include blindness and physical ailments.

bb. Such other, further, and different relief as the interests of justice and equity may require.


Dated:      New York, New York
            October 4, 2020

                                        From,


                                        s_/Towaki Komatsu

                                        *Plaintiff, Pro Se*
                                        802 Fairmount Pl., Apt. 4B
                                        Bronx, NY 10460
                                        (347) 872-1205
                                        Towaki_Komatsu@yahoo.com